Danielle E. Karst (D.C. Bar No. 481881)
Timothy J. Mulreany (Maryland Bar No. 8812160123)
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:    (202) 418-6158 (Karst)
Telephone:    (202) 418-5306 (Mulreany)
Facsimile:    (202) 418-5523
dkarst@cftc.gov
tmulreany@cftc.gov

> FILED ___    RECEIVED
> ENTERED ___    SERVED ON
> COUNSEL/PARTIES OF RECORD
>
> SEP 30 2019
>
> CLERK US DISTRICT COURT
> DISTRICT OF NEVADA
> BY:_____ DEPUTY

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

COMMODITY FUTURES TRADING
COMMISSION,

        Plaintiff,

v.

DAVID GILBERT SAFFRON
a/k/a DAVID GILBERT and
CIRCLE SOCIETY, CORP.,

        Defendants.

Case No.

## 2:19-cv-01697-KJD-DJA

### Declaration of George H. Malas Pursuant to 28 U.S.C. § 1746

I, George H. Malas, declare, pursuant to 28 U.S.C. § 1746, as follows:

## I.    BACKGROUND

    1.    I have personal knowledge of the following facts and, if called as a witness, could and would testify competently thereto.

    2.    I have worked as a Futures Trading Investigator for the Commodity Futures Trading Commission ("CFTC" or "Commission") since September 2009. Prior to joining the Commission, I held positions as a Compliance Officer and Branch Administrative Manager at Deutsche Bank Securities Inc. and as a Compliance Examiner, Investigator and Regulatory Analyst at the National Association of Securities Dealers (now known as "FINRA"). I have a

Bachelor of Science in Business Administration, with a Concentration in Finance, from Towson State University and a Master of Business Administration from Johns Hopkins University.

3.      My responsibilities as a Futures Trading Investigator include the investigation of registered and unregistered commodity futures and options trading firms and individuals located throughout the United States, in order to ensure compliance with and enforcement of the Commodity Exchange Act ("CEA") and the rules and regulations promulgated thereunder.  I routinely analyze and review financial records, including but not limited to, trading account documents and bank statements.

4.      I am the Futures Trading Investigator assigned to assist in the investigation of David Gilbert Saffron ("Saffron") and Circle Society, Corp. ("Circle Society").

## II.      RECORDS REVIEWED

5.      As part of the investigation of Saffron and Circle Society, I reviewed and analyzed the following documents, relevant certified copies of which are attached as Exhibits 1-27:[1]

a.    Certification of Registration documents provided by the NFA regarding the registration history of Saffron and Circle Society, attached hereto as Exhibit 1, showing neither Defendant has ever been registered with the Commission in any capacity.[2]

b.    Certification of corporate registration records provided by the Nevada Secretary of State concerning Circle Society, attached hereto as Exhibit 2.

---

[1] These documents are voluminous and therefore not all are attached to this declaration, but rather are summarized herein with some exhibits only containing excerpt pages.  All documents can be made available for review upon request.  Personal identifying information, such as account numbers and Social Security numbers, have been redacted in accordance with Fed. R. Civ. P. 5.2 and Local Rule IA 6-1.

[2] Pursuant to Commission Regulation 3.2, 17 C.F.R. § 3.2, the Commission's registration functions are delegated to the National Futures Association.

c.   Court records provided by the Superior Court of the State of California, County of Los Angeles, regarding two court cases against Saffron (Case Nos. BC708601 and BC723555), attached hereto as Exhibit 3.

d.   Information and documents produced to the Commission by the Murrin Law Firm ("MLF"), attached hereto as Exhibit 4.

e.   Information and documents produced to the Commission by Circle Society's registered agent and former attorney to Saffron, Preston Sterling Kerr ("Kerr"), attached hereto as Exhibit 5.[3]

f.   Information and documents produced to the Commission by Saffron's former legal counsel, David L. Kagel ("Kagel"), attached hereto as Exhibit 6.

g.   Account records produced to the Commission by various virtual currency exchanges including, but not limited to, account opening documents and monthly account statements for the following accounts.

| Account Name | Firm | Account No. |
|---|---|---|
| David Saffron, Exhibit 7 | Coinbase | - |
| David Saffron, Exhibit 8 | Uphold | - |
| David Saffron, Exhibit 9 | Gemini | ****5697 |
| David Saffron, Exhibit 10 | KuCoin | - |
| Preston Kerr, Exhibit 11 | Coinbase | - |

h.   Information and documents obtained during the course of this investigation

---

[3] Kerr is the listed registered agent for Circle Society in the company's corporate records filed with the state of Nevada and his firm, Law Offices of P. Sterling Kerr, previously represented Circle Society in one of the Los Angeles Superior Court cases (Case No. BC723555) noted above in paragraph 5c.

regarding the following bank account.

| Account Name | Bank | Account No. |
|---|---|---|
| Susan Lee Scott | JPMC | ****9059 |

     i.   A January 2018 video recording of Saffron's presentation to actual and prospective participants.[4]

     j.   A January 2018 audio recording of a presentation given by Saffron to actual and prospective participants.[5]

     k.   Documents obtained from Las Vegas, Nevada hotels and casinos including: Aria Resort & Casino Holdings, LLC ("Aria"), MGM Grand Hotel, LLC ("MGM"), and The Cosmopolitan of Las Vegas ("Cosmo").[6]

     l.   Information made available through, and documents obtained from, the Facebook, and/or Instagram pages of Saffron.[7]

     m.   Information made available through, and documents obtained from, the websites for Circle Society, www.circlesociety.com, Omnicron Trust, www.theomicrontrust.com, and BinBot Pro,[8] www.binbotpro.com, copies of which are attached hereto as Exhibit 12.

     n.   Podcast recordings uploaded by Saffron via Buzzsprout

---

[4] The video will be presented to the Court upon request.

[5] The audio will be presented to the Court upon request.

[6] Copies of these records will be presented to the Court upon request.

[7] Copies of these records will be presented to the Court upon request.

[8] BinBot Pro is a company that provides a robot for individuals to trade binary options.

(www.buzzsprout.com), a podcast hosting platform[9].

          o.   Transcript of Participant 7's Testimony Under Oath, March 1, 2019, attached hereto as Exhibit 13.

          p.   Transcript of Kagel's Testimony Under Oath, February 28, 2019, attached hereto as Exhibit 14.

          q.   Transcript of Kerr's Testimony Under Oath, March 27, 2019, attached hereto as Exhibit 15.

          r.   Materials produced by Participant 1, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society, attached hereto as Exhibit 16.

          s.   Materials produced by Participant 3, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 17.

          t.   Materials produced by Participant 4, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 18.

          u.   Materials produced by Participant 5, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 19.

          v.   Materials produced by Participant 7, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 20.

---

[9] The podcast will be presented to the Court upon request.

w. Materials produced by Participant 8, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 21.

x. Materials produced by Participant 13, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 22.

y. Materials produced by Participant 14, including, but not limited to, cryptocurrency transaction data, screenshots from Circle Society's website, and communications with Saffron and/or Circle Society attached hereto as Exhibit 23.

z. Declaration of Participant 5, attached hereto as Exhibit 24.

aa. Declaration of Participant 13, attached hereto as Exhibit 25.

bb. Declaration of Participant 14, attached hereto as Exhibit 26.

## III.   SUMMARY

6. My analysis of the documents listed in Section II, above, revealed the following information:

a. **David Gilbert Saffron** is a citizen of Australia and sometimes uses the alias "David Gilbert." Saffron's last known residence is 3765 Pacific Street, Las Vegas, Nevada 89121; however, it is believed that Saffron is currently commuting between residences he rents in Las Vegas and Los Angeles, California. Saffron has never been registered with the Commission in any capacity. *See* Certified Registration documents provided by the NFA, a copy of which is found at Exhibit 1 (SDKD-NFA-0000000002_0006-7; SDKD-NFA-0000000002_0016-17).

b. **Circle Society, Corp.** is a Nevada corporation based in Henderson, Nevada.

Circle Society was incorporated by Saffron on September 6, 2018, with a purported office at 2450 St. Rose Parkway, Suite 120, Henderson, Nevada 89074. Saffron is listed as the only officer of the company and Kerr is listed as the registered agent for Circle Society. *See* Certified corporate registration records provided by the Nevada Secretary of State, a copy of which is found at Exhibit 2 (SDKD-NSS-0000000001). Circle Society has never been registered with the CFTC in any capacity. *See* Certified Registration documents provided by the NFA, a copy of which is found at Exhibit 1 (SDKD-NFA-0000000002_0004).

c.   From at least December 2017 to present (the "relevant period"), Saffron, individually and on behalf of Circle Society, operated a Bitcoin ("BTC") Ponzi scheme through various business entities and cryptocurrency-related investment programs, including "Omnicron Trust" (or alternatively, "Omicron Trust"), "Bitcoin Wealth Management," "Custom Bot Trade Agreement," and Circle Society.

d.   During the relevant period, Saffron solicited and accepted at least $11 million worth of BTC and United States Dollars ("USD"), collectively ("funds") from at least 14 individuals ("participants"), for the purpose of participating in a commodity pool that purportedly utilized algorithmic trading programs, referred to by Saffron as "trading bots" and/ or "automated bot/AI trading software," that he allegedly created to trade binary options contracts on foreign currency ("forex") and cryptocurrency pairs, among other things.

e.   Moreover, since I began working on this investigation the Commission has obtained information and records that has revealed at least 25 additional participants who provided at least $409,000 worth of funds to Saffron for the purpose of trading binary options contracts on forex and cryptocurrency pairs.

f.   Saffron solicited actual and prospective participants through in-person meetings,

1 instant messaging services such as Telegram, podcasts, and by use of his various websites

2 www.theomicrontrust.com and https://circlesociety.com.

3        g.    Further, Saffron utilized these solicitation methods to attract participants by

4 making fraudulent misrepresentations including, but not limited to, the following:

5             i.    Saffron had 57 separate computers that he purportedly utilized to continually

6                run his trading bots. *See* CFTC Transcript of Participant 7's Testimony Under

7                Oath, March 1, 2019, at p. 132, lines 15-24, a copy of which is attached hereto

8

9                as Exhibit 13;

10            ii.    Saffron maintained a "personal portfolio" of more than $717 million, and

11                allegedly had a "company portfolio" of more than $2 billion;

12           iii.    Saffron guaranteed returns of up to 300% in three weeks for some investors;

13                at other times he promised to double participants' investment within one

14                month;

15

16            iv.    Saffron was a "master cryptocurrency trader who uses bots and automated

17                trading/algorithms to generate tremendous returns for clients, including

18                promising a 100% return on monies invested." *See* Court records provided by

19                the Superior Court of the State of California, County of Los Angeles

20                regarding Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-

21                LASC-0000000001_0065);

22

23            v.    Referral fees would be paid to participants in the amount of one Bitcoin for

24                every Bitcoin and/or equal to twenty percent (20%) of the assets invested by

25                their friends and acquaintances. *See* Court records provided by the Superior

26                Court of the State of California, County of Los Angeles regarding Case No.

27

28                                           8

BC723555, a copy of which is found at Exhibit 3 (SDKD-LASC-0000000001_0066; SDKD-LASC-0000000001_0078 );

vi.    Circle Society has approximately 600-800 participants. *See* Declaration of Participant 14, a copy of which is found at Exhibit 26 (SDKD-Welker-0000001625_0003);

vii.    Saffron has pooled more than $100 million worth of BTC. *See* Declaration of Participant 14, a copy of which is found at Exhibit 26 (SDKD-Welker-0000001625_0003);

viii.    Saffron trades cryptocurrency on 16 different exchanges including, but not limited to, KuCoin, Coinbase, and Kraken. *See* Declaration of Participant 14, a copy of which is found at Exhibit 26 (SDKD-Welker-0000001625_0003); and

ix.    Well-known investors such as Mark Cuban were participants in Saffron's cryptocurrency programs. *See* Transcript of Participant 7's Testimony under Oath, March 1, 2019, at p. 28, lines 5-10; p. 80, lines 12-16, a copy of which is found at Exhibit 13.

h.    Saffron enticed participants to invest with him by either having them: a) transfer BTC from their personal BTC address to a BTC address controlled by Saffron and/or Circle Society, or b) provide Saffron with USD in the form of cash.

i.    Once participants transferred their funds to Saffron, he would then allegedly pool their funds and utilize the trading bots he purportedly developed to trade binary options contracts on forex and cryptocurrency pairs on the participants' behalf.

j.    Contrary to Saffron's representations, he did not conduct trading on behalf of

participants as promised and instead misappropriated all of the participants' funds including, but not limited to, holding funds he received from participants in various virtual currency addresses that he controlled and using those funds to pay other participants in the manner of a Ponzi scheme.

k.   During the relevant period, participants made and continue to make repeated demands on Saffron for the return of their funds; however, the majority of the participants have been unable to obtain a return of any of their funds.

l.   Moreover, Saffron made and continues to make various false representations to participants as to why he is unable to return their funds as he had promised including, but not limited to, the following:

    i.   At the end of March 2019, there was a "solar flare" for two days that interrupted all of his electronic computer equipment. *See* Materials produced by Participant 14, a copy of which is found at Exhibit 23 (SDKD-Welker-0000001018), and Declaration of Participant 13, a copy of which is found at Exhibit 25 (SDKD-Marshsall-0000000004_0004);

    ii.   There are too many BTC transactions in Circle Society's daily investment plans which "jammed" up computer servers. *See* Declaration of Participant 14, a copy of which is found at Exhibit 26 (SDKD-Welker-0000001625_0002), and Declaration of Participant 13, a copy of which is found at Exhibit 25 (SDKD-Marshsall-0000000004_0004);

    iii.   "Russian Hackers" attempted to attack the Circle Society website and all payments to investors stopped while securing the website. *See*

Declaration of Participant 13, a copy of which is found at Exhibit 25

(SDKD-Marshsall-0000000004_0005); and

    iv.   Withdrawal delays at various virtual currency exchanges.

m.  Most recently, Saffron has promised to pay participants after he obtains a "balloon payment" from KuCoin, a cryptocurrency exchange based in Singapore.  For example, Saffron claims in Circle Society podcasts, referenced above in paragraph 5n, that participants' BTC are "spread out amongst seventeen different exchanges," but KuCoin is the main exchange that "has been holding our coin for a long time."  Saffron also claims in these podcasts that it is difficult to get BTC released from KuCoin:  "If we remove the amount of coin that we have in there . . . their site [KuCoin] would collapse," and "different positions on the market would collapse."

n.  Contrary to Saffron's claim noted above, his KuCoin account as of August 1, 2019, had a balance of 0.0065 Electroneum ("ETN"), another form of virtual currency, which as of August 30, 2019 was actually worth $0.00 USD based on ETN's closing price of 0.003584. *See* KuCoin virtual currency account records, copies of which are found at Exhibit 10 (SDKD-KuCoin-0000000005_0014).

o.  In fact, Saffron has recently made the following false representations to participants in response to their concerns of his alleged "balloon payment" claim:

    i.   He has had "6 interviews with government officers," and "So far and they seem to be satisfied with the evidence of exchanges holding funds." *See* Materials produced by Saffron Participant, a copy of which is found at Exhibit 27 (SDKD-Harrison-0000000002); and

11

ii. "George Malik [sic] at CFTC has it," "And FBI has it as of last week," "They both seem to be satisfied," "Since I'm still here and not arrested,", and "So again the stuff is being held." *See* Materials produced by Saffron Participant, a copy of which is found at Exhibit 27 (SDKD-Harrison-0000000003).

p. Moreover, Saffron has also recently offered a new investment plan to participants' through Telegram called the "**Coin Funding Trading Commune**" or "The **CFTC** plan", which appears to offer a 100% return in "18 business days." *See* Materials produced by Participant 14, a copy of which is found at Exhibit 23 (SDKD-Welker-0000001627).

q. During the relevant period, Saffron did not maintain any futures trading accounts in his name or in the name of any entity that he managed, controlled, handled, or owned.

r. During the relevant period, Saffron was affiliated with at least one personal bank account held at JPMorgan Chase Bank ("JPMC"). *See* Saffron's Gemini virtual currency account records, copies of which are found at Exhibit 9 (SDKD-Gemini-0000000007-8).

s. During the relevant period, Saffron maintained a total of four virtual currency accounts at Coinbase, Inc. ("Coinbase"), Uphold, Inc. ("Uphold"), KuCoin, and Gemini Trust Company, LLC ("Gemini"). *See* Coinbase, Uphold, KuCoin, and Gemini virtual currency account documents, copies of which are found at Exhibits 7-10.

## IV.     ANALYSIS

**Commission Registration**

7. Certifications produced by the NFA regarding the registration history of Saffron and Circle Society with the Commission show that neither Saffron nor Circle Society is registered with the Commission in any capacity or a member of the NFA, and that they were not

registered at any time relevant to the above-captioned matter. *See* Certified Registration documents provided by the NFA, copies of which are found at Exhibit 1 (SDKD-NFA-0000000002-0004-7; SDKD-NFA-0000000002-0016-17).

**Futures Trading Accounts**

8.      As part of my duties as the investigator assigned to this matter, in July 2019, I sent a request for documents pursuant to Section 4g of the Commodity Exchange Act to all firms registered with the Commission as Futures Commission Merchants ("FCMs"), requesting information relating to accounts in the name of or controlled by Saffron and/or Circle Society, since January 2013.  I received replies from all registered FCMs, which revealed there were no accounts identified in the name of Saffron or Circle Society during the relevant period.

**Virtual Currency Accounts**

9.      The Commission sent subpoenas to virtual currency exchanges Coinbase, Gemini, and Uphold and a voluntary request to virtual currency exchange KuCoin to ascertain whether there were any virtual currency accounts maintained, managed, controlled, handled, serviced by, owned or in any way affiliated with Saffron, and/or Circle Society.

10.      I received replies from all virtual currency exchanges noted above and determined that Saffron maintained a total of four virtual currency accounts in his name during the relevant period. *See* Coinbase, Uphold, Gemini, and KuCoin account documents, copies of which are found at Exhibits 7-10.

**Coinbase**

11.      The Commission received documents from Coinbase for one virtual currency account in the name of Saffron.

12.      Based upon my review of the Coinbase account documents for Saffron's account,

I determined that:

    a.   The account was never funded; and

    b.   No transactions occurred in the account during the relevant period. *See* Coinbase account documents, a copy of which is found at Exhibit 7.

**Uphold**

13.    The Commission received documents from Uphold for one virtual currency account in the name of Saffron.

14.    Based upon my review of the Uphold account documents for Saffron's account, I determined that:

    a.   The account was opened on or about April 20, 2018.

    b.   During the relevant period, there were only two transactions executed in the account. On April 21, 2018, 0.01131 BTC (worth approximately $100.00[10] at the time) was deposited in the account and immediately withdrawn on the same day.

    c.   As of August 13, 2019, the account is still open. *See* Uphold account documents, a copy of which is found at Exhibit 8.

**Gemini**

15.    The Commission received documents from Gemini for one virtual currency account in the name of Saffron, account ID ****5697.

16.    Based upon my review of the Gemini account documents for account ID ****5697, I determined that:

    a.   The account was opened on or around August 28, 2017, and closed on February 19, 2019.

---

[10] This amount was derived by taking the average of the high & low price of BTC on 4/21/2018 (8,824.86) multiplied by 0.01131 BTC [8,824.86 * 0.01131 = $99.81).

b.   Saffron listed a bank account held at JPMC in the name of Susan L. Scott ("Scott") in the "Bank" section of the account opening documents.

c.   The account was never funded; and

d.   No transactions occurred in the account during the relevant period. *See* Gemini account documents, a copy of which is found at Exhibit 9.

## KuCoin

17.   The Commission received documents from KuCoin for one virtual currency account in the name of Saffron.

18.   Based upon my review of the KuCoin account documents for Saffron's account, I determined that:

a.   The account was opened on or about April 26, 2018; however, Saffron refused, neglected or otherwise failed to complete KuCoin's Know Your Customer ("KYC") procedure pursuant to the exchange's KYC and Anti-Money Laundering ("AML") policies.  As such, KuCoin set a withdrawal limitation for Saffron's account whereby he is/was unable to withdraw any digital asset where the value exceeds two (2) BTC in each calendar day. *See* KuCoin account documents, a copy of which is found at Exhibit 10 (SDKD-KuCoin-0000000004_0003).

///

///

///

///

///

///

///

b.   During the relevant period, virtual currencies worth approximately $26,678.70
USD were deposited into the account calculated as follows:

| Date | Virtual Currency | Amount | USD Equivalent |
|---|---|---|---|
| 4/26/2018 | DigiByte ("DGB")[11] | 200,000 | $7.384.40[12] |
| 4/26/2018 | TenX ("PAY")[13] | 7,000 | $10,290.00[14] |
| 4/26/2018 | BTC | 1 | $9,004.30[15] |
| | | TOTAL | $26,678.70 |

c.   During the relevant period, virtual currencies worth approximately $25,054.62
USD were withdrawn from the account calculated as follows:

---

[11] According to www.coinmarketcap.com, DGB is a "global blockchain focused on cybersecurity for digital payments since 2014. DGB are digital assets that are mined through a combination of cryptographic algorithms with the intent to minimize mining centralization and maximize difficulty stability while reaching consensus at speeds as fast as 15-second block timings.

[12] This amount was derived by taking the average of the high & low price of DGB on 4/26/2018 (0.0369) multiplied by 200,000 DGB [0.0369 * 200,000 = $7,384.40].

[13] According to www.coinmarketcap.com, PAY is a payments platform that aims to enable users to use cryptocurrency for daily transactions. The PAY token is the cryptocurrency that the network uses for transactions. PAY offers a crypto card in selected countries, which will work in tandem with the PAY wallet to channel supported cryptocurrencies through the Visa payment gateway. To enable everyday purchases, the network performs token swaps from the chosen cryptoasset into the relevant fiat currency.

[14] This amount was derived by taking the average of the high & low price of PAY on 4/26/2018 (1.47) multiplied by 7,000 PAY [1.47 * 7,000 = $10,290.00].

[15] This amount was derived by taking the average of the high & low price of BTC on 4/26/2018 (9,004.30) multiplied by 1 BTC [9,004.30 * 1 = $9,004.30].

| Date | Virtual Currency | Amount | USD Equivalent |
|------|------------------|--------|----------------|
| 4/26/2018 | BTC | 1.099 | $7,664.22[16] |
| 5/1/2018 | BTC | 0.826 | $9,895.73[17] |
| 5/23/2018 | BTC | 0.985 | $7,494.68[18] |
| | | **TOTAL** | **$25,054.62** |

     d.    Saffron last logged into his KuCoin account on December 3, 2018, and the current

balance in the account as of August 1, 2019, was 0.0065 Electroneum ("ETN")[19], which as of

August 30, 2019 was worth $0.00 USD based on ETN's closing price of 0.003584.  *See* KuCoin

account documents, a copy of which is found at Exhibit 10 (SDKD-KuCoin-0000000005).

**Bank Accounts**

     19.    The Commission obtained information during the course of its investigation that

revealed one bank account held at JPMC that Saffron is affiliated with.

**JPMC ****9059**

     20.    Based upon my review of the information for account number ****9059, I

determined that:

---

[16] This amount was derived by taking the average of the high & low price of BTC on 4/26/2018 (9,004.30) multiplied by 1.099 BTC [9,004.30 * 1.099 = $9,895.73].

[17] This amount was derived by taking the average of the high & low price of BTC on 5/1/2018 (7,494.68) multiplied by 0.826 BTC [7,494.68 * 0.826 = $7,494.68].

[18] This amount was derived by taking the average of the high & low price of BTC on 5/23/2018 (7,664.22) multiplied by 1 BTC [9,004.30 * 1 = $9,004.30].

[19] According to www.coinmarketcap.com, ETN is a cryptocurrency that launched in 2017 with its own blockchain developed with the explicit intention of gaining mass adoption by targeting mobile audiences and smart phone users.

1

     a.   Saffron listed JPMC bank account ****9059 in the name of Scott in the banking

2

section of the account opening documents for his Gemini virtual currency account. *See* Exhibit 9

3

(SDKD-Gemini-0000000007-8).

4

**SOLICITATION OF PARTICIPANTS**

5

     21.    Based upon my review of Court records for the Superior Court of the State of

6

California, County of Los Angeles, I determined the following.

7

     **Bitcoin Wealth Management Program ("BWM")**

8

     22.    In late 2017, two participants ("Participant 9" and "Participant 10") were

9

introduced to Saffron by one of his recruiters ("Recruiter 1") and met with him at a private

10

medical office in Los Angeles, California. During this meeting, Saffron solicited Participants 9

11

& 10 to invest in an alleged "high-yield, low-risk cryptocurrency investment program" called the

12

Bitcoin Wealth Management Program. *See* Superior Court of the State of California, County of

13

Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-

14

LACSC-0000000002_0006). Moreover, Saffron made the following additional representations:

15

16

     a.   Participants would provide Saffron cryptocurrency and/or fiat currency and

17

Saffron would double their investment within one month. *See* Superior Court of the State of

18

California, County of Los Angeles records for Case No. BC708601, a copy of which is found at

19

Exhibit 3 (SDKD-LACSC-0000000002_0006);

20

     b.   The BWM program would provide participants very high yields with little to no

21

22

Risk. *See* Superior Court of the State of California, County of Los Angeles records for Case No.

23

BC708601, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000002_0006);

24

     c.   Saffron was an "experienced investor who had unique insight into cryptocurrency

25

26

markets that allowed him to produce huge returns on investments." *See* Superior Court of the

27

28

State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000002_0006); and

      d. Saffron had deposited approximately 1,290 BTC (worth approximately $19.3 million at the time[20]) in a secure cryptocurrency wallet and "the assets held in that wallet could serve as collateral to ensure that investors' funds were not dissipated without the investors receiving a return on their investments." *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000002_0007).

23. During the initial meeting with Saffron noted above in paragraph 22 and subsequent communications, Recruiter 1 made the following additional representations concerning Saffron and his BWM program:

      a. Participants "were guaranteed to receive the promoted return on their Investments." *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-CFTC-0000000001_0007);

      b. The BWM program was "fail-proof." *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-CFTC-0000000001_0007); and

      c. Saffron "is a genius investor who has earned millions of dollars using his investment strategies." *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-CFTC-0000000001_0007).

---

[20] This amount was derived by taking the average value of BTC in early January 2018 (15,000) multiplied by 1,290 BTC [15,000 * 1,290 = $19,350,000.00).

24.     Based on the representations noted above in paragraphs 22 & 23, Participants 9 & 10 invested a total of $200,000 in Saffron's BWM program as they each provided him with $100,000 in cash on about January 22, 2018, and entered into an agreement with Saffron whereby he promised to return $200,000 to each participant on or about February 22, 2018.  *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000002_0006-7; SDKD-LACSC-0000000002_0011-13);

25.     Between January 22, 2018, and August 2018, Participants 9 & 10 made repeated demands on Saffron for the return of their funds; however, they were unable to obtain any of their funds.

26.     On or about August 11, 2018, Participants 9 & 10 entered into a written agreement (the "August 2018 Settlement Agreement") with Saffron whereby Saffron agreed to pay a total of $175,000 to Participants 9 & 10 on or before August 13, 2018.  Contrary to the August 2018 Settlement Agreement, Participants 9 & 10 received no payment from Saffron and have yet to receive any return of their funds from Saffron.  *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC708601, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000002_0052-60).

**Custom Bot Trade Agreement ("CBTA")**

27.     Sometime in April or May 2018, another recruiter ("Recruiter 2") for Saffron contacted a participant ("Participant 11") via telephone and made the following representations:

a.     Saffron was a master crypto trader and was offering an investment opportunity through the deposit of BTC.  *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-

0000000001_0065); and

      b.   Recruiter 2 invested 11 BTC with Saffron and had received a return on his investment from Saffron. *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0065-66).

      28.     Several weeks after Participant 11 spoke with Recruiter 2, Saffron contacted Participant 11 directly via telephone and text and made the following representations:

      a.   Saffron had an algorithm and "bot" that traded cryptocurrency in a profitable manner. *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0066); and

      b.   Saffron provided participants a 100% return on any funds invested with him. *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0066).

      29.     Based on the representations noted above in paragraphs 27 & 28, Participant 11 entered into a "Custom Bot Trade Agreement" with Saffron and Recruiter 2, whereby Participant 11 would send 1,000 BTC from his BTC address to a BTC address controlled by Saffron, 19VaycFRP8Xsm7jTYGvX6VvPA1VRey6F9QB, on or before June 6, 2018 for the purpose of trading on the participant's behalf using Saffron's "A.I. Bot Trade Program." *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0066-67; SDKD-LACSC-0000000001_0078-79). In exchange, Saffron represented he would provide Participant 11 a 100% return over the course of four weeks. In addition, Saffron represented that 20% of the participant's 1,000 BTC investment (approximately 200 BTC) would be paid to Recruiter 2 as a

referral fee for his services with the transaction. *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0066-67; SDKD-LACSC-0000000001_0078-79).

30. On or about June 6, 2018, a friend and business associate of Participant 11, "Participant 12", sent 500 BTC from his BTC address to Participant 11's BTC address for the purpose of investing with Saffron. Shortly thereafter, Participant 11 sent 1,000 BTC (500 BTC of his own plus 500 BTC he received from Participant 12) to Saffron from his BTC address to a BTC address controlled by Saffron, 19VaycFRP8Xsm7jTYGvX6VvPA1VRey6F9QB. At the time of this investment, 1,000 BTC was worth approximately $8 million. *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0066-67; SDKD-LACSC-0000000001_0078-79).

31. Between June 2018 and August 2018, Participants 11 & 12 made repeated demands on Saffron for the return of their funds; however, they were unable to obtain any of their funds.

32. On or about August 29, 2018, Participants 11 & 12 entered into a "Settlement and Non-Disparagement Agreement" with Saffron whereby Saffron agreed to deliver a total of 1,250 BTC to a virtual currency wallet address controlled by Participant 11, 15P9G1RYG72SWnQyX8Ux8bPC1LQYMDg5HU. The payment was to be executed in two installments: 625 BTC sent on or before September 7, 2018, and 625 BTC sent on or before September 14, 2018. *See* Superior Court of the State of California, County of Los Angeles records for Case No. BC723555, a copy of which is found at Exhibit 3 (SDKD-LACSC-0000000001_0067; SDKD-LACSC-0000000001_0081-84). Contrary to the August 2018

Settlement and Non-Disparagement Agreement, Participants 11 & 12 received no payment from Saffron and have yet to receive any return of their funds from Saffron.

**Bot Investment Trading Program**

33.     Based upon my review of the documents listed above in Section II, I determined the following.

34.     During the period January 2, 2018 through approximately January 6, 2018, a group of eight participants sent Saffron a total of 206.5 BTC (worth approximately $3.1 million at the time) to a BTC address controlled by Saffron for the purpose of trading on the participants' behalf using Saffron's "A.I. Bot Trade Program." *See* letter from MLF to Kagel and Saffron dated February 5, 2018, a copy of which is found at Exhibit 4 (SDKD-Murrin-0000000011).

35.     The eight participants noted above in paragraph 34 were solicited to invest in Saffron's "Bot Investment Trading Program" by either word-of-mouth from existing Saffron participants, online webinar presentations made by Saffron, and/or in-person presentations made by Saffron.

36.     In a January 2018 video recording of Saffron's presentation to actual and prospective participants, Saffron performed a hypothetical trading demonstration on a laptop computer using a "BinBot Pro" trading platform and stated, "The more bots I have running, the more money it is for the bank.  Literally, it's like printing money.  Every thirty seconds, you're making on average anywhere between 1 and 400 fiat [currency], or you're making 1 and 400 Bitcoin."

37.     Contrary to Saffron's representation noted above in paragraph 36,  the "bots" he used during his hypothetical demonstration were not in fact his bots, but bots offered and provided by BinBot Pro which is a third-party software provider with no affiliation to Saffron or

Circle Society. *See* documents and information obtained from the BinBot Pro website, a copy of which is found at Exhibit 12 (SDKD-CFTC-WEB-0000000005). Moreover, the Commission conducted testimony under oath of one participant (Participant 7) who represented that Saffron was simply using BinBot Pro to demonstrate how a bot could be used to trade binary options contracts on forex and cryptocurrency pairs. Further, Participant 7 represented that Saffron wanted him to edit the January 2018 video by removing any reference to "BinBot Pro" in order to persuade more participants to give their funds to Saffron and make it appear as if the bot software being shown was actually developed by Saffron himself. *See* CFTC Transcript of Participant 7's Testimony Under Oath, March 1, 2019, at p. 129, line 19 – p. 132, line 9, a copy of which is found at Exhibit 13.

38.     Similarly, in a January 2018 audio recording of another presentation to actual and prospective participants, Saffron stated the following:

a.  "The System basically is any money you put in, within seven calendar days—seven days from when you put it in—you get your outlay back. So whatever you put in, you get your outlay back, fourteen days after that you get two-to-one on your money. Okay, so you're getting three-to-one on whatever position you have; it can go from one Bitcoin all the way to 10,000 Bitcoin, whatever it is. And I deal with all ranges."

b.  "My personal portfolio as you've seen has over $717 million . . . company portfolio is about $2 billion. My liquid outlay per day is anywhere between $2 million and $5 million . . . I know who to call, and I just know how to do things, but I don't know this town yet because I'm integrated in Los Angeles. So you guys know this town. Perfect. Now I can make you all damn rich."

c. "Test the System out at first; I'll give you a three-day outlay return, just to show you it works. So three days, you'll have your full return, outlay and two-to-one. Any money you give me, half a Bitcoin, $1,000, $2,000, $500 whatever you have I will triple it in three days and hand it back to you. Then, you can go to your people and go, 'this works.' Any person you bring to me, I'll give you one-to-one on whatever they put in. So you bring someone who has three Bitcoin, he puts three Bitcoin in, fourteen days and then seven-day outlay return, and then another fourteen days, seven days on that outlay return, he gets his money, you get yours. Okay? Very simple."

d. [Question by Prospective Participant]: "How . . . you're probably overwhelmed with people bringing you clients at this point? [Saffron's Answer]: Yes, I am. I don't want a client list from you. You're going to deal with the clients, okay. A client comes to you and goes, 'how the f**k do I get in this?' I want fifty Bitcoins to go to this guy. Okay. You go, 'I've got Jim who is putting in fifty Bitcoins.' I set up a wallet for Jim, send you a wallet address. He can check it on the computer its zero transactions. It's his personal wallet. He puts in the fifty Bitcoin. I send you a contract back, it says fifty Bitcoin received 12:04 pm. Fifty Bitcoin would be deposited back into wallet address on Friday, whatever date and fifty Bitcoin will be given to you as your commission. It's one-to-one. So understand the concept of that, okay that's money, millions within a month."

39.    On or around the time that the eight participants noted above in paragraph 34 sent BTC to Saffron, they received a letter from Saffron's legal counsel at the time, Kagel, which stated in pertinent part:

> We understand that you will be depositing bitcoin and other forms of cryptocurrency with Mr. Saffron which he will be investing on your behalf. He has agreed to return your investment to you together with a profit. In order to assure that your deposit will be returned in the event Mr. Saffron is unable or unwilling to do so he has deposited at least one thousand bitcoin in a wallet to which he has given us access. He has agreed to at all times maintain the deposit in the wallet and give this firm unrestricted access to it. If you have not received the return of your deposit from Mr. Saffron following ten business days' notice to him with a copy to us, upon five business days' notice to us we will return your deposit from the aforementioned wallet.

*See* Exemplar letter from Kagel to Participant 4, a copy of which is found at Exhibit 4 (SDKD-Murrin-00000000051 P.0004).

40.     Contrary to the representations made in the letters that participants received from Kagel, there were no precautions taken by Kagel to ensure the safekeeping of participants' BTC they provided to Saffron. For example, Kagel represented the following to the Commission during his testimony under oath:

a.     Kagel believed he had access to the wallet referenced in his letters to participants based on Saffron simply showing him a computer screen which revealed what appeared to be a wallet that "said 1,000 bitcoins, BTC, or – I don't remember exactly." *See* CFTC Transcript of Kagel's Testimony Under Oath, February 28, 2019, at p. 50, line 16 – p. 51, line 5, a copy of which is found at Exhibit 14; and

b.     Saffron provided Kagel a login and/or password to the alleged wallet; however, Kagel never tried to access the wallet during the relevant period with the credentials provided by Saffron. *See* CFTC Transcript of Kagel's Testimony Under Oath, February 28, 2019, at p. 51, lines 6 – 10, a copy of which is found at Exhibit 14.

41.     In February 2018, the eight participants noted above in paragraph 34 retained MLF in an attempt to obtain their promised returns and/or profits from the BTC they invested with Saffron.

26

42.     On February 5, 2018, MLF sent a letter to Saffron and Kagel requesting that they

return all BTC deposits and promised returns to Participants 1-8.  *See* February 5, 2018 letter

from MLF to Kagel and Saffron, a copy of which is found at Exhibit 4 (SDKD-Murrin-

0000000011).

43.     On February 12, 2018, Kagel sent a letter to MLF which stated in pertinent part:

On January 23, 2018 Mr. Saffron was brutally beaten and robbed of his computer
at his apartment.  His life was threatened by his assailants in an attempt to obtain
access to his bitcoin wallets, including the wallet held for the benefit of your
clients.  In order to secure the contents of the wallets, and at the risk of his life,
Mr. Saffron disabled access to them by anyone other than himself, including the
undersigned.

When his assailants left Mr. Saffron called the Los Angeles police.  After taking a
report he was arrested on an outstanding warrant from the State of Georgia on a
relatively minor matter, not involving bitcoin, which he believed had been
resolved.

Following his release I believe that Mr. Saffron will contact all of his investors,
including your clients, and return their deposits or otherwise make arrangements
satisfactory to them.

*See* February 12, 2018 letter from Kagel to MLF, a copy of which is found at Exhibit 4 (SDKD-

Murrin-0000000047).

44.     On February 15, 2018, MLF sent another letter to Saffron and Kagel requesting

that they return all BTC deposits and promised returns to Participants 1-8.  *See* February 15,

2018 letter from MLF to Kagel and Saffron, a copy of which is found at Exhibit 4 (SDKD-

Murrin-0000000051).

45.     Further, on March 2, 2018, MLF sent a letter to the State Bar of California

concerning their clients BTC investments, and Saffron's failure to return the BTC deposits and

promised returns to Participants 1-8 after repeated requests made to Kagel and Saffron.  *See*

March 2, 2018 letter from MLF to State Bar of California, a copy of which is found at Exhibit 4

(SDKD-Murrin-0000000024).

46.     Of the 206.5 BTC Saffron solicited and accepted for his Bot Investment Trading Program, he returned a total of 130 BTC to two of the eight participants (Participants 4 & 7) in the nature of a "Ponzi" scheme.  Moreover, Participant 7 claimed that he immediately sent back the 30 BTC he received to a BTC address controlled by Saffron.  *See* CFTC Transcript of Participant 7's Testimony Under Oath, March 1, 2019, at p. 59, lines 2 - 19, a copy of which is found at Exhibit 13, text messaged between Participant 7 and Saffron, copies of which are found at Exhibit 4 (SDKD-Murrin-0000000402; SDKD-Murrin-0000000488), and materials produced by Participant 4, copies of which are found at Exhibits 18 (SDKD-Hitesh-0000000001; SDKD-Hitesh-0000000003).

47.     Contrary to Saffron's repeated promises, Participants 1-8 received no payment from Saffron and have yet to receive any return of their funds from Saffron, other than the 130 BTC returned to Participants 4 & 7 referenced above in paragraph 46.

**Omicron Trust**

48.     Based upon my review of records produced to the Commission by Kerr and Kagel, I determined the following.

49.     Sometime in May 2018, Kerr and two of his clients ("Clients 1 & 2") met with Saffron in Kerr's office located in Henderson, Nevada, during which Saffron made the following representations:

a.   He was a genius when it came to mathematics and computer programming and he had created some algorithms he referred to as "bots."  *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 59, lines 2-8, a copy of which is found at Exhibit 15;

b.   The bots he created would automatically generate trades on various virtual

currency exchanges, which allowed him to take BTC and "multiply it exceedingly quickly." *See*
CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 59, lines 11-16, a copy
of which is found at Exhibit 15; and

      c.   He provided a "referral fee" to actual and prospective participants, equal to 20%
of any assets that the participants' friends and/or acquaintances deposited with Saffron. *See*
CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 64, lines 10-25, a copy
of which is found at Exhibit 15.

     50.   During the meeting noted above in paragraph 50, Saffron also showed Kerr the
website for Omicron, http://theomicrontrust.com,[21] which is where actual and prospective
participants would register for one of the Omicron investment plans.  For example, there was a
"30-day" program that allegedly would "double your money," and a "45-day" program that
allegedly offered three-to-one returns. *See* CFTC Transcript of Kerr's Testimony Under Oath,
March 27, 2019, at p. 63, line 18 – p. 64, line 1; p. 65, lines 16-21, a copy of which is found at
Exhibit 15.

     51.   Subsequent to the May 2018 meeting referenced above in paragraph 50, Clients
1 & 2 requested that Kerr conduct additional due diligence on their behalf regarding Saffron's
Omicron Trust program in order to "give them comfort" before they invested any funds with
Saffron. *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 147, lines
14-20, a copy of which is found at Exhibit 15.

     52.   On or about June 15, 2018, Kerr met with Saffron at his hotel suite in Las Vegas,
Nevada and represented that the following took place during the meeting:

---

[21] Based upon my review, the Omicron website was registered with Shinjiru MSC Sdn Bhd, a web-hosting company based in Malaysia, on or about May 15, 2018, and is no longer active as of March 8, 2019. *See* documents and information obtained from the Omicron website, copies of which are found at Exhibit 12 (SDKD-CFTC-WEB-0000000022_0003-5).

a.   Saffron utilized his personal laptop computer to show Kerr various Excel spreadsheets that revealed the historical trading activity and return on investment ("ROI") for certain clients of Saffron;

b.   Saffron showed Kerr a demo trading history report for a four hour time block; and

c.   Kerr engaged in a 26-minute test trade of BTC using Saffron's trading algorithm, referred to by Saffron as "bots." *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 151, line 1 – p. 154, line 4, a copy of which is found at Exhibit 15.

53.    Based on Kerr's June 15, 2018 meeting with Saffron, he prepared an opinion letter for Clients 1 & 2 which rendered opinions including, but not limited to, the following:

a.   Kerr assumed that Saffron "has been engaged in the crypto-currency industry for many years";

b.   Kerr "independently verified [Saffron's] programming credentials";

c.   Saffron had historical trades that revealed a ROI for clients of a minimum of two times the investment, although there were certain client trades that revealed a ROI that was "substantially higher" than two times the investment;

d.   Saffron's bots traded "fiat/BTC pairs, FOREX pairs and other crypto-currency pairs" across 16 different virtual currency exchanges "(i.e., Gemini, GDAX)";

e.   The June 15, 2018 trading demo, which occurred between 2:00 a.m. – 6:00 a.m., "started with fiat $1,000 USD and concluded the four (4) hour block with $54,900 USD"; and

f.   Saffron's trading algorithm "generated two (2) times the investment in BTC over a 26 minute test period." *See* June 15, 2018 letter from Kerr, a copy of which is found at Exhibit 6 (SDKD-Kagel-0000000001).

54.    Moreover, Kerr executed his own personal "test" trade with Saffron on June 15,

2018, by transferring 0.2 BTC from his personal Coinbase account to a BTC address controlled by Saffron, who then allegedly "inserted the BTC into the trading algorithm and timed the trading for 26 minutes." In fact, Kerr represented that he opened the Coinbase application ("app") on his personal cell phone and handed his phone to Saffron who then executed the 0.2 BTC transfer for him. At the end of the 26-minute "test period", Saffron transferred 0.4 BTC from a BTC address that he controlled to Kerr's Coinbase account. *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 50, lines 9-23; p. 115, lines 6-19; p. 201, lines 12-25 , a copy of which is found at Exhibit 15; Exhibit 6 (SDKD-Kagel-0000000001 P.0002), Kerr's Coinbase account documents, a copy of which is found at Exhibit 11 (SDKD-Coinbase-0000000001_0003), and a screenshot from Kerr's Coinbase app taken on June 15, 2018, a copy of which is found at Exhibit 5 (SDKD-Kerr-0000000003).

55.     On or about July 9, 2018, Kerr and another one of his clients ("Client 3") had a breakfast meeting with Saffron during which Saffron explained his Omicron trading program to Client 3, as well as the referral fees that Saffron offered to his participants. *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 83, lines 3-19, a copy of which is found at Exhibit 15.

56.     Based on the July 9, 2018 meeting noted above in paragraph 55, Client 3 decided to invest in Saffron's Omicron trading program and on or about July 9, 2018, transferred 50 BTC (worth approximately $333,000 at the time) from his virtual currency account to Kerr's Coinbase account. On July 10, 2018, Kerr sent the 50 BTC he received from Client 3 to a BTC address controlled by Saffron, and on the same day Saffron sent 10 BTC back to Kerr from a BTC address he controlled to Kerr's Coinbase account as Kerr's "commission for [Client 3's] investment." *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 80,

line 16 – p. 81, line 11, a copy of which is found at Exhibit 15, and Kerr's Coinbase account documents, a copy of which is found at Exhibit 11 (SDKD-Coinbase-0000000001_0003).

57.     Client 3 received no payment from Saffron and has yet to receive any return of his funds from Saffron.  *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 121, lines 12-17, a copy of which is found at Exhibit 15.

58.     On July 11, 2018, Kerr returned his "commission" of 10 BTC that he received from Saffron, noted above in paragraph 56, plus 1.4 BTC of his own by sending a total of 11.4 BTC from his Coinbase account to a BTC wallet address controlled by Saffron.  *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 81, lines 9-25, a copy of which is found at Exhibit 15, and Kerr's Coinbase account documents, a copy of which is found at Exhibit 11 (SDKD-Coinbase-0000000001_0003).

**Circle Society**

59.     Based upon my review of the documents listed above in Section II, I determined the following.

60.     Sometime in August 2018 Saffron rebranded Omicron Trust and changed the name of his cryptocurrency investment program to Circle Society.

61.     The Circle Society website, https://circlesociety.com, was registered with GoDaddy.com on or about May 9, 2011.  *See* documents and information obtained from the Circle Society website, copies of which are found at Exhibit 12 (SDKD-CFTC-WEB-0000000018).  As of June 14, 2019, the website had the following message posted:

> "We are currently closed for maintenance.  In order to maintain members growth during Site maintenance All accounts will be given the "Transition Rollover" and final balances will be adjusted accordingly."  *See* documents and information obtained from the Circle

Society website, a copy of which is found at Exhibit 12 (SDKD-CFTC-WEB-0000000018).

62.     Further, as of August 27, 2019, the Circle Society website represented in pertinent part:  **"Site Update"** and "Circle Society's site is currently in maintenance."  *See* Exhibit 12 (SDKD-CFTC-Web-0000000019_0001).

63.     In September 2018, Saffron asked Kerr to help him establish Circle Society, and on September 5, 2018, Saffron sent approximately 0.2 BTC (worth approximately $1,999.00 at the time) from a BTC address he controlled to Kerr's Coinbase account.  This transaction represented the fee that Kerr charged Saffron for helping him set up Circle Society.  *See* CFTC Transcript of Kerr's Testimony Under Oath, March 27, 2019, at p. 48, line 25 – p. 49, line 7, a copy of which is found at Exhibit 15, and Kerr's Coinbase account documents, a copy of which is found at Exhibit 11 (SDKD-Coinbase-0000000001_0002).

64.     On September 6, 2018, Circle Society was incorporated and registered with the state of Nevada, with Kerr listed as the registered agent and Saffron listed as the sole owner and officer of the company.

65.     During the relevant period, the Circle Society website (https://circlesociety.com) made representations including, but not limited to, the following:

a.     "Circle Society is an automated crypto-currency trading system that gives fixed returns over time using leveraged high-frequency algorithmic trading via statistical arbitrage."  *See* Exhibit 23 (SDKD-Welker-0000000046.0001).

b.     "CS uses long and short positions to multiply potential gains, while minimizing losses."

c.     "CS detects and exploits trends in pair trading opportunities."

d.   Circle Society "is a registered Money Service Business with FinCEN and is a licensed money transmitter in numerous states."  This representation is false as a search on the Financial Crimes Enforcement Network ("FinCEN") website (https://www.fincen.gov/msb-registrant-search) for Money Service Businesses ("MSBs") revealed no matches for Circle Society.  *See* Exhibit 23 (SDKD-Welker-0000000076.0008).

e.   Circle Society "enables you to use your cryptocurrency with others to facilitate a profitable venture using cryptocurrency as payment for goods or services, and process cryptocurrency payments that we receive from the Purchaser.  We are not a crypto exchange, wallet, or a place to purchase or sell cryptocurrencies.  Our Services are only available to individuals that purchase a plan or service."  *See* Exhibit 23 (SDKD-Welker-0000000076.0018).

f.   Circle Society "is a private club." *See* Exhibit 23 (SDKD-Welker-0000000076.0019).

66.   Through the Circle Society website, Saffron offered and continues to offer participants various investment plans.  The plans vary by amount required to be invested and guarantee rates of return within a specified time period such as the following:

a.   <u>Weekly BTC</u> – provides "Returns 149%" in "7 Consecutive Days;"

b.   <u>Daily</u> – provides "Returns 5.00%" in "30 Consecutive Days;"

c.   <u>Year of the Pig</u> – provides "Returns 188%" in "38 Consecutive Days;"

d.   <u>No commission plan</u> – provides "Returns 200%" in "22 Business Days;" and

e.   <u>The Power of 3</u> – provides "Returns 300%" in "45 business days."

*See* Exhibit 23 (SDKD-Welker-0000000070.0001 and SDKD-Welker-0000001147).

67.   Through the Circle Society website, participants can transfer their BTC to

Circle Society from the participants' own cryptocurrency addresses and view their purported account balance (denominated in BTC) with Circle Society.

68.     The Commission conducted telephone interviews of Participants 13 & 14, and determined the following.

<u>Participant 13</u>

a.   Participant 13 became aware of Circle Society in early 2018 and understood that Saffron had a "super trading algorithm" for trading cryptocurrency and was offering an investment opportunity through the deposit of BTC.  This participant also represented that:

> i.   Saffron was buying and selling options on cryptocurrencies, mostly BTC but also Etherium ("ETH") and Litecoin ("LTH"), on multiple virtual currency exchanges all over the world; and
>
> ii.  Saffron offered a referral program whereby he promised to pay participants a commission equal to 10% of the total amount of BTC any new participant made.

b.   In February 2019, Participant 13 decided to invest in Circle Society's "daily plan" that was offered on the company's website and "promised daily returns of 5% per day for 30 days."  Specifically, on February 20, 2019, the participant transferred one (1) BTC from his Coinbase account to a BTC address he obtained from the Circle Society website.

c.   Over the course of 20 days after his initial February 2019 investment, Participant 13 represented that he received daily returns totaling one (1) BTC, which he then then reinvested back into Circle Society by transferring a total of one (1) BTC on March 10 & 11, 2019 to a BTC address he obtained from the Circle Society website.

d.   On or about March 21, 2019,  Participant 13 made an additional deposit into his

Circle Society daily plan as he transferred six (6) BTC from his Coinbase account to a BTC address he obtained from the Circle Society website.

      e.  On or about March 27, 2019, Participant 13 met an individual named Justin Baraglia ("Baraglia") during which he learned the following:

            i.  Baraglia was part of a group of investors who allegedly provided approximately $8 million worth of BTC to Saffron; and

           ii.  Baraglia was very "heated" about Saffron not returning any of his BTC deposit and/or profits.

      f.  Participant 13 has received no further payments or any return of his funds from Saffron to date, other than the return of one (1) BTC noted above in paragraph 68c. *See* Declaration of Participant 13, attached hereto as Exhibit 25 (SDKD-Marshall-0000000004).

<u>Participant 14</u>

      g.  Participant 14 became aware of Circle Society in October 2018 and understood that the company was offering an investment opportunity through the deposit of BTC.

      h.  In April 2019, Participant 14 learned that Saffron was the sole principal of Circle Society from messages posted on Telegram.

      i.  On or around April 15, 2019, Participant 14 decided to invest in Circle Society's "daily plan" and transferred 37 Ethereum ("ETH"), which at the time was worth approximately 0.55 BTC or $5,500 USD, from his electronic ETH address to an ETH address he obtained from the Circle Society website that he believed was controlled by Saffron.

      j.  Approximately five business days after Participant 14's April 2019 investment, he received returns from Circle Society totaling approximately 15 ETH, which at the time was worth approximately 0.55 BTC, which were sent from Circle Society's ETH address to

Participant 14's ETH address.  The Participant then rolled his return of 0.55 BTC back into Circle Society's "weekly plan."

      k.  On or around May 24, 2019, Participant 14 logged into the Circle Society website to view his purported account which showed his original investment of 0.55 BTC and a "Balance Due" of 2.3600 BTC.

      l.  Participant 14 has received no further payments or any return of his funds from Saffron to date, other than the return of 0.55 BTC noted above in paragraph 68j, which he reinvested into a new Circle Society investment plan.  *See* Declaration of Participant 14, attached hereto as Exhibit 26 (SDKD-Welker-0000001625).

### V.    <u>SUMMARY</u>

69.    In summary, during the relevant period, Saffron, individually and on behalf of Circle Society, solicited at least $11 million worth of funds from at least 14 participants for the purpose of participating in a commodity pool that purportedly traded binary options contracts on forex and cryptocurrency pairs, among other things.  During this time, a total of at least $11 million in participant funds were deposited into various virtual currency addresses controlled by Saffron and/or Circle Society.

      Of the at least $11 million solicited for trading, Saffron did not open **any** U.S. futures trading accounts in his name, nor the name of Circle Society, and did not conduct any trading on behalf of the participants he solicited as promised.  Instead, Saffron misappropriated all of the at least $11 million he obtained from participants by failing to put the assets into a separate pooled account, retaining participants' funds in his own personal virtual currency addresses, and by providing a total of 130 BTC to initial participants using the BTC of later participants, in the nature of a "Ponzi" scheme.

Saffron misrepresented and continues to mispresent material facts in his solicitations and other communications with actual and prospective participants, including by misrepresenting that participants' funds were being held at virtual currency exchange KuCoin, and would be returned back to participants once Saffron received a very large "balloon payment" from KuCoin.

Contrary to Saffron's claim concerning the "balloon payment" he has been promising participants he would be receiving, his KuCoin account in fact is worthless with a current balance of 0.0065 ETN, which as of August 30, 2019 was worth $0.00 USD.[22]   Further, Saffron made and continues to make false statements to participants about the alleged "balloon payment" including, but not limited to:  a) He has had "6 interviews with government offices," and "So far and they seem to be satisfied with the evidence of exchanges holding funds"; and b) "George Malik [sic] at CFTC has it," "And FBI has it as of last week," "They both seem to be satisfied," "Since I'm still here and not arrested,", and "So again the stuff is being held."

Lastly, the majority of participants have been unable to obtain a return of any of their funds even after repeated demands on Saffron.  Instead, Saffron continues to offer new investment plans to active and prospective participants' including, but not limited to, the following:

      a.  "Coin Funding Trading Commune" or "The CFTC plan"– provides a 100% return in "18 business days;"

      b.  "The Dream Warriors Club" – 0.1 BTC to participate, "3 New Plans offered," "30-60-90 Days," and "variable % per plan;" and

      c.  "Macs TixE" plan – provides a 30% return in "just 12 days."

---

[22] This amount was derived by taking the closing price of ETN on 8/30/2019 (0.003584) multiplied by 0.0065 ETN [0.003584 * 0.0065 = $0.00].

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

George H. Malas

CFTC Futures Trading Investigator

Executed in Washington, D.C. on September 26, 2019.

39