# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Commodity Futures Trading Commission,

     Plaintiff

v.

David Gilbert Saffron a/k/a David Gilbert and Circle Society, Corp.,

     Defendants

Case No.: 2:19-cv-01697-JAD-DJA

**Sealed Order re: Motions for Pretrial Equitable Relief and Related Matters**

[ECF Nos. 2, 3, 5]

     The Commodity Futures Trading Commission sues David Gilbert Saffron and his Nevada corporation Circle Society for injunctive relief, restitution, disgorgement, and civil monetary remedies under 7 U.S.C. § 13a-1, alleging that they violated the Commodity Exchange Act (CEA) by fraudulently soliciting the public to participate in an unregistered commodity pool that purportedly trades off-exchange binary option contracts on foreign currency and cryptocurrency pairs.[1]  The Commission moves on an ex parte and emergency basis for an order temporarily restraining defendants from destroying records of their operations, permitting authorized representatives of the Commission to inspect those records, and freezing defendants' assets.[2]  It also seeks and order converting the statutory restraining order—if one is entered—into a preliminary injunction pending trial.[3]  The Commission additionally moves to seal the docket and all documents in this case until the earlier occurrence of either two weeks after entry of its requested restraining order or service is effectuated on Saffron.[4]  Finally, the Commission moves

---

[1] ECF No. 1.

[2] ECF No. 5.

[3] ECF No. 6.

[4] ECF No. 2.

to permit attorneys Timothy J. Mulreany and Danielle E. Karst to practice before the court in all matters relating to this case.[5]

For the reasons set forth below, I grant the motions for a temporary restraining order, to temporarily seal the docket, and for government attorneys to practice before the court. I also set the motion for a preliminary injunction for hearing at 1:30 p.m. on October 15, 2019.

## Discussion

**I.    Emergency ex parte motion for temporary restraining order [ECF No. 5]**

**A.    Standard to obtain temporary restraining order without notice**

Rule 65 of the Federal Rules of Civil Procedure authorizes district courts to "issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if" two conditions are met.[6] First, specific facts that "clearly show that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition" must be established by affidavit or verified complaint.[7] Second, "the movant's attorney" must certify "in writing any efforts made to give notice and the reasons why it should not be required."[8]

### 1.    *Imminent irreparable harm*

The Commission relies on the declaration George H. Malas to show irreparable injury. Malas is a Futures Trading Investigator for the Commission and has held that position for ten years.[9] Malas explains that his duties include investigating registered and unregistered

---

[5] ECF No. 3.

[6] Fed. R. Civ. P. 65(b)(1).

[7] *Id.* at 65(b)(1)(A).

[8] *Id.* at 65(b)(1)(B).

[9] ECF No. 5-1 at ¶ 2.

commodity futures and options-trading firms and individuals in the United States to ensure compliance with the CEA and to enforce its rules and regulations.[10]  As part of his work, Malas routinely analyzes and reviews financial records, including trading-account documents and bank statements.[11]  Malas explains that he's been assigned to investigate Saffron and Circle Society.[12]

Malas declares that, from at least December 2017 to the present, Saffron has run a Bitcoin Ponzi scheme using various business entities and cryptocurrency-investment programs like Circle Society, Omnicron Trust, Bitcoin Wealth Management, and Custom Bot Trade Agreement.[13]  The alleged scheme involves Saffron soliciting Bitcoin and dollars American from prospective investors through in-person meetings, instant-messaging services like Telegram, podcasts, and websites like www.theomicrontrust.com and www.circlesociety.com.[14]  Saffron's pitch is that investors will participate in a commodity trading pool that uses "algorithmic trading programs" he calls "trading bots" and "automated bot/AI trading software" and that he claims to have created "to trade binary options contracts on foreign currency . . . and cryptocurrency pairs, among other things."[15]  Malas declares that evidence shows that Saffron solicited and obtained at least $11 million worth of Bitcoin and U.S. currency from at least 14 different participants.[16]  Based on records that the Commission has obtained since Malas joined the investigation team, he

---

[10] *Id.* at ¶ 3.

[11] *Id.*

[12] *Id.* at ¶ 4.

[13] *Id.* at ¶ 6(c).

[14] *Id.* at ¶ 6(f).

[15] *Id.* at ¶ 6(d).

[16] *Id.*

believes that at least 25 more participants provided at least $409,000 to Saffron in furtherance of the scheme.[17]

Malas explains that Saffron attracts participants by claiming that he is a "master cryptocurrency trader" and "genius investor" who owns 57 separate computers on which his bots run continually, and has a personal portfolio of more than $717 million and a company portfolio that exceeds $2 billion.[18]  Saffron guarantees returns "of up to 300% in three weeks" for some participants and "double in one month" for others.[19]  Saffron also claims that he has pooled more than $100 million worth of Bitcoin, his Circle Society commodity pool has 600–800 participants, and his bots trade cryptocurrency on 16 different exchanges.[20]  Saffron bandies about names of well-known investors like Mark Cuban and claims that they participate in his trading pools.[21]

Saffron also entices participants with live demonstrations for participants to get a taste of what he's offering.  Malas explains that Saffron will have a potential participant transfer cash or Bitcoin to an electronic wallet that's controlled by Saffron or one of his entities.  Saffron tells the participant that their funds have been added to his pool and his bots are trading on the participant's behalf.[22]  But, Malas declares, Saffron doesn't trade with the participant's funds using bots or otherwise; rather, Saffron uses the funds that he obtains from some participants to pay other participants "in the manner of a Ponzi scheme."[23]

---

[17] *Id.* at ¶ 6(e).

[18] *Id.* at ¶ 6(g)(i)–(ii), 23(c).

[19] *Id.* at ¶ 6(g)(iii).

[20] *Id.* at ¶ 6(g)(vi)–(viii).

[21] *Id.* at ¶ 6(g)(ix).

[22] *Id.* at ¶ 6(h)–(i).

[23] *Id.* at 6(j).

1    Saffron also uses attorneys to provide a veneer of legitimacy to his scheme.  Malas

2 explains that after participants send their Bitcoin to Saffron, they receive a letter from Saffron's

3 attorney, David L. Kagel, acknowledging the deposit and assuring the participant their

4 investment is protected by a 1,000 Bitcoins that Saffron placed into an electronic wallet and to

5 which Kagel's law firm has "unrestricted access."[24]  Kagel further instructs in his letter that "[i]f

6 you have not received the return of your deposit from Mr. Safron following ten business days'

7 notice to him with a copy to us, upon five business days' notice to us[,] we will return your

8 deposit from the aforementioned wallet."[25]  When a participant called on Kagel to honor the

9 letter and refund the his deposit from that wallet, Kagel discovered that he couldn't access the

10 wallet with the username and password that Saffron had provided him.[26]  Kagel had never tried

11 to access the wallet before that time.[27]

12    Differently, Saffron obtained an opinion or due-diligence letter from attorney P. Sterling

13 Kerr about a cryptocurrency-investment program called Omnicron Trust.[28]  Saffron provides that

14 letter to potential participants.[29]  Kerr has instructed Saffron to cease and desist using that letter

15 because it "was very limited in purpose and directed only to Meta-Tech Consultants, LLC[,]" of

16 which Saffron is no longer a part.[30]

---

[24] *Id.* at ¶ 39.

[25] *Id.*

[26] *Id.* at ¶ 40.

[27] *Id.*

[28] *Id.* at ¶¶ 48–53.

[29] *Id.*

[30] *See* ECF No. 5-2 at 88.

When participants ceased receiving profits using Saffron's system, let alone the high returns that Saffron had promised and demonstrated were possible, they demanded that he return their funds. Saffron made several excuses for why he why couldn't, including that a solar flare knocked out his trading computers and Russian hackers tried to infiltrate his system.[31] Two different sets of participants sued Saffron after he ignored their repeated demands to return their funds.[32] Saffron settled with each set, but never honored his agreement to pay.[33] Around the time that he got sued in Los Angeles, Saffron moved his operations to Las Vegas.[34] He continued to pursue and obtain new participants throughout those lawsuits using his Omnicron Trust program.[35] After he settled the lawsuits, however, Saffron retained Kerr to create the Circle Society entity, which he has since used to pursue new participants.[36]

Malas concludes that Saffron misappropriated at least $11 million that he obtained from participants.[37] Saffron didn't put the participants' funds into a separate pooled account and then trade with those funds as promised.[38] Instead, Saffron retained those funds for his own use and provided a total of 130 Bitcoin to the initial participants of the scheme by using Bitcoin that he had obtained from later participants.[39] Malas declares that Saffron "continues to offer new

---

[31] ECF No. 5-1 at ¶ 6(l)–(m).

[32] *Id.* at ¶¶ 26, 32.

[33] *Id.*

[34] *Compare* ECF No. 5-1 at ¶ 22 (Saffron meets with participants and a recruiter in Los Angeles in late 2017), *and* ECF No. 5-2 at 32 (settlement agreement recital providing that participants sued Saffron in Los Angeles in June 2018), *with* ECF No. 5-1 at ¶ 52 (Saffron meets with participants in Las Vegas in June 2018).

[35] *See, e.g.*, *id.* at ¶ 56.

[36] *Id.* at ¶¶ 59–64.

[37] ECF No. 5-1 at ¶ 69.

[38] *Id.*

[39] *Id.*

investment plans to active and prospective participants . . . ."[40]  Attached as exhibits to Malas's

declaration are hundreds of pages of documents, court filings, and testimony that the

Commission obtained in the course of its investigation and on which Malas relies.[41]

This evidence shows that Saffron has the means and ability to switch his business

operations to avoid detection.  It can be reasonably inferred from this evidence that once Saffron

or his operations received legal scrutiny in one location, he moved to another location and

changed the name of his program to avoid detection.  It can also be reasonably inferred from this

evidence that, were defendants provided notice and an opportunity to be heard, they would

dissipate, move, hide, and conceal their assets, business equipment, and records, and that Saffron

would continue his operations either directly or indirectly.  So, I find that the evidence shows

that immediate and irreparable injury, loss, or damage will result if defendants are permitted be

heard in opposition on the motion for a temporary restraining order.

### 2.    *Explanation for why notice should not be required*

Counsel for the Commission explains in their motion that defendants have not received—

and should not receive—notice because the evidence shows that they have a habit of

disregarding the law, their records and assets are likely only electronic, hidden or encrypted, and

on devices that can be easily concealed or moved.[42]  Counsel also argues that Congress,

"[m]indful that notice 'may result in the destruction of books and records and the dissipation of

customer funds,'" expressly authorized courts under the CEA to issue ex parte orders freezing

assets and restraining persons from destroying books and records and from "refusing to permit

---

[40] *Id.*

[41] *Id.* at 5-2–5-5.

[42] ECF No. 5 at 9–11.

1  authorized representatives of the Commission to inspect, when and as requested," any such

2  books and records.[43]  Though it is a close call, I find that counsel has adequately explained why

3  notice should not be required in this case.

4  **B.  Standard to obtain a temporary injunction**

5  The legal standard for issuing a temporary restraining order and the legal standard for

6  preliminary injunctive relief are "substantially identical."[44]  Both are "extraordinary" remedies

7  and "never awarded as of right."[45]  The Supreme Court clarified in *Winter v. Natural Resources*

8  *Defense Council, Inc.* that, to obtain an injunction, the plaintiff "must establish that [it] is likely

9  to succeed on the merits, that [it] is likely to suffer irreparable injury in the absence of

10 preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the

11 public interest."[46]  The Ninth Circuit also recognizes an additional standard: "if a plaintiff can

12 only show that there are 'serious questions going to the merits'—a lesser showing than

13 likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance

14 of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are

15 satisfied."[47]

16 The Commission implicitly argues that an even lesser standard applies here—that

17 irreparable harm is presumed—because it seeks injunctive relief under a federal statute that

18

19

20 [43] *Id.* at 10 (quoting H.R. Rep. No. 97-565(I), at 53–54, 93 (1982)).

21 [44] *See Stuhlbarg Intern. Sales Co. v. John D. Bush and Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (stating that the "analysis is substantially identical for the injunction and the TRO").

22 [45] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[46] *Id.* at 20.

23 [47] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

1    expressly authorizes such relief.[48]  The statute provides that, "[u]pon a proper showing, a

2    permanent or temporary injunction or restraining order shall be granted without bond."[49]  But the

3    statute doesn't articulate what constitutes a "proper showing."  The Seventh Circuit explained in

4    *CFTC v. Hunt* that "[a]ctions for statutory injunctions need not meet the requirements for an

5    injunction posed by traditional equity jurisprudence.  Once a violation is demonstrated, the

6    moving party need show only that there is some reasonable likelihood of future violations."[50]

7    The Fifth Circuit similarly explained in *CFTC v. Muller* that "[i]n actions for a statutory

8    injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as

9    required in private injunctive suits.  A prima facie case of illegality is sufficient."[51]

10           This jurisprudence all predates the Supreme Court's decisions in *Winter* and *eBay, Inc. v.*

11   *MercExchange, LLC.*[52]  But I need not decide whether the rule implicitly urged by the

12   Commission remains good law in the face of these Supreme Court decisions because the

13   Commission meets the higher *Winter* standard.  As I explained above, I find that the Commission

14   has shown that it and the class of persons it seeks to protect are likely to suffer irreparable harm

15   if the defendants are not temporarily restrained from disposing or concealing their books,

16   records, assets, and other property, so I consider the three remaining *Winter* factors.

17

18   [48] ECF No. 5 at 7–12 (arguing that the statute authorizes the court to issue the "limited ex parte restraining order" that the Commission seeks without addressing which legal standard applies to
19   determine if the Commission is entitled to that relief (italics emphasis omitted)).

     [49] 7 U.S.C. § 13a-1(b).
20
     [50] *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

21   [51] *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978).

22   [52] *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) (holding that courts must apply the traditional four-factor test when deciding whether to award permanent injunctive relief to a
23   prevailing party whose claims arise under the Patent Act and, thus, rejecting rule that courts "generally issue permanent injunctions against patent infringement absent exceptional circumstances").

### 1.   *Likelihood of success on the merits*

The Commission asserts four claims for relief under the CEA alleging, among other things, that defendants violated, are violating, and are about to violate the CEA by cheating, defrauding, or deceiving persons in connection with defendants' offers to enter into commodity-options contracts.[53]  To obtain a temporary restraining order, the Commission must therefore show that it is likely to succeed on the merits of its claim for binary-options fraud under 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4, which has three elements: (1) the making of a misrepresentation, misleading statement, or deceptive omission, (2) scienter, and (3) materiality.[54]  The Commission argues that the evidence shows it is likely to succeed in demonstrating that defendants solicited and accepted at least $11 million worth of Bitcoin and U.S. currency from at least 14 members of the public to participate in an unregistered commodity pool by guaranteeing them returns in an area of investing—futures trading—that is necessarily speculative, unpredictable, and where risk is unavoidable.  It adds that defendants neglected to inform the participants of material facts, like that there was no pooled account, defendants were not registered with the Commission, and returns paid to early participants were actually funds provided by later participants.

The Commission relies on Malas's declaration to demonstrate that it's likely to succeed on the merits of its claim that Saffron defrauded the participants.  Malas declares that Saffron didn't maintain any futures-trading accounts in his name or the name of an entity he managed, controlled, handled or owned.[55]  The National Futures Association has no record of either

---

[53] ECF No. 1 at ¶¶ 46–52.

[54] *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002).

[55] ECF No. 5-1 at ¶ 6(q).

Saffron or Circle Society registering as a commodity-pool operator or of Saffron registering as an associated person of a commodity-pool operator.[56]  Firms registered with the Commission as Futures Commission Merchants reported that they have no accounts identified with the name of either Saffron or Circle Society.[57]  In the deposition testimony that Malas provides, participants describe Saffron using language assuring them that they'll receive significant returns on their investments and there's no downside to his systems.  Malas also describes how Saffron uses live demonstrations and actual letters from real attorneys to create the impression that his investment programs are the real thing.  But documents produced by cryptocurrency exchanges subpoenaed by the Commission show that virtual currency accounts maintained or controlled by Saffron or Circle Society don't match the pitch he gave to participants: only one account was funded, and while it held the equivalent of $26,678.70 during the relevant time period, $25,054.62 of that had been withdrawn and the 0.0065 of Electroneum remaining in the account was worth $0.00 as of August 30, 2019.[58]  I find that the Commission is likely to establish that defendants are knowingly engaged in a scheme to defraud the public with representations about commodity-options trading that are materially misleading.

### 2.    *Balance of equities*

This factor requires me to balance the potential harm to the plaintiff in the absence of a temporary restraining order with the potential harm to the defendants if such an order is granted. The commission seeks to restrain the defendants from committing two categories of acts, so I address the relative harms for each category.

---

[56] *Id.* at ¶ 7.

[57] *Id.* at ¶ 8.

[58] *Id.* at ¶¶ 9–18.

The Commission seeks to freeze the defendants' assets and to prohibit defendants from opening any safe deposit boxes.  I perceive that the Commission and the public will be harmed if, in the absence of a restraining order, defendants continue to commit acts of or in furtherance of the commodity-trading scheme.  The harms to members of the public who participate in Saffron's programs include the loss of money with little chance of recovery; false feelings of hope that they've found a successful investment system; false feelings of urgency to reinvest in that system; and feelings of anger, embarrassment, or distress when no return or money is forthcoming.  The harms to the Commission include the continued use of its protections and name to perpetuate a scheme to defraud U.S. citizens and any distrust or anger those citizens feel toward that system or the United States as a result of being defrauded.

The only harm I perceive that could befall defendants if they are so enjoined is that Saffron might be unable to pay for ordinary living expenses like food, shelter, transportation, and insurance premiums.  The court, however, has no evidence of what Saffron needs for legitimate and reasonable living expenses.  The potential harm to Saffron can be lessened with a shorter restraining period order.  But with a truncated hearing and briefing schedule for the Commission's motion for a preliminary injunction—where Saffron can present evidence of his needs—the harms to the Commission and the public outweigh the harms to Saffron.

The Commission also seeks to restrain the defendants from destroying, deleting, removing, or transferring any and all business, financial, accounting, and other records concerning their operations.  It also seeks to prohibit defendants from refusing to permit authorized representatives of the Commission to inspect, when and as requested, any of defendants' books or records of their operations.  The only harm I perceive that could befall the defendants if they are so enjoined is having to pay to maintain these records and any copies.

This is a minimal harm, and I anticipate that the defendants are already required to maintain many of these records for several years under federal or state law.  The harm to the Commission and the citizens, especially the victims of this alleged scheme, is loss of documentation necessary for restitution or recovery, which outweighs the defendants' potential harm.  Thus, I conclude that the balance of equities weighs in favor of issuing a temporary restraining order.

### 3.   *Public interest*

The final *Winter* factor requires me to determine whether the requested temporary restraining order would advance or impair the public's interest.  The purpose of the requested order is to prevent future harm to the public by denying the defendants' ability to continue to operate an allegedly fraudulent scheme.  The public has a strong interest in protecting its members from being used by schemers and fraudsters.  I find that the requested temporary restraining order would advance that public interest.  So, I conclude that this factor is also met.

The Commission has met its burden to obtain a temporary restraining order without notice freezing the defendants' assets and prohibiting defendants from disposing of their business records.  Thus, I grant the Commission's motion for that relief and address its other motions.

## II.   Motion to temporarily seal case [ECF No. 2]

"The public has a 'general right to inspect and copy public records and documents including judicial records and documents.'"[59]  "Although the common law right of access is not absolute, '[courts] start with a strong presumption in favor of access to court record.'"[60]  "A party seeking to seal judicial records can overcome the strong presumption of access by providing 'sufficiently compelling reasons' that override the public policies favoring

---

[59] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1118–19 (9th Cir. 2012) (quoting *Nixon v. Warner Commcns., Inc.*, 435 U.S. 589, 597 (1978)).

[60] *Id.* at 119 (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

disclosure."[61]  "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records."[62]  "To seal the records, the district court must articulate a factual basis for each compelling reason to seal[,] [which] must continue to exist to keep judicial records sealed."[63]  The Ninth Circuit has, however, "'carved out an exception to the presumption of access' to judicial records" that is "'expressly limited to' judicial records 'filed under seal when attached to a *non-dispositive* motion.'"[64]  "Under the exception, 'the usual presumption of the public's right is rebutted[,]' so "a particularized showing of 'good cause' under [FRCP] 26(c) is sufficient to preserve the secrecy of sealed discovery documents attached to non-dispositive motions."[65]

The Commission moves under the higher "compelling reasons" standard.[66]  I find that this higher standard applies in this context—the motion is dispositive because it addresses the merits of the action and seeks a restraining order before trial.  The Commission argues that I should temporarily seal the entirety of this case because Saffron has a history of ignoring the law, moving operations, and "[w]ith just a few keystrokes on a keyboard or smart phone, [he] could easily transfer funds currently within this [c]ourt's jurisdiction to other unknown . . . or foreign bank accounts or virtual currency accounts, thus frustrating" the Commission's ability to obtain relief for itself and the class of citizens it seeks to protect.[67]  The Commission asserts that

---

[61] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[62] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).

[63] *Id.* (citing *Kamakana*, 447 F.3d at 1179; *Foltz*, 331 F.3d at 1136).

[64] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[65] *Id.* (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002) and *Foltz*, 331 F.3d at 1135, 1138).

[66] ECF No. 2 at 3.

[67] *Id.* at 3–4.

it seeks to seal this case for a maximum of two weeks until it can serve Saffron with process and the court's anticipated temporary restraining order.  The evidence shows that defendants have the means and willingness to continue their operations and divert payments from participants and other assets on the fly.  Based on this record, I find compelling reasons exist to temporarily seal the entirety of this case.

**III.    Motion to permit appearance of government attorneys [ECF No. 3]**

Finally, the Commission moves to permit government attorneys Timothy J. Mulreany and Danielle E. Karst to practice before the court for all matters related to this case.[68]  Counsel represent that they are attorneys with the U.S. Commodity Futures Trading Commission, an agency of the federal government, and are members in good standing of the Bars of the District of Maryland (Mr. Mulreany) and District of Columbia and Virginia (Ms. Karst).  The Commission has met its burden for this relief.

<b>Conclusion</b>

Accordingly, and with good cause appearing, IT IS HEREBY ORDERED that the emergency ex parte motion for a temporary restraining order **[ECF No. 5] is GRANTED**.  The defendants David Gilbert Saffron a/k/a David Gilbert and Circle Society, Corp. and their officers, agents, servants, employees, and attorneys who receive actual notice of this order by personal service or otherwise are temporarily restrained from:

1.    Transferring, selling, alienating, liquidating, encumbering, pledging, leasing, loaning, assigning, concealing, dissipating, converting, withdrawing, or otherwise disposing of any assets, directly or indirectly, wherever located and whenever acquired; **however,** defendants must close out or liquidate any open trading positions in contracts, agreements, or transactions in

---

[68] ECF No. 3.

commodity futures, foreign currency, or options on those futures or currency in accounts that they control.

2.     Opening or causing to be opened, directly or indirectly, any safe deposit boxes.

3.     Destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents related to defendants' business activities or personal finances.

4.     Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any documents related to defendants' business activities or personal finances.

IT IS FURTHER ORDERED that this temporary restraining order will automatically **EXPIRE on October 15, 2019, at 6:00 p.m.** unless it is extended by the court for cause or converted into a preliminary injunction.

IT IS FURTHER ORDERED that the Commission is directed to serve the defendants with summonses and copies of the complaint, all motions, and this order as soon as practicably possible and to thereafter file proof of that service.

IT IS FURTHER ORDERED that the Commission is **not** required to post a bond for security for the issuance of this temporary restraining order.[69]

IT IS FURTHER ORDERED that the motion to temporarily seal this case **[ECF No. 2] is GRANTED.**  This case will remain **SEALED** until the earlier of 6:00 p.m. on October 17, 2019, or the Commission serves defendants as instructed in this order, after which time the court will direct the Clerk of Court to unseal this case without further prior notice.

IT IS FURTHER ORDERED that the Commission's motion to permit government attorneys to practice **[ECF No. 3] is GRANTED.**

---

[69] *See* Fed. R. Civ. P. 65(c); 7 U.S.C. § 13a-1(b).

16

1    IT IS FURTHER ORDERED that the Commission's motion for a preliminary injunction

2 **[ECF No. 6] will be heard** in Courtroom 6D of the Lloyd D. George Federal Courthouse, 333

3 Las Vegas Blvd. So., Las Vegas, Nevada 89101, **at 1:30 p.m. on October 15, 2019.**

4    The Clerk of Court is directed to send an electronic copy of this order to the

5 Commission's attorneys at their listed email addresses.

6    _____

7    U.S. District Judge Jennifer A. Dorsey
    October 3, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

17