JOHN H. GUTKE
Nevada Bar No. 10062
JOHN P. WITUCKI
Nevada Bar No. 10800
**GUTKE LAW GROUP**
552 E. Charleston Blvd.
Las Vegas, Nevada 89104
Phone/Fax: 702.766.1212
jgutke@gutkelaw.com
jwitucki@gutkelaw.com

Attorneys for Defendants
DAVID GILBERT SAFFRON and
CIRCLE SOCIETY, CORP.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　Plaintiff,<br>　v.<br>DAVID GILBERT SAFFRON, a/k/a DAVID GILBERT, and CIRCLE SOCIETY, CORP.,<br><br>　　　　　Defendants, | Case Number 2:19-cv-1697-JAD-DJA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF CFTC'S THIRD MOTION FOR AN ORDER TO SHOW CAUSE AS TO WHY DEFENDANTS SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR VIOLATIONS OF THE COURT'S ASSET FREEZE** |

Defendants David Gilbert Saffron ("Saffron") and Circle Society, Corp. ("Circle Society," and together with Saffron, "Defendants") file this response in opposition to the Commodity Futures Trading Commission's ("CFTC" or "Plaintiff") *Third Motion for an Order to Show Cause as to Why Defendants Should Not Be Held in Civil Contempt for Violations of the Court's Asset Freeze* ("Motion," ECF No. 98).

Plaintiff's Motion should be denied because Defendants have not violated the Court's asset freeze. The CFTC's allegations, as presented and supported by the evidence included with the Motion, do not demonstrate violations of the asset freeze.

1

The CFTC's conclusions regarding Defendants' alleged contempt are not established by the supporting documentation and can best be described as the CFTC's conclusory speculations about the bank accounts presented in the Motion. Simply put, the CFTC has not carried its burden to present clear and convincing evidence required to establish its allegations of Defendants' supposed violation of the Court's asset freeze. Accordingly, Defendants respectfully request that the Motion be denied.

## I. INTRODUCTION

From the outset of this case, the CFTC has relied on vague statements and unsubstantiated conclusions to incorrectly accuse Defendants and non-parties of transferring assets using "straw men" to move funds. This allegation is a common theme, but there has been no evidence to support the allegation.[1] The present Motion identifies four accounts—two owned by third parties and two personal accounts used by Saffron—in a failed attempt to show that transfers from those accounts were made or directed by Saffron as intentional violations of this Court's orders. However, there is no evidence presented to tie the funds in these accounts with frozen funds, nor does the CFTC establish any improper use of funds by Defendants, let alone show any violations of the preliminary injunction order to warrant a contempt finding.

Saffron has used his two personal accounts identified in the Motion to pay everyday expenses and to live on over the past approximately year and a half since entry of injunctive relief in this case. Another account identified in the Motion belongs to an unrelated company that owns and runs a fashion magazine, for which Saffron performed work and earned income in 2020. The final account is a trust account from

---

[1] *See, e.g.*, CFTC's Opposition to Motion to Quash Subpoena (ECF No. 87), in which the CFTC opposed third-party James Damien Scott's motion to quash subpoenas for Mr. Scott's banking records by alleging "the CFTC has strong reason to believe that Scott may be acting as an intermediary to Saffron by accepting, holding, and/or disbursing customer funds on Saffron's behalf." ECF No. 87, at p. 2. Tellingly, even after defeating Mr. Scott's motion and presumably receiving Mr. Scott's banking records, the Motion does not include any such evidence from Mr. Scott's records.

Saffron's former attorney. None of the accounts or transfers identified in the Motion show evidence of a violation of the Court's asset freeze.

Given the broad fishing expedition the CFTC has embarked on to obtain financial records from anyone and everyone with any relation or connection to Saffron (including his deceased father, his stepmother, his stepsiblings, a former employer, former attorneys, and so on), it is telling that the Motion relies only on these four accounts as the only alleged violations of an asset freeze that prevents Saffron from transferring funds, which the CFTC alleges are in excess of $11 million. This is because, as shown below, Defendants have not violated the Court's asset freeze. For these reasons, Defendants respectfully request that the Motion be denied.

## II. BACKGROUND FACTS

### A. Procedural History Relevant to the Motion.

The CFTC filed its Complaint in this matter on September 30, 2019, and immediately sought *ex parte* injunctive relief against Defendants. *See* Complaint, ECF No. 1; *see also* Emergency Motion for Statutory Restraining Order, ECF No. 5. On October 3, 2019, the Court entered an order granting, among other things, a temporary restraining order ("TRO") freezing Defendants' assets. *See* ECF No. 9.

On December 6, 2019, the Court entered an order converting the previously-entered TRO into a preliminary injunction. The Order Granting Motion for Preliminary Injunction ("PI Order") orders that "Saffron's and Circle Society's assets are FROZEN pending trial or further court order." *See* ECF No. 9 at p. 4. The PI Order also states that "[a]ssets obtained after the effective date of this Order are not subject to the terms of this Order unless they are derived from or related to the activities alleged in the Complaint." *Id*.

On October 7, 2020, the CFTC filed a motion for leave to issue third-party subpoenas to certain financial institutions (the "Subpoena Motion"). *See* ECF No. 79. In its Subpoena Motion, the CFTC argued that it "has reason to believe that certain persons and entities are acting as 'strawmen' to hold and move Defendants' assets, and

3

that there are financial institutions and digital currency exchanges with accounts holding Defendants' assets and/or on which Saffron is a signatory." *Id.*, at p. 4. This Court granted the CFTC's Subpoena Motion on October 29, 2020. *See* ECF 80.

On November 9, 2020, the CFTC filed its notice of intent to serve subpoenas on multiple different financial institutions. *See* Notices of Subpoena Duces Tecum, ECF Nos. 81-83. Among the subpoenas issued, the CFTC requested the production of all of Defendants' financial documents or sought the identity of the account holders of certain accounts, from multiple financial institutions, including American Express (ECF No. 81-1), Wells Fargo Bank (ECF No. 81-5), BitPay, Inc. (ECF No. 82-1), Coinbase, Inc. (ECF No. 82-2), Gemini Trust Company, LLC (ECF No. 82-4); and Uphold HQ, Inc. (ECF No. 82-5). The CFTC also sent subpoenas to multiple financial institutions requesting all records belonging to several third parties, such as Hydra Auctions LLC (subpoena to Comanche National Bank, ECF No. 81-2); Kagel Law and Kinetic Marketing Systems, Inc. (subpoena to JPMorgan Chase, ECF No. 81-3); Hydra Auctions LLC, Alternative Renewable Solutions, and ARS Management LLC (subpoena to NBH Bank, ECF No. 81-4); Runway Beauty, Inc. (subpoena to Wells Fargo Bank, ECF No. 81-5); Bedrock Protection Agency LLC (subpoena to Nevada State Bank, ECF No. 81-6); Alternative Renewable Solutions LLC and Hydra Auctions LLC (subpoena to Comerica Bank, ECF No. 82-3); Alan G. Saffron (subpoena to Bank of America, ECF No. 83-1); Alan G. Saffron (subpoena to Comerica Bank, ECF No. 83-2); Alan G. Saffron (subpoena to PNC Bank, ECF No. 83-5); Vincent Mazzotta (subpoena to FirstView, LLC, ECF No. 83-3); and Sterling Kerr, Vincent Mazzotta, and James Damien Scott (subpoena to JP Morgan Chase Bank, ECF No. 83-4).

Included within this wide net of subpoenas cast by the CFTC, the CFTC sought banking records from Vincent Mazzotta ("Mazotta") (ECF Nos. 81-5, 83-3, and 83-4) and David Kagel, Esq. ("Kagel") (ECF No. 81-3). The Motion focuses on documents

4

obtained from Mazzotta, Kagel, and two recently-established personal accounts used by Saffron.

**B.   Background Facts Surrounding Saffron's Personal Bank Accounts.**

Saffron reviewed the PI Order and it was his understanding that the asset freeze language, coupled with paragraph 2 on Page 4 of the PI Order, meant that while all of Defendants' assets as of December 6, 2019 were frozen, he was allowed to obtain and spend money that he may earn or receive after the PI Order was entered, as long as the money is not "derived from or related to" Circle Society's alleged activities as alleged in this lawsuit. *See* Declaration of David Saffron at ¶ 5, attached hereto as **Exhibit A**. He has operated under the understanding that the PI Order's asset freeze does not prohibit him from continuing to live his life, earn money, receive money in the form of loans or gifts, and spend that money to continue to live his life while this lawsuit is pending and the PI Order is in place. *Id*. at ¶ 6.

Based on that understanding, Saffron has complied with the asset freeze, and Defendants' assets at the time of the PI Order have remained frozen. *Id*. at ¶ 6. Following the PI Order's entry, Saffron opened a bank account at Wells Fargo with the account number xxxx-3959 ("Personal WF Account"). *Id*. at ¶ 7. He opened this account to keep a completely separate account in which to deposit funds to live off of. *Id*. Saffron made an initial deposit of $50 from funds not frozen and not derived from activities related to this lawsuit. *Id*. All of the funds that have ever been deposited into Saffron's Personal WF Account were either from income earned after December 6, 2019 and/or from funds received in the form of gifts or loans, and are completely unrelated to Circle Society or anything alleged in this lawsuit. *Id*.

Saffron funded his Personal WF Account largely with funds disbursed from his late grandfather's estate. *Id*. at ¶ 8. His brother, Adam Saffron, transferred those funds directly into the account, and Saffron has also received payments that were placed into this account from individuals for whom he has done consulting work, in addition to

5

loans from friends. *Id.*

Saffron did not object to the myriad subpoenas in part because he understood the PI Order to mean the CFTC is entitled to his records—which is why he already has provided records to the CFTC and signed a "Consent to Release of Financial Records" at the CFTC's request. In other words, Saffron did not object to the subpoenas in a good faith effort to comply with the PI Order and allow the CFTC to obtain all of Defendants' banking records. *Id.* at ¶ 9.

After the PI Order was entered, Saffron was trying to figure out how he would survive (pay rent, purchase food, cover other living expenses, and so on without violating the PI Order's asset freeze). *Id.* at ¶ 10. He reached out to Kagel for financial assistance, as Kagel has been a friend of the Saffron family for many years and also was Saffron's attorney. *Id.* Since December 2019, Kagel has sent money on various occasions to help pay for Saffron's living expenses. *Id.* The payments from Kagel are loans that Saffron plans to repay when he is able. *Id.*

Among the payments Kagel has advanced to Saffron was a payment sent to the Shumway Van law firm for their prior work as Defendants' attorney in this case, since Defendants had been without an attorney in this case at various times because of the CFTC's repeated threats that Saffron was not able to hire counsel without violating the PI Order. The Motion states, without providing any supporting evidence, that the CFTC has "serious concerns as to whether Defendants have retained [current] counsel [from Gutke Law Group] using assets that have been frozen in violation of the Courts Orders." (ECF No. 98 at p. 7). This concern is unfounded and has been a theme the CFTC continues to use to threaten and/or scare lawyers from being able represent Saffron, who has confirmed in his declaration that he has not utilized any frozen funds to retain counsel. *See* Saffron Decl. at ¶ 17. The Court previously advised Saffron in open court that he is allowed to retain counsel (ECF 68-1) after he said that he understood, based on the CFTC representations, that the asset freeze prevented him

6

from hiring counsel.[2]

In addition to his Personal WF Account, Saffron has also utilized a cryptocurrency-backed debit card called a "BlockCard," issued by a company called Ternio. *See* Saffron Decl. at ¶ 15. All funds deposited into Saffron's BlockCard account came from income earned in 2020 (*i.e.*, after the PI Order was entered) and are completely separate and unrelated to anything to do with Circle Society or the allegations in this lawsuit. *Id*. In February 2021, Saffron tried to use his BlockCard to pay for a routine purchase, when he learned that the card had been disabled/frozen. *Id*. at ¶ 16. He contacted BlockCard and learned that the card was frozen at the CFTC's direction, after the CFTC sent Ternio documents from this proceeding and instructed Ternio to freeze Saffron's funds in the account. *Id*. Saffron had approximately $11,000 in his BlockCard account at the time it was frozen, and he needed those funds to pay rent. *Id*. He has been unable to access these funds since the CFTC instructed Ternio to freeze the account. The CFTC's Motion does not identify any particular charge on either Saffron's Personal WF Account, or on his BlockCard account, which it claims was made with funds that were frozen or tied to Circle Society.

**C.     Saffron's Relationship with Mazzotta and Runway Beauty, Inc.**

As described above, the CFTC's subpoenas included subpoenas to Wells Fargo Bank, JPMorgan Chase Bank, and FirstView LLC, seeking Mazzotta's personal, business, and family financial records. Mazzotta is the CEO, President, and founder of Runway Beauty, Inc., an Arizona Corporation ("Runway"). *See* Mazzotta Declaration at ¶ 3, attached hereto as **Exhibit B** ("Mazzotta Decl."). Runway was created in 1997 and incorporated in 2006 and is a privately owned company with private stock mainly

---

[2] The CFTC's repeated heavy-handedness with defense counsel—threatening any would-be attorney with motions for sanctions, disgorgement of funds, and making immediate accusations of impropriety in an attempt to prevent Defendants from being represented in this matter—has been a recurring theme from the start of the case and will be discussed in further detail in a forthcoming motion that Defendants will request to be heard at the time of the hearing on the present Motion.

7

owned by the Mazzotta Trust and several smaller investors. *Id*. at ¶ 4. Runway's business operations include publishing a magazine and producing a TV channel. *Id*. at ¶ 5.

Mazzotta and Saffron have known each other since 2012. *See* Saffron Decl. at ¶ 11; Mazzotta Decl. at ¶ 9. Saffron was introduced to Mazzotta as a salesperson who could help Runway increase its revenue, and that in the time since the two met, Runway has employed Saffron as an independent contractor to serve as a business advisor and to work as an advertising sales representative. *See* Mazzotta Decl. at ¶ 9. Saffron has advised Runway on where it could find advertisers, and he has introduced Runway to many top-end clothing advertisers. *Id*. From 2017 through 2019, Mazzotta barely saw Saffron, and the two very rarely interacted with each other during those years. *Id*. at ¶ 10.

Mazzotta learned at the end of 2019 that Saffron was having issues with his own business stemming from this civil lawsuit, in which the TRO and PI Order froze all of Saffron's assets associated with his business. *Id*. at ¶ 11. Because of the lawsuit and its asset freeze, Saffron was looking for opportunities to earn income to pay living expenses. *See* Saffron Decl. at ¶ 11; Mazzotta Decl. at ¶ 12. Mazzotta gave Saffron work as a full-time advertising representative in charge of sales, because Saffron had always shown great concern for Mazzotta and Runway, and had been a valuable sales representative and friend. *See* Mazzotta Decl. at ¶ 11. Because Saffron was good at introducing potential clients and advertisers, Mazzotta decided to hire him again and gave him a lot of responsibility, placing him in charge of all of Runway's in-house leads. Mazzotta further asked Saffron to travel to out-of-town client meetings because Mazzotta has certain health problems that prevent him from traveling. *Id*. at ¶ 12.

Saffron was given a company debit card to allow make charges from Runway's Wells Fargo checking account ("Runway WF Account"), allowing him to operate in his new full-time advertising sales role and pay for business expenses, such as entertaining potential clients, meals, travel, and related expenditures. *Id*. at ¶ 13. Some of the ads

Runway sells can cost as much as $25,000 to $30,000 for a single ad, thus at times significant amounts were spent to land these lucrative contracts. *Id*. Again, Runway provided Saffron with a company debit card so he could pay for business expenses, and Saffron was added as a signatory on the account due to Wells Fargo's policy pertaining to card holders. *Id*. at ¶ 14; Saffron Decl. at ¶ 12

Saffron's work for Runway in 2020 was as an independent contractor, and he earned a positive income and was issued an IRS Form 1099 by Runway. *Id*. at ¶ 15; *see also* Saffron's 1099 from Runway, attached hereto as Exhibit B-1. Mazzotta denies the CFTC's allegation that Saffron has used him to move assets related to Circle Society, stating that the "allegation is simply not true and is completely unsupported by my financial records as well as Runway's. Again, while David and I have had financial transactions together stemming from his role with Runway, no part of David's cryptocurrency business ever involved me or Runway." *Id*. at ¶ 18.

Mazzotta found out about the subpoenas when Wells Fargo and Chase contacted him, as the CFTC never served the subpoenas to him. *Id*. at ¶ 19; *see also* Bank Letters attached as Exhibit 2 to Mazzotta Decl. When Mazzotta's banks informed him of the subpoenas, he was very upset and felt that the subpoenas were overbroad and an improper invasion of his privacy. *Id*. He even retained a lawyer in Las Vegas to attempt to quash the subpoenas, but ultimately decided that the cost of fighting the subpoenas was not worth the expense and he did not object because he believed that nothing in the records were of any concern to this lawsuit. *Id*. The records the CFTC subpoenaed related to Mazzotta included not only the Runway accounts attached to the CFTC's Motion, but also included his mother Catherine Mazzotta's trust account on which he is a beneficiary and the account of his photography agency, FirstView LLC, which has nothing to do with Saffron or Circle Society. *Id*.

**C.     Financial records from Saffron's former attorney, David Kagel.**

The CFTC's subpoenas also included a subpoena requesting financial records from Kagel, who is an attorney licensed in California and has served as Saffron's

9

counsel over the course of many years. *See* Declaration of David Kagel, Esq. ("Kagel Decl."), attached hereto as **Exhibit C**. Kagel never received a copy of the subpoena seeking his personal and business banking records and did not have an opportunity to object to it, but claims he would have objected because it is extremely overbroad, improper, and infringes on attorney-client privileges as to his client trust account. *See* Kagel Decl. at ¶ 5. Kagel was appalled to see that not only did the CFTC obtain his IOLTA account, but the CFTC has divulged attorney-client privileges by publicly filing unredacted banking records from Kagel's law firm's IOLTA account. *Id*. at ¶ 5; *see also* Kagel's unredacted IOLTA Trust Account records attached to Malas Decl. (ECF No. 98-1, Ex. B). In response to the CFTC's allegation that Kagel is "moving funds for Saffron" and that deposits from Kagel into Saffron's account were in violation of the PI Order, Kagel states that these allegations are categorically untrue. *See* Kagel Decl. at ¶ 13.

Kagel is a long-time friend of Saffron's family and has known Saffron for over twenty years. *Id*. at 10. Before Saffron's grandfather passed away, he asked Kagel if Kagel would assist Saffron if he ever needed help, and Kagel said he would. *Id*. When Kagel learned that Saffron was being sued in this civil matter by the CFTC and his assets were frozen, he agreed to provide financial assistance to Saffron. *Id*. at 11. All of the deposits shown in the bank records from Kagel were from his own funds (*i.e.*, not derived from Defendants' business) and Kagel has advanced funds to Saffron as a loan to be repaid when Saffron is able. *Id*. Kagel advanced money to pay for Saffron's prior attorneys, Shumway Van. *Id*. Kagel states in his declaration that if Saffron is never able to pay him back, then the advances will have been gifts, but he trusts Saffron and knows that he will repay the loans when Saffron is no longer constrained by this lawsuit and the asset freeze.

**III.   ARGUMENT**

**A.   Legal Standard for Orders to Show Cause and Civil Contempt.**

A party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by "clear and convincing evidence," not merely by a

10

preponderance of the evidence. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993), citing *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982). Further, a party should not be held in contempt for alleged disobedience with a court order if the party's action "appears to be based on a good faith and reasonable interpretation of the [court's order]." *Vertex*, 689 F.2d at 889. "Substantial compliance" with the court order is a defense to civil contempt and is not vitiated by "a few technical violations" where reasonable efforts have been made to comply." *Id.* at 891.

**B.    CFTC's Motion Does Not Establish Any Violation of the Court's Order.**

The Motion alleges that Saffron violated the asset freeze contained in the PI Order (ECF No. 6)[3] entered in this matter in the following three[4] ways: (1) Receiving money into his personal Wells Fargo account[5]; (2) Transferring funds into, and receiving payments from, the Runway WF Account[6]; and (3) Using a personal digital currency account to make day to day purchases.[7]

To support these allegations, the CFTC relies on the Supplemental Declaration of George H. Malas ("Malas Declaration," ECF No. 98-1). However, while the Malas Declaration claims the documents he reviewed in his investigation reveal "numerous violations of the Court's asset freeze," this conclusion is supported only by hearsay and vague references to information the CFTC "has obtained." The allegations amounts to nothing more than the CFTC's interpretation of the records it reviewed. However, the

---

[3] While the Motion points to language contained in the Order Granting Temporary Restraining Order ("TRO," ECF No. 9) as well as in the Order Granting Preliminary Injunction ("PI Order," ECF No. 31), only the PI Order is at issue, as the TRO expired and was converted to the PI Order.

[4] Although the Malas Declaration attached records from the four accounts identified earlier in this Opposition, the Motion itself focuses only on the three listed here.

[5] *See* Motion at p. 4.

[6] *See* Motion at p. 5.

[7] *See* Motion at p. 6.

1  CFTC did not even attach all of the records which it claims support its conclusions.
2  Instead, it chose to have Mr. Malas testify as to what the documents supposedly show
3  and stated that the documents "can be made available for review upon request." See
4  Malas Declaration (ECF 98-1) at footnotes 1, 2, 4, and 8. When Defendants' counsel
5  requested copies of the documents for review in preparation for this Opposition,
6  Plaintiff's counsel responded with fury, questioning Defendants' counsel's "temerity to
7  demand records from the Commission." Plaintiff's counsel further stated that it was
8  "disingenuous at best" for Defendants' counsel to request the records, which are
9  clearly needed for the Defendants' to fully brief this Opposition and prepare for the
10 upcoming hearing on the Motion, and advised that the CFTC is not obligated to
11 exchange records because there has been no Rule 26 conference in this case. *See*
12 Declaration of John Gutke, attached hereto as **Exhibit D**, and the emails between
13 counsel attached thereto as Exhibit D-1. While the CFTC's counsel eventually stated
14 that the documents supporting the Motion would be uploaded five days after the
15 request, to be received by Defendants' counsel on March 1, 2021 (the day before this
16 Opposition was due), the link provided on March 1 contained no documents, only an
17 empty folder. *Id*. Defendants thus did not receive any of the documents cited and relied
18 on by the CFTC in its Motion, despite counsel's request.

19  A party seeking a civil contempt order carries the burden to establish the need
20 for such a drastic sanction by clear and convincing evidence. *Vertex*, 689 F.2d at 885.
21 Here, the CFTC has not provided documents to support the conclusions reached in the
22 Malas Declaration, nor have they even alleged specifically which transactions, if any,
23 represent the improper use of frozen assets. Because the CFTC has not carried its
24 burden of establishing its allegations by *any* evidence related to the accounts at issue,
25 let alone by clear and convincing evidence, its Motion should be denied.
26 . . .
27 . . .
28

### 1. Saffron's use of his Wells Fargo bank account is not a violation of the Preliminary Injunction.

The CFTC alleges that Saffron's bank accounts show he has violated the PI Order's asset freeze. Motion at 4-5. The documents attached to the Motion show that Saffron opened his Personal WF Account on December 8, 2019—after the Preliminary Injunction was entered. *See* ECF 98-2 at p. 3. Saffron did this to ensure compliance with the PI Order; he wanted to have a separate account where funds received after the PI Order could be deposited and he could have a new account from which to pay day-to-day living expenses. *See* Saffron Decl. at ¶¶ 7-8. He opened the account with a mere $50 deposit, and a few months later received a deposit from his brother, which was a disbursement from their deceased grandfather's estate. *Id*. He also received deposits from David Kagel, as described above, in various amounts. These funds were loaned by Kagel to help Saffron have funds to pay rent and other living expenses. *Id*. at ¶ 14.

As much as the CFTC apparently wants Saffron to be unable to pay for basic living expenses, be unable to hire counsel, and be unable to purchase *anything*, simply using a personal checking account is **not a violation of this Court's orders**. The Motion appears to take the position that any use of money *at all* by Saffron is, per se, a violation of the Court's orders and a flagrant display of disobedience by Saffron. However, the PI Order is clear: it does not apply to assets obtained after the effective date of the order, *unless* derived from activities alleged in the Complaint. Here, it is undisputed that the funds spent by Saffron from his Personal WF Account were obtained after the order's effective date—since the account was not even opened before it. Therefore, the CFTC must be arguing that the funds were "derived from" or are "related to" the activities alleged in the Complaint; however, the Motion does not make this clear nor does the CFTC attempt to show why it believes the funds received and spent by Saffron were derived from the previous Circle Society cryptocurrency funds at issue in the Complaint. Accordingly, Saffron's use of his Personal WF Account is not a violation of the PI Order and provides no basis for a contempt charge.

### 2. Runway Beauty's payments to Saffron are not violations of the Preliminary Injunction.

The CFTC next argues Saffron's use of Runway's Wells Fargo Account is also a violation of the PI Order. Similarly, however, the CFTC's evidence in support of this claim falls far short of the clear and convincing standard required for a finding of contempt. As with the "evidence" presented with regard to Saffron's personal account, the evidence related to the Runway WF Account is limited only to hearsay testimony from Mr. Malas regarding his interpretation and opinions of what the statements show. The bank records themselves were not submitted, and even had they been submitted there is no allegation that the funds spent from the Runway WF Account were either frozen by the PI Order or were derived from funds that were frozen.

Runway is a separate entity for which Saffron has performed work and received income. The funds going into and out of Runway's bank account are not uncommon for the amount of revenue generated by a company like Runway. While the Malas Declaration attempts to testify as to the documents, which were not attached and not provided to Defendants' counsel, his interpretation or opinion of the bank records and what they say is not admissible evidence. Further, even if some of the entries allegedly shown in the bank accounts[8] relate to Saffron or were deposited for Saffron's use (rather than for Runway), this is not evidence that said funds came from sources that were frozen, nor is it evidence that said funds were derived from activities at issue in this case. The CFTC would have to show these conditions to be present in order to establish a violation of the Court's asset freeze order. However, it has not alleged that

---

[8] Again, it is important to note that the CFTC has not provided these documents to Defendants' counsel, and omitted detailed statements from the Motion—instead relying only on Mr. Malas' declaration as evidence of what the documents say. Offering Mr. Malas' statements to prove the truth of what is allegedly in the documents is hearsay, and also violates the best evidence rule. If the CFTC withheld the documents with the intent to sandbag Defendants with additional evidence in reply or at the hearing, such gamesmanship should not be allowed and any new evidence the CFTC may attempt to submit after the fact should be stricken.

these conditions exist. Instead, it argues that Saffron's use of the Runway WF Account is, per se, a violation of the PI Order (which it is not). Accordingly, Plaintiff has not carried its burden to show that a show cause order should issue.

> **3. Saffron's use of his BlockCard account to pay his everyday expenses is not a violation of the PI Order, and the CFTC's oppressive action of freezing the account and depriving Mr. Saffron from being able to use his own funds was an abuse of its authority.**

The last account identified in the Motion as evidence of Saffron's supposed violation of the PI Order's asset freeze is Saffron's BlockCard account, issued by Ternio. In addition to his Personal WF Account, Saffron has also utilized a cryptocurrenty-backed debit card called a BlockCard, to pay for everyday expenses including rent, food, and random everyday expenses. *See* Ex. A, Saffron Decl., at ¶ 15.

The CFTC's inclusion of Saffron's BlockCard in this Motion is particularly egregious because there is absolutely no evidence provided to show how the CFTC has formed its "information and belief" that Saffron is using this account "to accept, hold, and/or disperse customer funds." *See* Motion at p. 6. No account records were attached, no details were provided, and the CFTC does not explain how it "became aware of information revealing a digital currency account at Ternio in Saffron's name" nor does it even attempt to argue that the funds in Saffron's BlockCard account were derived from previously-frozen funds.

The CFTC's evidence to support its allegation relating to the BlockCard account says that it "obtained information during the course of its litigation that revealed a digital currency account held at [Ternio] in Saffron's name", with no mention of what that information was or where it came from. Malas Decl., 98-1 at ¶ 12. The Malas Declaration continues: "[b]ased upon my discussions with Ternio's Compliance Officer, it appears that Saffron *may be* accepting, holding, *and/or* dispersing customer funds via his Ternio digital currency account." *Id*. (emphasis added). In other words, the testimony is hearsay (based on discussions with third parties, offered for the truth

15

of what the third party said) as well as speculative and equivocal ("may be").

This unsubstantiated, presumptuous, and speculative "evidence" falls well short of the high clear and convincing standard needed to establish contempt, and thus cannot form the basis for issuance of an order to show cause against Saffron. Yet, based on this speculation, the CFTC jumped straight to the conclusion that Saffron's use of the account was a violation of the PI Order and sent the PI Order to Ternio with a demand that Ternio freeze Saffron's account. *See* Malas Decl., 98-1 at ¶¶ 12-13. This type of self-help action, without any notice to Defendants' counsel or authorization from the Court, is an abuse of the CFTC's governmental powers and caused Saffron to be unable to make purchases with personal funds he rightfully should be able to spend. Defendants respectfully request that this Court issue an order advising Ternio that the BlockCard has not been ordered frozen, and issue sanctions against the CFTC for its deliberate interference with Saffron's ability to live his life while this litigation is pending.

**C.    The CFTC's Repeated Request to Incarcerate Saffron is Draconian and is Neither Warranted nor Appropriate Under the Prevailing Law.**

The Motion rehashes CFTC's ongoing arguments attempting to have the Court order Saffron's incarceration. *See* Motion at p. 10. Even if the Court concludes that the Motion's scant evidence of alleged violations of the asset freeze merits relief, the proper remedy for the CFTC's Motion is the issuance of an order to show cause, and a show cause hearing at which time Defendants would have the opportunity to present evidence in defense of the request for a contempt finding. But holding to its form of wanting to skip over formalities like evidence, due process, and affording Defendants the opportunity to defend the claims and refute its allegations, the CFTC again demands incarceration—as it has requested many times previously.

Defendants have briefed the issue of incarceration as a form of punishment for alleged contempt of court in their previously-filed Opposition to the CFTC's Motion for Additional Sanctions (ECF No. 68), which Defendants incorporate by reference herein.

16

As will be further demonstrated in Defendants' forthcoming motion(s), Defendants have substantially complied with prior orders to the best of their ability, have been thwarted from complying further by the CFTC's rejection of Defendants' attempts to provide additional documents, and have been denied effective assistance of counsel in large part due to CFTC's menacing threats toward counsel and would-be counsel. Furthermore, incarceration is a punitive, drastic remedy and would not coerce compliance with the items the CFTC claims have not been complied with.[9]

The CFTC's legal authorities cited in the Motion in support of its request for incarceration are flawed or misleading. In particular, the CFTC cites to *In re Dyer*, 322 F.3d 1178, 1192 (9th Cir. 2003) to support the argument that "civil contempt sanctions must be either 'compensatory or designed to coerce compliance' and may include incarceration." This statement is misleading; the Ninth Circuit does not mention incarceration (or any form of imprisonment, jailing, etc.) whatsoever in its *Dyer* opinion.

The CFTC relies on *Shillitani v. United States*, 384 U.S. 365, 370-72 (1966) for the proposition that "Incarceration under a civil contempt order pending compliance with court orders is clearly within the Court's authority." Motion at 11. However, in *Shillitani*, a witness was imprisoned for repeatedly refusing to testify before a grand jury. *Shillitani*, 384 U.S. at 370-72. That is not remotely the case we have here with Saffron and the alleged compliance that the CFTC ostensibly wants to coerce.

Given the history and posture of the case, Saffron's incarceration is draconian, unnecessary, uncalled for, and not supported by the case law relied on in the Motion.

---

[9] The significant fines that the CFTC repeatedly demands to be paid are already sufficiently punitive and more than coercive. A forthcoming motion will address the pending compliance fine; but suffice it to say for now that regardless of Defendants' production of documents and records, the CFTC has demonstrated clearly that it will never be satisfied and will continue to demand fines and incarceration; thus necessitating the Court's clarification and, if necessary, relief from fines so that Defendants can bring themselves into compliance.

17

## IV. CONCLUSION

For all the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion.

Dated: March 2, 2021.

                                      **GUTKE LAW GROUP, PLLC**

                                      */s/ John H. Gutke*
                                      JOHN H. GUTKE, ESQ.
                                      JOHN P. WITUCKI, ESQ.
                                      552 E. Charleston Blvd.
                                      Las Vegas, Nevada 89104

                                      Attorneys for Defendants
                                      DAVID GILBERT SAFFRON and
                                      CIRCLE SOCIETY, CORP.

GUTKE LAW GROUP
552 E. Charleston Blvd.
Las Vegas, Nevada 89104

18

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March 2021, the foregoing **Defendants' Opposition to Plaintiff CFTC's Third Motion for an Order to Show Cause as to Why Defendants Should Not be Held in Civil Contempt for Violation of the Court's Asset Freeze** was electronically served on the counsel of record listed below, and on any other individuals registered to receive electronic service in this matter, by filing this document with the Clerk of Court using the CM/ECF system.

Danielle E. Karst
Timothy J. Mulreany
Commodities Futures Trading Commission
1155 21st Street NW
Washington, D.C. 20581
*Attorneys for Plaintiff*

/s/ John Gutke
An employee of Gutke Law Group