Danielle E. Karst (D.C. Bar No. 481881)
Timothy J. Mulreany (Maryland Bar No. 8812160123)
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:   (202) 418-6158 (Karst)
Telephone:   (202) 418-5306 (Mulreany)
Facsimile:   (202) 418-5523
dkarst@cftc.gov
tmulreany@cftc.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAVID GILBERT SAFFRON<br>a/k/a DAVID GILBERT and<br>CIRCLE SOCIETY, CORP.,<br><br>Defendants. | Case No.  2:19-cv-1697-JAD-DJA<br><br>**PLAINTIFF CFTC'S REPLY MEMORANDUM IN SUPPORT OF THIRD MOTION FOR AN ORDER TO SHOW CAUSE AS TO WHY DEFENDANTS SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR VIOLATIONS OF THE COURT'S ASSET FREEZE** |

Plaintiff Commodity Futures Trading Commission ("Plaintiff" or "CFTC") hereby submits the following Reply Memorandum in support of its Third Motion for an Order to Show Cause as to Why Defendants Should Not Be Held in Civil Contempt for Violations of the Court's Asset Freeze, filed on February 16, 2021 ("CFTC's Show Cause Motion III," or "Motion," ECF No. 98).

**I.   INTRODUCTION**

Defendants' Opposition to the CFTC's Show Cause Motion III ("Opposition," ECF No. 101) fails to address their failure to simply comply with the Court's orders since this matter was filed in September, 2019; rather, the Opposition provides extraneous and irrelevant arguments and focuses on grievances unrelated to Defendants' asset freeze violations outlined by the CFTC.

Defendants want to have it both ways, claiming both that they have "substantially complied" with the Court's prior orders and blaming the CFTC for their own refusals to comply. Had Defendants obeyed the Court's multiple, previous orders requiring production of all of Defendants' business records and an accounting of their assets, the CFTC would not have needed to seek and obtain leave of court to issue third-party subpoenas in an attempt to locate Defendants' financial records. In their Opposition, Defendants do not dispute that they spent nearly $800,000 in funds from Saffron's Wells Fargo Bank account, Runway Beauty's Wells Fargo Account, and Saffron's digital currency account at Ternio. Although Defendants have no known source of lawful income, Defendants claim that the spent funds were derived from approximately $200,000 of income earned after entry of the December 6, 2019 Order of Preliminary Injunction ("PI Order," ECF No. 31), with the remaining $600,000 attributed to "gifts" or "loans." *See* Opp. at 5.

In support of their claims, Defendants offer only self-serving, defective declarations with false and questionable claims, including from Saffron, Saffron's business associate Vincent Mazzotta a/k/a "Vincent Midnight," and attorney David Kagel as discussed in more detail below. Notably, Defendants fail to advise the Court of pertinent facts and fail to provide any loan agreements or gift tax returns in support of their claims. The Court should reject Defendants' claims and excuses in their Opposition and enforce the asset freeze in order to preserve the Court's ability to grant effective final relief to defrauded customers.

## II.     ARGUMENT

### A.     Defendants Do Not Dispute Spending the Funds as Outlined by the CFTC

Defendants violated the Court's asset freeze to the tune of at least $796,910 since the asset freeze was first imposed pursuant to the October 3, 2019 Temporary Restraining Order

(ECF No. 9) over seventeen months ago.[1] Defendants do not dispute that they transferred or disposed of $796,910 in funds from Saffron's Wells Fargo Bank account, Runway Beauty's Wells Fargo Account, and Saffron's digital currency account at Ternio. *See* Opp. at 13-16. Defendants offer a variety of vague and unsubstantiated arguments as to why the transfer of funds from these accounts did not violate the asset freeze, including that the spent funds were derived from income earned after the PI Order, were "gifts" or "loans" from friends or attorney David Kagel, and/or "were separate and unrelated to anything to do with Circle Society or the allegations in this lawsuit." *See* Opp. at 5-9. Given Defendants' past false statements to this Court, is it respectfully suggested that the representations concerning "gifts," "loans" and purported employment are equally unbelievable.

### B. The Declarations Provided by Defendants Contain False Claims and Omit Pertinent Facts

**1. Saffron**

In his declaration submitted with Defendants' Opposition, Saffron broadly declares that he has "complied with the asset freeze at all times, as all of [his] assets and Circle Society's assets have been frozen since the date of the Court's initial Temporary Restraining Order and subsequent PI Order." Saffron Decl. ¶ 6 (ECF No. 101-1). After the CFTC raised the issue of Defendants' asset freeze violations with the Court, Saffron conveniently claims that the funds he received and spent are "*either from income earned after December 6, 2019 and/or from funds received in the form of gifts or loans, and are completely unrelated to Circle Society or*

---

[1] Defendants attempt to ignore their TRO violations by arguing that the TRO "expired" and only the "PI Order is at issue." Opp. at 11. However, the fact of the matter is that the Court converted the TRO to a PI Order on December 6, 2019, and "the PI Order continued the asset freeze imposed by the TRO." *See* Civil Contempt Order at 3 (ECF No. 51).

3

*anything alleged in the lawsuit*." Saffron Decl. ¶ 7 (emphasis added). Tellingly, Saffron provides no loan agreements or gift tax forms showing any evidence of loans or gifts. No tax returns are offered showing Saffron reported any income for calendar years 2019 or 2020. Saffron also makes a number of false claims in his declaration, including that "the CFTC indicated I was not able to hire counsel without violating the PI Order," (*Id.* ¶ 14),[2] and "the CFTC instructed BlockCard to freeze the account" (*Id.* ¶ 16).[3] Saffron's claims, similar to his previous "excuses and promises" to produce documents as ordered by the Court, are unbelievable & should be ignored. *See* Civil Contempt Order at 1, 4 (ECF No. 51).

### 2. Attorney David Kagel

**Declaration**

David Kagel's declaration similarly contains false claims and omits important information. Kagel, an attorney licensed to practice law in California, has twice been suspended by the California Bar and permanently barred from practicing before the Securities and Exchange Commission. *See* Certified David Kagel disciplinary records by State Bar of Cal., submitted herewith as Exhibit 1;[4] *In the Matter of David L. Kagel*, S.E.C. Release No. 34-34680,

---

[2] At no time has the CFTC provided Saffron with any legal advice. As set forth in previous court filings and raised with the Court, the CFTC asked Defendants' counsel to identify the source of his fees and communicated its position that Defendants needed to make an application for a carve-out from the asset freeze prior to retaining counsel. *See, e.g.,* CFTC's Show Cause Motion III at 7 (ECF No. 98).

[3] The CFTC did not "instruct" Ternio or any financial institution to freeze any of Defendants' accounts. The CFTC provided Ternio, a global fintech company where Saffron holds a personal digital currency account, with a copy of the Court's PI Order. Malas Decl. V. ¶ 13 (ECF No. 98-1).

[4] *In re David Kagel on Discipline*, Supreme Court of Cal., State Bar Court Case No. 94-J-18858, March 31, 1997 (ordering suspension in connection with violations of Securities Act and Securities Exchange Act); *In re David L. Kagel on Discipline*, Supreme Court of Cal.,

4

57 S.E.C. Docket 1593, 1994 WL 526716 (Sept. 16, 1994). Kagel's claims of providing "loans" or "gifts" to Saffron are unsubstantiated by any loan agreements or gift tax forms. As Kagel's "gifts" to Saffron exceeded $15,000, it appears as though Kagel was required to report them to the Internal Revenue Service on IRS-Form 709.[5] In his declaration, Kagel does not dispute providing funds to Saffron's former counsel at the Shumway Van firm. *See* Kagel Decl. ¶ 11 (ECF No. 101-3); Malas Decl. V. ¶ 7d (ECF No. 98-1).[6] Kagel characterizes his transfer of funds to Saffron's former counsel as a "loan to be repaid later," or alternatively as a "gift" in the event Saffron is unable to pay him back. *See id*.

Most significantly, Kagel's claim that he has "never been involved with Circle Society or any other aspect [sic] Mr. Saffron's Bitcoin business" is demonstrably false. Kagel Decl. ¶ 12. In January 2018, Kagel sent a letter on Kagel Law letterhead to a number of victims of Defendants' fraud in which Kagel claimed, in relevant part:

> ***In order to assure that your deposit will be returned in the event that Mr. Saffron is unable or unwilling to do so he has deposited at least one thousand bitcoin in a wallet to which he has given us access. He has agreed to at all times maintain the deposit in the wallet and given this firm unrestricted access to it***. If you have not received the return of your deposit from Mr. Saffron following ten business days' notice to him with a copy to us, upon five business days' notice to us we will return your deposit from the aforementioned wallet.

---

State Bar Court No. 09-O-15403, March 12, 2012 (ordering suspension in connection with client trust account).

[5] *See* IRS Instructions for Form 709, available at https://www.irs.gov/instructions/i709.

[6] The CFTC apologizes for causing any discomfort in failing to redact certain items from the corporate JP Morgan Chase bank account records in the name of Kagel Law, A Professional Corporation, Exhibit B to Malas Decl. V. (ECF No. 98-3). As soon as the CFTC learned of the unredacted items as discussed in Defs.' Opp. (ECF No. 101), the CFTC immediately contacted the Clerk's Office to request restriction of the public viewing of the initially-filed Exhibit B. Thereafter, the CFTC promptly re-filed the corrected exhibit with the proper redactions. *See* CFTC's Notice of Corrected Image, ECF No. 103.

*See* Letter from David L. Kagel dated Jan. 7, 2018 ("Letter"), attached as Exhibit 2 (emphasis added).[7] Despite Kagel's representation of having "unrestricted access" to at least 1,000 Bitcoin in a wallet and promising to return customers' deposits, the majority of Defendants' customers have been unable to obtain a return of any of their funds. *See, e.g.,* Compl. ¶ 41 (ECF No. 1).

When the CFTC took Mr. Kagel's sworn investigative testimony, he admitted the Letter to Defendants' customers was his and that he never even attempted to access the wallet purportedly holding the Bitcoin. *See* CFTC Transcript of David Kagel's Testimony, Feb. 28, 2019 at 24:10-25; 51:6-14. The CFTC asked Kagel further questions about the Letter—the Letter he wrote and sent to third-party customers who were not his clients—but he refused to answer based on the grounds of attorney-client privilege and ultimately invoked his Fifth Amendment privilege against self-incrimination. The CFTC requests that the Court draw an adverse inference from Kagel's assertion of his Fifth Amendment privilege to the CFTC's questions and attach no credibility to his declaration in which he falsely claims he has never been involved with any aspect of Saffron's Bitcoin business. *See Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976) (stating "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

**Subpoenaed Records**

Kagel complains that he never received a copy of the subpoena "seeking his personal and business banking records and did not have an opportunity to object to it." Opp. at 10 (ECF No. 101); Kagel Decl. ¶ 5 (ECF No. 101-3). The CFTC subpoenaed corporate records for Kagel Law directly from JP Morgan Chase Bank and did not subpoena Kagel's personal records. Corporate

---

[7] The CFTC is aware of this same Letter from David Kagel being sent to at least eighteen of Defendants' customers.

accounts are not protected under the Right to Financial Privacy Act ("RFPA") because a corporation is not a customer as defined under the statute. RFPA, 12 U.S.C. § 3401(4)-(5); *United States v. Daccarett*, 6 F.3d 37, 51 (2d Cir. 1993). As the CFTC sought corporate account records in the name of Kagel Law, it was not required to serve notice on the corporate account holder.

### 3. Vincent Mazzotta

**Declaration**

The representations in Vincent Mazzotta's declaration (ECF No. 101-2) are facially false and/or defective. Mazzotta claims that he re-hired Saffron sometime at the end of 2019 or 2020 to work as a "full-time advertising representative in charge of sales" for his fashion magazine. Mazzotta Decl. ¶¶ 11, 15. Mazzotta does not dispute that he added Saffron as a signatory on Runway Beauty's Wells Fargo account and represents that he did so in order to get Saffron a "company debit card" in his name. Mazzotta Decl. ¶ 14. However, Mazzotta added Saffron as a signatory on the account on July 24, 2019, which is prior to the time of Mazzotta's purported re-hiring of Saffron at the end of 2019 or 2020. *See* Malas Decl. V. ¶ 9(b) (ECF No. 98-1); Runway Beauty's Wells Fargo account addendum documents, SDKD-WFB-7 (Exhibit C to Malas Decl. V, ECF No. 98-4). Mazzotta represents that Saffron's "work for Runway in 2020 was as an independent contractor, and was full time, so he earned a positive income and was issued an IRS Form 1099 for the income earned." Mazzotta Decl. ¶ 15. Mazzotta attaches a questionable IRS Form 1099 for 2020, which reports "Other Income" paid by Runway Beauty to Saffron in the amount of $203,411.00. *See* Exhibit B-1 to Mazzotta Decl. (ECF No. 101-2).

More significantly, Mazzotta declares that "while David and I have had financial transactions together stemming from his role with Runway, ***no part of David's cryptocurrency***

7

*business ever involved me or Runway*." Mazzotta Decl. ¶ 18 (emphasis added). According to Saffron's own Excel file of customer names produced to the CFTC in February 2020 (the sole document ever produced by Defendants), "Vincent Midnight," with the email address of "ceo@runway.net," and "Caterina Mazzotta" are or were customers of Defendants. *See* CFTC's Mot. for Additional Sanctions at 5 (ECF No. 62) (describing Excel file provided by Saffron on Feb. 28, 2020). Conveniently, Mazzotta fails to advise the Court that Saffron and Mazzotta developed and launched a virtual coin together, named "RunwayCoin," which was touted in Runway Beauty's and RunwayCoin's advertisements and social media posts. *See* Runway Beauty magazine, RunwayCoin website and Facebook page excerpts, submitted herewith as Exhibit 3. Mazzotta's declaration also fails to explain certain deposits to and withdrawals from Runway Beauty's Wells Fargo account involving Saffron, including why Kagel Law deposited $120,000 into the account,[8] or why a total of nearly $49,000 was transferred out of the account to Saffron's mother and father.[9] *See* Malas Decl. V. ¶¶ 10-11 (ECF No. 98-1). Kagel similarly fails to address these transfers to Runway Beauty.

**Subpoenaed Records**

Finally, Mazzotta makes certain claims regarding the CFTC's subpoenas. Mazzotta Decl. ¶ 19. The CFTC subpoenaed the corporate records of Runway Beauty from Wells Fargo, and it was not required to serve notice on the corporate account holder because corporate accounts are

---

[8] Based on Runway Beauty's Wells Fargo account records, Kagel Law deposited a total of $120,000 into Runway Beauty's Wells Fargo account during the period of May 27, 2020 to July 28, 2020 ($30,000 on May 27. 2020; $40,000 on July 22-24, 2020; $50,000 on July 27-28, 2020). Malas Decl. V. ¶ 10 (ECF No. 98-1).

[9] Based on Runway Beauty's Wells Fargo account records, a total of $36,980.00 was transferred to Alan Saffron on October 3, 9, 11, and 29, 2019, and a total of $11,999.99 was transferred to Genevieve Saffron on February 13, 2020 and March 10, 2020. Malas Decl. V. ¶ 11 (ECF No. 98-1).

not protected under the RFPA as discussed above. *See* 12 U.S.C. § 3401(4)-(5). The CFTC also issued RFPA subpoenas to JP Morgan Chase Bank ("JPMC") and FirstView, LLC ("FirstView") for two personal accounts in the name of Mazzotta (account ****0259 at JPMC and ****9979 at FirstView). Although the CFTC attempted to personally serve Mazzotta in Arizona and California with these JPMC and FirstView subpoenas and provide him with proper notice and all of the required RFPA materials, the CFTC was unable to achieve personal service on him. As a result, the CFTC did not provide JPMC or FirstView with the certificates of compliance required for them to release the records.

The requirement of a certificate of compliance prior to release of the records by JPMC and/or First View was highlighted in the cover letter the CFTC sent to JPMC with its RFPA subpoena stating in relevant part that the RFPA "*prohibits you from releasing these records to the CFTC until we have furnished you with a certificate of compliance with that Act, which you will receive when the requirements of the applicable provisions of RFPA have been satisfied.*" *See* CFTC Letter to JPMC dated Nov. 9, 2020, submitted herewith as Exhibit 4 (emphasis added). The CFTC subsequently alerted JPMC as to its inability to serve Mazzotta with the subpoena and RFPA materials. *See* Email from CFTC to JPMC dated Nov. 19, 2020, submitted herewith as Exhibit 5. Despite these communications with JPMC and the lack of certificate of compliance, JPMC inadvertently produced records for Mazzotta's personal JPMC accounts, including a joint account with Catherine Mazzotta which the CFTC was neither aware of nor requested records for. As JPMC produced Mazzotta's records as part of a larger production of over 2,000 pages, the CFTC was unaware it had obtained these specific JPMC records until after researching the issue once it was raised by Mazzotta in his declaration. The CFTC is in the

process of destroying the JPMC records and did not rely upon or cite to any of these records in its Show Cause Motion III.

Similarly, the CFTC provided a cover letter to FirstView with its RFPA subpoena stating in relevant part that the RFPA "*prohibits you from releasing these records to the CFTC until we have furnished you with a certificate of compliance with that Act, which you will receive when the requirements of the applicable provisions of RFPA have been satisfied.*"  See CFTC Letter to FirstView dated Nov. 9, 2020, submitted herewith as Exhibit 6 (emphasis added).  Despite the lack of certificate of compliance, FirstView inadvertently produced records for Mazzotta's personal FirstView account.[10]  The CFTC is in the process of destroying the FirstView records and did not rely upon or cite to any of these records in its Show Cause Motion III.

### 4. Defendants' Counsel

Defendants' counsel John Gutke claims that the CFTC did not provide "any of the documents cited by the CFTC in its Motion and requested by [him] on February 24, 2021." Gutke Decl. ¶ 7 (ECF No. 101-4); Opp. at 12.  As discussed below, that is simply false.  Pursuant to defense counsel's request, on March 1, 2021, the CFTC uploaded 506 documents to the CFTC's secure file transfer protocol site ("FTP site") and provided instructions and credentials to counsel for accessing the FTP site.  *See* Email from CFTC to J. Gutke dated March 1, 2021, submitted herewith as Exhibit 7; Declaration of Litigation Support Specialist Tashieka Taylor dated March 9, 2021 ("Taylor Decl.") ¶¶ 6, 10(a), submitted herewith as Exhibit 8.  Mr. Gutke did not notify the CFTC of any issues accessing the documents, and the CFTC only learned of

---

[10] The CFTC understands that there may have been some confusion here because a CFTC investigator followed up on his own with FirstView as to its lack of response to the subpoena and asked FirstView to look into the matter.  The investigator did not recall that the CFTC was unable to effect service of the subpoena on Mazzotta.

his issues upon reviewing Defendants' Opposition on March 3, 2021. *See* Email from CFTC to J. Gutke dated March 3, 2021 (Exhibit 7); Taylor Decl. ¶ 7 (Exhibit 8). On March 3, 2021, the CFTC again reached out to Mr. Gutke, providing the FTP site instructions a second time and asking him to contact the CFTC if he needed assistance accessing the documents. *See* Email from CFTC to J. Gutke dated March 3, 2021 (Exhibit 7). Later on March 3, 2021, Mr. Gutke informed the CFTC he was in fact able to access the files from the FTP site. *See id.* As explained in the attached Taylor Declaration, the CFTC researched the issue and found no record of any external party accessing the FTP site until March 3, 2021. Taylor Decl. ¶ 10 (Exhibit 8); Exhibit A to Taylor Decl. (Exhibit 8). Therefore, counsel's claims regarding the CFTC's failure to provide him with access to documents are false.

Nowhere in his declaration does Mr. Gutke disclose the source and amount of fees paid to him and his firm to represent Defendants as requested by the CFTC on multiple occasions. Given Defendants' propensity to use third parties to move their assets, the CFTC has good cause to believe that Mr. Gutke's fees violate the asset freeze provisions of the Court's PI Order. Mr. Gutke's continued refusal to produce such information is concerning, and the CFTC requests that the Court order him to disclose the source and amount of fees paid to him in this matter and to surrender all fees accepted in violation of the Court's asset freeze to the Registry of the Clerk of the Court. *See* CFTC's Show Cause Motion III at 7.

**C.     Defendants' Other Claims Lack Merit**

**1.  Defendants Complain About the Asset Freeze But Have Not Sought Any Modification of the Asset Freeze**

In an apparent attempt to obscure Defendants' asset freeze violations, Defendants complain that the asset freeze, and the CFTC's actions in seeking to enforce the Court's lawful orders, have interfered with Saffron's "ability to live his life while this litigation is pending."

11

*See* Opp. at 16 (ECF No. 101).  Despite these allegations of hardship caused by the asset freeze, at no time have Defendants made any application to the Court for relief from the asset freeze, including any type of request to modify the asset freeze for attorney's fees or living expenses.  In reality, the asset freeze has had little to no effect on Defendants because the location and disposition of the millions in funds fraudulently obtained from customers as alleged in the Complaint are largely unknown.  *See, e.g.,* CFTC's Motion for Leave to Engage in Limited Third-Party Discovery at 3-4 (ECF No. 79).  To this day, Defendants have intentionally refused to provide any business records, an accounting of their assets, or responses to the questions set forth in the Court's Civil Contempt Order, including but not limited to the private key information for all virtual currency addresses associated with Defendants.  *See* Contempt Order at 6-7 (ECF No. 51).  The asset freeze violations outlined by the CFTC in its Motion involve Defendants' transfer and dissipation of funds through the limited accounts the CFTC was able to identify on its own and obtain third-party records for pursuant to the Court's October 29, 2020 Order (ECF No. 80).

Similar to Defendants' other complaints, Defendants allege that the CFTC has threatened Defendants and Defendants' counsel.  Opp. at 6-7.  This is also false.  The CFTC has never threatened anyone but has repeatedly urged Defendants to comply with the Court's orders.  Such false and misleading claims reflect Defendants' attempts to deflect and hide the real issue of their ongoing contempt.

> **2. Defendants Complain that the Daily Fines Previously Ordered by the Court Are "Punitive," But the Amount of the Fines Are Due to Defendants' Contempt of the Court's Authority**

Defendants complain that the daily fines ordered by the Court for Defendants' failures to comply with the Court's orders, totaling $792,000 ($396,000 for each Defendant) as of the date

of this filing,[11] are "sufficiently punitive and more than coercive." Opp. at 17, n. 9. The reality is that the fines are what that they are because of Defendants' longstanding contempt of this Court's authority. Had Defendants obeyed the Court's orders they could have avoided the fines altogether. To the extent Defendants believe that the fine amounts are onerous, it is entirely a problem of their own making. Contrary to Defendants' assertions that the daily fines are "more than coercive," these fines have proven completely insufficient to coerce Defendants' compliance with any of the Court's three orders. Incarceration is the only remaining sanction that has not been imposed by this Court that will compel Defendants' compliance with the Court's orders.

## CONCLUSION

For the foregoing reasons, Plaintiff CFTC respectfully requests that the Court grant its Third Motion for an Order to Show Cause As to Why Defendants Should Not Be Held in Civil Contempt for Violations of the Court's Asset Freeze (ECF No. 98), hold Defendants in contempt for violating the PI Order and Civil Contempt Order, and order the relief requested in the CFTC's Motion.

Dated: March 9, 2021               Respectfully submitted,

By: /s/ Danielle E. Karst
Danielle E. Karst
Timothy J. Mulreany
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000

---

[11] *See* Contempt Order at ¶¶ 5-6 (ECF No. 51) (ordering daily fines of $1,000 per day for each Defendant, beginning on Feb. 8, 2020, and lasting until such time as each Defendant has purged its contempt).

13

# **CERTIFICATE OF SERVICE**

I certify that on March 9, 2021, I filed a copy of *Plaintiff CFTC's Reply in Support of Its Third Motion for an Order to Show Cause As to Why Defendants Should Not Be Held in Civil Contempt for Violations of the Court's Asset Freeze*, with the Clerk of the Court using the CM/ECF system, which will serve notice to counsel of record below.

**John H. Gutke**
**John P. Witucki**
Gutke Law Group, PLLC
552 E. Charleston Blvd.
Las Vegas, Nevada 89104
(Counsel for Defendants David Gilbert Saffron and Circle Society, Corp.)

      /s/ Danielle E. Karst
      Danielle E. Karst