2:19-cv-01697-JAD-DJA - March 19, 2021

1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEVADA

3    COMMODITY FUTURES TRADING      )
     COMMISSION,                    )
4                                   ) Case No. 2:19-cv-01697-JAD-DJA
                 Plaintiff,         )
5                                   ) Las Vegas, Nevada
     vs.                            ) March 19, 2021
6                                   ) 10:34 a.m. - 12:17 p.m.
     DAVID GILBERT SAFFRON a/k/a    ) Courtroom 6D
7    DAVID GILBERT and CIRCLE       ) MOTIONS HEARING
     SOCIETY, CORP.,                )
8                                   )
                 Defendants.        )
9    _____) *CERTIFIED COPY*

10

11      REPORTER'S TRANSCRIPT OF PROCEEDINGS CONDUCTED VIA ZOOM
             BEFORE THE HONORABLE JENNIFER A. DORSEY
12               UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:

16        *DANIELLE E. KARST, ESQ.*
          *TIMOTHY J. MULREANY, ESQ.*
17        *COMMODITY FUTURES TRADING COMMISSION*
          *Three Lafayette Centre, 1155 21st Street, N.W.*
18        *Washington, D.C. 20581*
          *(202) 418-6158*

19

20   (Appearances continued on page 2.)

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

1    APPEARANCES CONTINUED:

2    For the Defendants:

3        *JOHN H. GUTKE, ESQ.*
         *GUTKE LAW GROUP, PLLC*
4        *552 East Charleston Boulevard*
         *Las Vegas, Nevada 89104*
5        *(702) 766-1212*

6    Also Present:

7        *George Malas, CFTC Investigator (Telephonically)*

8

9                        *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cv-01697-JAD-DJA - March 19, 2021

 1          LAS VEGAS, NEVADA; FRIDAY, MARCH 19, 2021; 10:34 A.M.

 2                            --o0o--

 3                    P R O C E E D I N G S

 4          **COURTROOM ADMINISTRATOR:**  Now's the time set for a

 5   motions hearing in Case Number 2:19-cv-1697-JAD-DJA, Commodity

 6   Futures Trade -- Trading Commission versus David Gilbert

 7   Saffron.

 8          Counsel, please state your appearances for the

 9   record.

10          **MR. KARST:**  Danielle Karst for the Commodity Futures

11   Trading Commission.

12          **MR. MULREANY:**  For the record, Tim Mulreany also on

13   behalf of the Commission.

14          **MR. GUTKE:**  John Gutke on behalf of the defendants,

15   and also present on the video call is Mr. Saffron.

16          **MR. SAFFRON:**  David Saffron present.

17          **THE COURT:**  Thank you.

18          So, Mr. Gutke, you're here on behalf of Circle and

19   Mr. Saffron?

20          **MR. GUTKE:**  Yes, Your Honor, on behalf of the

21   defendants.

22          **THE COURT:**  Okay.  Thank you.

23          And I understand we have a number of people on the

24   phone.  We muted them because it was very loud from here, and

25   we couldn't really hear ourselves.  So they can hear us, but

```
 1    we can't hear them.

 2            Ms. Karst, do you -- is it your understanding that

 3    there are people that are attending by phone?

 4        MR. KARST:  From the CFTC, Your Honor, Investigator

 5    George Malas is on the phone and is on standby.  He is

 6    available if the Court would like to hear from him.  He has

 7    submitted two supplemental declarations in support of our

 8    default judgment motion and our third motion for an order to

 9    show cause.

10        THE COURT:  Right.  I think we have something like 35

11    people appearing by phone.  So I was just curious if either of

12    the lawyers understand who those people might be.

13        MR. KARST:  Other than Mr. Malas, Your Honor, I don't

14    know.

15        THE COURT:  All right.  Mr. Gutke?

16        MR. GUTKE:  I also do not know, Your Honor,

17    specifically who would be on the phone, but I suspect that

18    there are individuals who are interested because they are

19    following this case.  And among them would be several

20    individuals who repeatedly contact my clients, sometimes with

21    very vulgar threats and things like that.  I'm not saying that

22    everyone who would be listening is -- falls in that category,

23    but I'm aware from my client that he gets regular contact from

24    people who were -- who put money into Circle Society.  So I

25    assume that's who's on the -- on the line.
```

1      **THE COURT:**  All right.  All right.  Well, so let's go

2    ahead and get to it.  This is the plaintiff Commodity Futures

3    Trading Commission's motion for default judgment.  It's filed

4    in the docket at Number 61.  There's a motion for sanctions

5    filed in the docket at Number 62.  There's a motion to strike

6    notice in the docket at 95, and then a third motion for order

7    to show cause at Number 98.

8          These are fully briefed.  I've read everything, I

9    fully understand the arguments, but I'm still going to allow

10   each side 15 minutes of arguments and.  I will allow the

11   Commission to reserve -- so, Ms. Karst, I'm assuming you're

12   going to speak on behalf of the Commission; is that right?

13     **MR. KARST:**  Yes, Your Honor.

14     **THE COURT:**  All right.  And I will allow you to

15   reserve up to five minutes of your 15 for rebuttal.  Do you

16   want the full five minutes for rebuttal?

17     **MR. KARST:**  Yes, Your Honor.

18     **THE COURT:**  Okay.  All right.  So I'm going to put

19   ten minutes then for you on the clock, Ms. Karst.  And

20   whenever you are ready, I'm ready to hear your argument.

21     **MR. KARST:**  Thank you.  Good morning, Your Honor.

22          With me on the video today is Timothy Mulreany.  He

23   is a chief trial attorney and the supervising attorney on this

24   case.  As I mentioned, Investigator George Malas is available

25   on the phone and he's on standby if the Court wishes to hear

2:19-cv-01697-JAD-DJA - March 19, 2021

1    from him.

2            Your Honor, we're here on multiple pending motions,

3    but the issues really come down to this.  The first issue is

4    whether or not defendants have done anything to purge their

5    contempt since the Court issued its January 2020 contempt

6    order.  And the answer to that is no.  In fact, additional

7    acts of contempt have been committed since that time, and we

8    briefed, for example, the asset freeze violations in our third

9    motion for an order to show cause.

10           The second issue, Your Honor, is whether or not this

11   case is ripe for entry of a default judgment at this time, and

12   the answer is yes.

13           The Court has already found defendants in contempt.

14   The terms in the contempt order for defendants to purge their

15   contempt were crystal clear, but since that time in

16   January 2020 there have simply been no efforts for defendants

17   to purge their contempt.  Instead, what we have are only

18   additional acts of contempt.

19           This is the CFTC's third motion for contempt and the

20   fifth hearing that we've had in this case over the past 16

21   months.  And we're here today because of the contempt, which

22   is taking up the Court's time, and the CFTC is forced to spend

23   time and attorney's fees to seek compliance with this Court's

24   orders.

25           Defendants are in complete contempt of the Court's

2:19-cv-01697-JAD-DJA - March 19, 2021

1    three orders.  I note that it has been 17 months from the

2    entry of the October 2019 temporary restraining order.  We are

3    15 months from the December 2019 preliminary injunction order,

4    and now we are over 13 months from the January 2020 civil

5    contempt order.

6            The defendants have failed to produce any business

7    records to this day.  They have failed to produce an

8    accounting to the Commission.  They have failed to provide any

9    responses to the written questions set forth in the Court's

10   civil contempt order, and they have repeatedly violated the

11   Court's asset freeze.  And, in addition, defendants owe

12   $812,000 in daily fines as of today, none of which have been

13   paid.

14           The Court -- the CFTC requests that the Court at this

15   time grant its default judgment motion, and I'm happy to

16   discuss that in further detail.  We also ask that the Court

17   grant the CFTC's motion for additional sanctions that was also

18   filed in March of last year.  This -- these are sanctions for

19   defendants' failures to produce documents and accounting as

20   required by the Court's orders.

21           And, finally, we ask that the Court grant the CFTC's

22   third motion for an order to show cause finding defendants in

23   contempt for violating the Court's asset freeze provisions of

24   the temporary restraining order and the preliminary injunction

25   order.

1          And candidly, at this stage, Your Honor, the CFTC

2     submits that the only remaining sanction available that has

3     not been imposed by the Court is incarceration, and we believe

4     that that is the only sanction that will compel defendants'

5     compliance with Your Honor's orders.

6          **THE COURT:**  Ms. Karst, let me talk -- I want to talk

7     more about the motion for default judgment and the remedies

8     that are requested for that default judgment.  You are asking

9     for disgorgement, restitution, and a civil penalty.  I want to

10    break those up a little bit.

11         Disgorgement and restitution, I'm seeing -- so

12    there's the 14 -- 14-ish million dollars and the 15-ish

13    million dollars.  Talk to me about how much money did it --

14    did the defendants acquire illegally.

15         So if I'm looking at a disgorgement or a restitution

16    remedy, I think the distinction between those two figures is

17    that CFTC has established that what happened was the defendant

18    was taking in money, that $15 million, but paid some of it

19    back in this Ponzi scheme concept to make it appear like there

20    were returns coming back, but really it was just money from

21    Peter to pay Paul at that point.

22         Is that the distinction between those two figures?

23         **MR. KARST:**  Yes, Your Honor.  We have requested in

24    our default judgment papers disgorgement of defendants'

25    ill-gotten gains of 15.8 million, requesting this on a joint

1    and several basis, along with post-judgment interest.  And the

2    disgorgement calculation requires only reasonable

3    approximation of the profits causally connected to the

4    violation.  So at the time we filed our default judgment

5    motion, that -- that amount was a total amount that we were

6    aware of that defendants had taken in fraudulently at that

7    time.

8            **THE COURT:**  And what is that --

9            **MR. KARST:**  And --

10           **THE COURT:**  Tell me what that number is right now.

11   Because what I want to make sure is that there aren't two

12   different buckets here, that there wasn't a bucket of

13   15 million something and a bucket of 14 million.  The total

14   taken in ill-gotten gains is one of those numbers, which I

15   think is probably the 15.8.

16           **MR. KARST:**  That's correct, Your Honor.  The

17   disgorgement is the total amount of funds solicited,

18   15.8 million that we were aware of at the time of our filing.

19   And the restitution figure, that is the 15.8 million minus the

20   payments back to customers that we are aware of, which is

21   $974,000.  So if you subtract those payments, we request

22   restitution in the amount of 14.8 million.  So it's -- it's

23   the same -- we're going with the same larger number

24   subtracting out the refunds or the Ponzi payments that

25   customers -- certain customers received back.

2:19-cv-01697-JAD-DJA - March 19, 2021

1          **THE COURT:**  So if I were to order, for example, the

2     14.8-ish million in restitution and disgorgement, it wouldn't

3     be 14.8 in restitution and 14 -- another 14.8 in disgorgement;

4     it's two separate vehicles for essentially the return or

5     release or -- of the $14.8 million?

6          **MR. KARST:**  Your Honor, we're requesting both as we

7     are authorized to do under the Commodity Exchange Act.  We're

8     requesting and we're entitled to request both for the

9     disgorgement of ill-gotten gains and restitution to

10    customers --

11         **THE COURT:**  Right.  So that --

12         **MR. KARST:**  -- along with --

13         **THE COURT:**  -- that's the way -- there's sort of two

14    avenues to get at the same bucket of money; right?  There

15    aren't two buckets of $14 million?

16         **MR. KARST:**  That's correct.

17         **THE COURT:**  Okay.

18         **MR. KARST:**  And I think, to follow up on your

19    previous question, Your Honor -- I don't, you know, want to

20    miss it -- as I stated, at the time we are aware of 15.8

21    million and 179 customers.  And, you know, it's been a year

22    since we filed the motion.  So since that time, you know, we

23    are aware of more funds that defendant solicited in the

24    relevant time period.  Today we are aware of $16.5 million and

25    210 customers.  And, you know, the change in the numbers is

1   really a reflection of defendants' ongoing contempt and our

2   really inability to determine the full scope of the fraud and

3   the number of defrauded customers.  So that is an explanation

4   as to why, you know, what we're aware of today is different

5   than what we were aware of one year ago.

6           THE COURT:  Okay.  And so the numbers, though, in the

7   motion for default judgment and proposed order, have you --

8   has -- do I have a supplement that has the new numbers?

9           MR. KARST:  No, Your Honor.  I am -- the CFTC is

10  happy to, you know, provide that and brief that to the Court

11  and -- but we don't -- I don't have anything filed as of today

12  with the Court, but I am happy to do so with the additional

13  numbers.

14          THE COURT:  All right.  I want to talk about civil

15  penalties now.  So under the statute there are different

16  approaches to -- that the Court can take to civil penalties.

17  Essentially you're asking for three times the ill-gotten gains

18  as a penalty here, which would be something in the range of,

19  based on the prior numbers, $47 million.

20          I don't think it does a lot of good to give the

21  Government a civil penalty award that there are no potential,

22  in a million years, ways for someone to satisfy.  But also a

23  civil penalty certainly has to have a deterrent effect.  Can

24  we talk then -- if you could kind of explore for me some of

25  the thoughts behind various dollar amounts or ways that the

1    Court should best calculate a civil penalty amount that would

2    go along with this default judgment.

3          **MR. KARST:**  Yes, Your Honor.  You know, under our

4    statute, you know, we're entitled to seek a civil monetary

5    penalty, the higher of triple the gain from each violation or,

6    you know, a straight today inflation adjusted is $187,000 per

7    violation.  And it's really, you know, within the Court's

8    authority and discretion to determine a civil monetary penalty

9    that's both appropriate to the gravity of the offense, which

10   what we here have are demonstrated, you know, acts of fraud

11   over a number of years, defrauding of hundreds, if not

12   thousands, of customers.  So sufficient -- you know, we need a

13   penalty that's sufficient to act as a deterrent.  And we don't

14   know that he -- that defendants are unable to pay $47 million.

15   We have never received a document to this day, no accounting.

16   So I have no idea whether or not defendants could satisfy any

17   or a portion of that.

18          **THE COURT:**  All right.  Thank you, Ms. Karst.

19          All right.  I'm going to turn to Mr. Gutke.  I'm

20   going to put 15 minutes on the clock for you, sir.

21          **MR. GUTKE:**  Thank you, Your Honor.

22          First of all, I think it is -- it's wrong for the

23   CFTC to repeatedly mischaracterize the defendants' actions in

24   this case as completely and wholly non-compliant.  Counsel

25   stated that defendants have failed to produce any business

```
1    records, and that's just false, Your Honor.  Their own
2    documents demonstrate that, after the contempt hearing in
3    January of last year, Mr. Saffron was in regular contact with
4    them.  He uploaded business records, as he promised to
5    Your Honor that he would do in court that day, and had
6    communications with them in an attempt to give them
7    information regarding the business records that he was able to
8    reconstruct or put together.
9            Even more recently since I've been retained, I've
10   attempted to send over hard copies of customer records;
11   reached out to counsel from the CFTC voluntarily advising
12   them, hey, good news, I've got documents, I'd like to send
13   them over to you, but I need a protective order because these
14   documents contain customers records -- you know,
15   cryptocurrency wallet addresses, things that are confidential
16   that defendants have a reasonable interest in protecting
17   their -- their customers' privacy -- and the response I got
18   back was that of rage and anger for even asking for a
19   protective order and accusing me of violating the Court's
20   order by asking to be able to --
21           THE COURT:  Mr. Gutke, when did --
22           MR. GUTKE:  -- get a protective order.
23           THE COURT:  -- when did these communications with
24   CFTC happen?
25           MR. GUTKE:  This would be in our opposition to motion
```

1    at Docket Number 98, but this was approximately I would say a

2    month ago.

3            THE COURT:  Um-hum.

4            MR. GUTKE:  I'm guessing.

5            THE COURT:  Right.

6            MR. GUTKE:  I couldn't give you an exact timeline on

7    that.  But that's a pattern, Your Honor, and that's -- and

8    so --

9            THE COURT:  And here -- here's -- here's my other

10   question:  Did you file a motion for a protective order?

11           MR. GUTKE:  I have not been able to do that yet,

12   Your Honor.

13           THE COURT:  What do you mean you haven't been able to

14   do that yet?

15           MR. GUTKE:  Well, we had this court date coming up,

16   other issues that have been brought forward by the CFTC that

17   we've had to respond to.  So really there's a more -- another

18   answer to your question, Judge, that I need to step back a

19   bit.

20           I mean, first of all, I assume and hope that it's

21   okay that I'm here representing the defendants and that I'm

22   not in violation of prior orders in this case.  Because before

23   I had even entered an appearance, I was immediately sent

24   e-mails by counsel for the CFTC telling me that I am violating

25   Judge Dorsey's orders by even being retained by the defendant.

1    Just per se, if they hire attorneys, that is a violation of

2    the Court's order.

3          And that's a disturbing pattern.  And if this case

4    moves forward and we're able to present additional information

5    and file a motion to try to reset this case -- which I think

6    is what should happen, so the defendants can defend

7    themselves -- we will present -- and it's already in the

8    record, Your Honor.  Prior counsel has repeatedly been told by

9    the CFTC and the CFTC has said on the record in court that, if

10   the defendants retain counsel, that that's a violation of

11   their preliminary injunction or the TRO before that, and that

12   they would be violating the asset freeze, violating the

13   injunction.  And I have been threatened with motions for

14   sanctions against me simply by trying to represent the

15   defendant.

16         **THE COURT:**  So wouldn't -- wouldn't the right

17   approach then, Mr. Gutke, be that you come to the Court and

18   you file a motion for some kind of a determination saying,

19   hey, this is what I'm doing, I'm trying to represent, he's

20   defaulted -- that's part of the problem, is that the

21   defendants are defaulted.

22         But isn't your avenue of relief with the Court -- and

23   yet, here we are, this case has been ongoing for over a year

24   and a half, and yet these are the kinds of stories that I get

25   every single time that we appear for a hearing, is this, oh, I

1    didn't get a chance, I wasn't able to, we're really trying,

2    just give us one more chance and we're going to -- we promise

3    we're going to comply.  And that -- I get -- that is the

4    defendants' response that I get in -- and on the other side of

5    that I have a mountain from CFTC of affidavits and documents

6    and evidence showing me that there's ongoing fraud.

7          And it just seems that it's this pattern that's

8    happening that really has to stop.  And so I guess what I'm

9    trying to ask is:  Why didn't you come to the Court to seek

10   relief if that is the situation you have that's going on?

11         **MR. GUTKE:**  Well, Your Honor, I'll be the first to

12   admit that this case, from having reviewed the record now, has

13   been kind of -- I don't know the right word.  I was going to

14   say bungled.  I don't know if that's a legal, technical term.

15   But prior counsel -- that was my thought, was that, you know,

16   why -- why didn't prior counsel file answers?  Why didn't

17   prior counsel respond to motions, and why did they come in and

18   then withdraw?

19         But then, after going through and seeing the

20   communications -- and then just after experiencing it myself.

21   I can say honestly that, you know, I was on my heels

22   immediately.  I mean, the day -- the day after I had a limited

23   agreement with the defendants to come in and try to just read

24   the record, Judge -- I just wanted to read the docket and

25   decide is this a case that we can take?  You know, do we want

```
 1    to come on the case?  I'm immediately getting e-mails that are
 2    just guns blazing.
 3           And I'm not trying to play a victim here or accuse
 4    them of being bad people.  But I've never dealt with counsel
 5    in any case -- I'm not inexperienced as some attorneys, but
 6    I've been around, you know, a decade and a half or more.  And
 7    I've just never dealt with counsel who their immediate
 8    instinct is to sort of flex the authority that they have.  And
 9    I would say that it's a unique situation because this is the
10    Federal Government.  I mean, this is the United States of
11    American that's the plaintiff.  It's not any plaintiff.
12           And when their initial contact with me is that of
13    threatening me with disgorgement of funds, with contempt
14    orders, et cetera, it puts you in an odd state of mind, Judge.
15    And -- and not -- not in an odd state of mind.  I'm not
16    articulating this very well.  But you become very defensive,
17    and you start thinking, gosh, am I going to get in trouble?
18           And so going back and reading from prior attorneys
19    and seeing the communications, they were getting the same
20    thing.  And so let's just go back to the most recent hearing
21    before today -- and it's been awhile, but it was in January of
22    2020.  Mr. Saffron appeared pro se.  You know, the very first
23    thing he said was that he wants to make this right, he wants
24    to return everyone's outlay to them and work with the CFTC to
25    make -- you know, to rectify the situation --
```

1        **THE COURT:**  Right.  And did --

2        **MR. GUTKE:**  And --

3        **THE COURT:**  -- that happen?  Has everybody gotten a

4    refund of all of their $15 million?

5        **MR. GUTKE:**  No.  And, in fact, the first thing that

6    the CFTC said to me when I -- when they told me that I was

7    violating the Court's order by representing the defendants was

8    that also they're in violation for trying to settle with any

9    of the victims.  And I went back, and I've looked at the

10   orders.  I don't see where it says that the defendants can't

11   settle with people that are coming after them and demanding

12   money.  But the CFTC's position is very clearly, based on

13   their -- what they've said, in fact, in the pending motion

14   today, the third -- the third contempt motion, they've made it

15   very clear that the CFTC's position is that the plaintiffs

16   cannot pay anybody back.  You know, it's got to go through

17   them, I guess.

18        But, to me, what I -- my opinion on this and our

19   position is that the CFTC is really not interested in having

20   that restitution back to these alleged victims.  And I think

21   that's also demonstrated by the damages and penalties that

22   they're asking in their default judgment request, which is,

23   you know, 14-, $15 million in restitution and disgorgement but

24   $47 million to the Government in civil penalties.  You know,

25   that's not going to the victims.  And so I think that's one

1  issue with the default judgment request that I have.  The
2  question is, so if the default judgment is entered, does that
3  then -- is that akin to a class action settlement where anyone
4  who is a victim of the claims that the CFTC has brought in
5  this complaint, they've -- they don't have civil remedies and
6  have to stop harassing my client and demanding money and
7  threatening him with violence if he doesn't pay them?  Those
8  are issues that I think need to be briefed as far as the
9  default judgment goes in terms of how that -- how would the
10 default judgment affect the people that are the alleged
11 victims of -- of the allegations in the complaint?
12         But getting back to then the hearing in January,
13 Mr. Saffron appeared.  He indicated he wants to cooperate, and
14 then he did make efforts to cooperate after that time.  He was
15 given 14 days to produce documents.  He sent over a list of
16 multiple customers of Circle Society, more -- more individuals
17 than what the Government has said today they've been able to
18 determine.  And he also asked for a protective order, which
19 I -- I didn't even know that.  I hadn't seen that part of --
20 of the record when I requested the protective order.  But
21 their response to him was the same:  No, we won't give you a
22 protective order because that's a unilateral violation of the
23 Court's order, you -- and they wouldn't -- wouldn't do it.
24         So to go back to what I was saying earlier, it's my
25 opinion that the Government -- they don't want the defendants

1    to be able to comply, and there's really nothing they could do

2    to comply short of just going ahead and literally handing them

3    over the keys to all their assets, you know [indiscernible]

4    their bank accounts and the passwords to the bank accounts and

5    giving them all their money.  And that, to me, is just not a

6    typical path of a civil lawsuit.

7            I understand that the Government got default in this

8    case.  The TRO was entered ex parte, I would add.  And so

9    because -- because of the way this case started, the

10   defendants have literally never had an opportunity to defend

11   the claims or the allegations.  They have not had that

12   opportunity.  We've just been on our heels.  And the

13   Government has used that ex parte TRO from the start to --

14   to -- as a sword to keep attorneys from being able to

15   represent the defendants, to accuse the defendants of

16   noncompliance with orders, to go out and get documents from

17   banks and from third parties and from anyone even tangentially

18   ever related to the defendants, getting bank records from my

19   client's stepmother or subpoenaing them, subpoenaing records

20   from individuals that he's worked with -- not just business

21   records but personal records, family trusts of individuals who

22   have worked with Mr. Saffron or who he has worked for.

23           Excuse me.

24           And -- and it's just -- it's been a difficult grind

25   for the defendants because they've been told that they can't

2:19-cv-01697-JAD-DJA - March 19, 2021

1    have counsel.  So it's been a while, I know, but if the

2    judge -- if you recall, Judge, in January of last year, when

3    Mr. Saffron appeared in person, he was very I think -- at

4    least the way I read the record -- sounded sort of sheepish,

5    wasn't sure, you know, what was going to happen, thought he

6    was going to go to jail even.  I mean, he showed up that day

7    despite the CFTC's repeated requests, which they continue to

8    make in every single pleading, for him to be incarcerated.

9    And that's only fueling the anger and hostility of the people

10   who probably are the ones listening in on this hearing, who

11   continually say you're going to be in jail, you're going to be

12   raped, you're going to do this, that, and we're going to love

13   to see you rot in hell, y'know?

14        And I understand the people are upset because they

15   have a claim for damages for money, but no one deserves to

16   have those threats given to them.  And I think that the CFTC's

17   demeanor and the manner in which they have litigated this case

18   only fosters that -- that -- those actions.  And I'm not

19   blaming them for these people's actions either, Your Honor.

20        But my point is that from the start the defendants

21   haven't really had an opportunity to actually defend the

22   claims.  And I know that you said that the CFTC continues to

23   bring evidence -- mountains of evidence, affidavits, et

24   cetera, of the ongoing fraud.  But as I read the evidence,

25   it's not all completely evidence.  It's their speculation or

1    their hunch or what they continually say is we have grave

2    concern that this is happening or we've been informed that

3    this is happening.  So this is all hearsay.  Even the motion

4    for sanctions is based on their interpretation of -- of what

5    information they have.  It's -- it's really not what I would

6    classify as proof positive --

7            **THE COURT:**  And --

8            **MR. GUTKE:**  -- that this is happening.

9            **THE COURT:**  -- and have -- have the defendants filed

10   a document in this case that breaks all of that down and

11   demonstrates that this isn't true and provides their true

12   defense in this case and shows how this isn't happening?

13           **MR. GUTKE:**  I wish I would have been able to do that,

14   Judge.  I mean, I was able to get a small retainer.  I'm

15   overextended because the defendants don't have funds to even

16   hire counsel because, again, they're told -- or I'm told, from

17   the moment I even think about representing the defendants,

18   that I can't do that without violating the Court's order.  And

19   that's after -- again, going back to the January 2020 hearing,

20   Mr. Saffron said, I don't think -- my understanding is I can't

21   have a lawyer.  And Your Honor rightfully said no, absolutely

22   you can have an attorney.  And Your Honor even said, I don't

23   know who would have told you that, but of course you can have

24   an attorney.  I don't want to characterize your words, but

25   I've read the transcript a lot.  I believe that's almost

1    exactly what you said.

2            And the answer to your query in the January 2020

3    hearing as far as who advised Mr. Saffron he can't have an

4    attorney, the answer is the plaintiff.  That's who continually

5    has sent the message that you cannot hire counsel.

6            And so, what the CFTC wants is not to have to prove

7    their claims on their merits.  They want a default judgment to

8    get relief based on the defendants not ever having an

9    opportunity to defend themselves.

10           Back in October and December of 2019 when the

11   defaults were entered, you'll recall -- recall that Mr. Van

12   appeared, but he was even very skittish to appear because I

13   think, again, he had been told you're going to be in contempt

14   of Court.

15           And it's just something that, as an attorney, you

16   don't take those sort of threats and accusations lightly,

17   especially when it's, again, the United States of America

18   Government, a regulatory body with a lot of power and

19   capability that's saying that to you.

20           **THE COURT:**  Right.  I get that, Mr. Gutke.  I get

21   that.  But the remedy is you come to the Court and you file a

22   motion and you say, we're being told that we can't have -- he

23   can't have a lawyer, you told him he could have a lawyer,

24   let's figure out how we do this.  There's clear case law --

25           **MR. GUTKE:**  Right.

 1          **THE COURT:**  -- on how this is -- is established, and

 2   no one took those steps.

 3          And so it's just a history of a year and a half in

 4   this case where it's, oh, gosh, we really wish we had another

 5   opportunity and, no, we didn't do a thing to try to protect

 6   the defendants' rights here.  The defendant didn't do a thing

 7   to protect his rights here.  And at some point, you know, the

 8   music stops and there's no chairs left here, and I'm afraid

 9   that's where we're at right now.

10          So I appreciate your argument.  Thank you very much.

11   Your time is up.  I'm going to move back to Ms. Karst for her

12   five minutes of rebuttal.

13          Go ahead, Ms. Karst.

14          **MR. KARST:**  Thank you, Your Honor.

15          There are a lot of falsehoods, misrepresentations in

16   Mr. Gutke's statements to the Court.  You know, these are all

17   kind of interesting arguments we feel -- and, you know, we

18   briefed some of these arguments in our brief last week -- but

19   this is really just a sideshow.  This is the same song and

20   dance that we've been hearing.  Additional time for the

21   defendants to comply really accomplishes nothing.  We feel as

22   though defendants are litigating in bad faith.

23          Counsel said that Mr. Saffron had been in regular

24   contact with the CFTC and had, in fact, uploaded his business

25   records.  Okay.  That's a false statement.  I can tell you

1    what we have received from Mr. Saffron, which -- none of which

2    are business records.  He sent two Excel files to the CFTC

3    that he claimed he compiled; therefore, using withheld

4    business records.  These were files listing over 2,000 names.

5    There are no headings to these files.  It just simply lists

6    names, e-mail addresses, and virtual currency addresses.  That

7    is all that he's produced.  So I don't -- you know, we've yet

8    to see a single business record produced to this day despite

9    Your Honor's civil contempt order ordering the production of

10   those records over a year ago.

11          And, in fact, Mr. Gutke sent the CFTC an e-mail over

12   a month ago saying he was in possession of, quote, a

13   significant volume of documents; however, we've yet to see the

14   first document.  We provided Mr. Gutke with an FTP link to

15   upload those documents and/or the option to deliver paper

16   copies to the U.S. Attorney's Office there in Las Vegas.  And

17   we find it outrageous that counsel is and has been in

18   possession of records but hasn't produced any of them to us in

19   clear defiance of the Court's orders.

20          And his arguments regarding a request for a

21   protective order, well, that's requesting a modification of

22   the Court's order, and that's improper, Your Honor.  If he

23   wants to make an application to the Court for a protective

24   order, you know, he can.  It is not necessary here.  We

25   already have Your Honor's clear orders for defendants to

1    produce their records, and we -- we simply cannot agree to any

2    kind of modification outside of those terms.  That would

3    violate the local rules, the federal rules of civil procedure,

4    and counsel admitted he had done nothing to seek a protective

5    order.  It appears that's simply another excuse at this late

6    stage for defendants' failure to comply and, indeed, to

7    disobey the Court's orders.

8           And as, you know, the substance of a protective

9    order, you know, it's not necessary here.  We actually need

10   and want records that identify all the customers.  We need to

11   determine where the funds came from, where they went to.  You

12   know, we need all of this information in order to obtain full

13   restitution for customers.

14          And if defendants are truly concerned about

15   confidentiality, then, you know, they can produce the

16   documents to the Court *in camera*, and the Court can make a

17   facial determination.  But, you know, we've seen nothing.

18   This is simply, you know, another excuse as to why, you know,

19   over a year since the civil contempt order defendants have not

20   obeyed this Court's orders.

21          **THE COURT:**  All right.  Thank you.

22          All right.  So it's my intention to rule on these

23   motions on the record today, but I'm also going to enter a

24   written order that memorializes the rulings that I make today.

25          I'm going to begin with the Commission's motion for

1    default judgment, and I'm going to walk through that.

2            So Federal Rule of Civil Procedure Rule 55(b)(2)

3    permits a plaintiff to obtain default judgment if the Clerk

4    previously entered default based on a defendant's failure to

5    defend.  After entry of default, the complaint's factual

6    allegations are taken as true except those relating to

7    damages.  Whether to grant a motion for default judgment lies

8    in the Court's discretion, which is guided by the seven

9    factors outlined by the Ninth Circuit in *Eitel versus McCool*.

10   That's at 782 F.2d 1470.

11           Applying the *Eitel* standards to this motion, I grant

12   it in part.  I'm going to walk through the *Eitel* factors, but

13   I'm going to analyze them a little bit out of order.

14           I'm going to start with the first, fifth, and sixth

15   *Eitel* factors.  The first factor requires me to consider

16   whether the Commission would suffer prejudice if I denied its

17   motion for default judgment.  The fifth requires me to

18   consider if there's a possible dispute concerning material

19   facts.  And under the sixth factor I consider whether

20   defendants' default may have resulted from excusable neglect.

21           I begin analyzing these factors by noting that

22   defendants' dilatory behavior is well documented in my orders

23   filed in the docket at Number 52 and 57.  In short, Circle

24   Society never answered the complaint.  Saffron's answer was

25   late and struck because he had already been defaulted.  So he

1  was given a deadline to move under Rule 55(c) to set aside the

2  default.  He blew that deadline by nearly a month.  When the

3  defendants eventually moved to set aside the defaults, they

4  didn't mention their motion's tardiness let alone show that

5  their delay was the product of excusable neglect.  I

6  nonetheless considered the motion on its merits, but I denied

7  it after carefully considering the three disjunctive factors

8  set out by the Ninth Circuit in *Faulk*, F-a-u-l-k, *versus Allen*

9  at 739 F.2d 461 for determining motions to set aside the entry

10 of default.  I concluded that, although defendants had a

11 good-faith explanation for their defaults -- basically

12 problems obtaining representation -- they were overshadowed by

13 evidence of their devious and deliberate conduct seeking to

14 skirt the judicial process.  That is my order at Document

15 Number 77.

16         Since I made that finding, the defendants have done

17 nothing to alleviate my concerns that their conduct is

18 intended to avoid any decision on the merits in this case.

19 Indeed, despite obtaining new counsel last December,

20 defendants have not sought leave to file a response to the

21 default judgment motion or clarified my perception about their

22 behavior or move to reconsider, modify, alter, or amend any of

23 my prior orders in this case.  I'm, therefore, persuaded that

24 the first *Eitel* factor weighs heavily in favor of default

25 judgment because the Commission's ability to obtain a judgment

2:19-cv-01697-JAD-DJA - March 19, 2021

 1   on the merits will be prejudiced if I denied its motion for
 2   default judgment.
 3        The sixth factor also weighs in favor of default
 4   judgment because, as my prior ruling on the motion to set
 5   aside default indicated, the default was not the product of
 6   excusable neglect.
 7        Also troubling is the fact that the defendants have
 8   not identified a clear defense to the Commission's claims or
 9   offered any proof to show that they have a meritorious defense
10   or basis to dispute the material facts, as I highlighted
11   during Mr. Gutke's argument.  The most that the defendants
12   have offered is their attorney's statement last March in
13   moving to set aside default that, quote "As will be set forth
14   in greater detail in a subsequent filing with the Court, it
15   increasingly appears that plaintiff simply misunderstands the
16   workings and basis of defendants' business," end quote.  So
17   the fifth *Eitel* factor also weighs in favor of default
18   judgment.
19        I'm going to take a quick aside here because
20   something just occurred to me.  I note that we do have a
21   number of people who are listening in on this hearing.  I'm
22   assuming that they are the public for the most part who have
23   an interest in this hearing and so, unfortunately, we, because
24   of the pandemic, are not having large, in-person hearings.
25   This one's being conducted by video.  So the public is allowed

2:19-cv-01697-JAD-DJA - March 19, 2021

1    to attend by telephone, and it appears that that's what's

2    happening.

3           I want to let anyone who is listening by phone to

4    know that the rules of this Court and the orders of this Court

5    prohibit anyone from live streaming the audio of this or the

6    video of this.  They also prohibit anyone from recording and

7    keeping a recording or playing later a recording or posting it

8    on the Internet or e-mailing it to someone or texting it to

9    someone.  So if anyone is listening or observing this hearing,

10   please know that the orders of this Court expressly prohibit

11   you from recording this and disseminating a recording of this

12   or otherwise sharing a recording of this.

13          Thank you.  I apologize for that aside.

14          But I'm going to jump back into the *Eitel* factors,

15   and I'm going to turn to the second and third *Eitel* factors,

16   which are the merits of the plaintiff's claim and the

17   sufficiency of the complaint.

18          Taking the many well-pled facts in the complaint as

19   true and considering the evidence that the Commission has

20   provided throughout the entirety of this case, I find that

21   these factors also weigh in favor of granting default

22   judgment.  The Commission's complaint contains four claims for

23   relief under the Commodity Exchange Act.  The first claim

24   contends that defendants committed options fraud in violation

25   of the Act.

2:19-cv-01697-JAD-DJA - March 19, 2021

1          To prevail on this claim, the Commission must prove

2     that:  One, the defendants made a representation, misleading

3     statement, or a deceptive omission admission; two, defendants'

4     conduct or omissions were either reckless or intentional; and

5     three, materiality.

6          The Commission has alleged and shown that the

7     defendants made material misrepresentations to their

8     participants, that their funds would be pooled and used to

9     trade binary options on foreign and cryptocurrency pairs for

10    the participants' benefit when, in reality, Mr. Saffron placed

11    those funds in his personal E-Wallet and used some of them to

12    pay the profits that the defendants guaranteed to earlier

13    participants in the manner of a Ponzi scheme, and to further

14    the allusion that pooled options trading was actually going

15    on.  Defendants also misrepresented that profits were

16    guaranteed.  They, likewise, guaranteed that participants

17    would be paid referral fees for each investor steered to

18    defendants' alleged commodity pool.

19         The Commission has demonstrated that defendants acted

20    with knowledge that their statements were false and has shown

21    that defendants acted with reckless disregard for the fact

22    that trading these types of commodities is risky and profits

23    cannot be guaranteed.  Saffron's failure to disclose that

24    neither he nor Circle Society were registered with the

25    Commission was at least done in reckless disregard of the true

1    fact.  And the allegations and evidence show that defendants

2    misappropriated the participants' funds by using the deposits

3    of later participants to pay the profits that were guaranteed

4    to earlier participants.  The Commission has, therefore,

5    established a meritorious claims for options fraud under 7 USC

6    § 6c(b).

7         The Commission's second claim asserts that Circle

8    Society committed fraud in its capacity as an unregistered

9    commodity pool operator and Saffron committed fraud in his

10   capacity as an unregistered associated person both in

11   violation of the Act.  This claim shares elements, alleged

12   conduct, and evidence with the Commission's options fraud

13   claim, and it is similarly and likewise meritorious.

14        The Commission's third claim alleges that defendants

15   failed to comply with 17 CFR § 4.20's requirements that a

16   commodity pool operator operate its pool, quote, "as an entity

17   cognizable as a legal entity separate from that of the pool

18   operator," end quote, receive all funds in the pool's name,

19   and prohibition against commingling property of the pool with

20   property of another person.

21        And its fourth claim alleges that Circle Society

22   failed to register as a commodity pool operator and Saffron

23   failed to register as an associated person resulting in both

24   of them violating 7 U.S.C. § 6m(1)'s requirement that only

25   registered entities can use the U.S. Mail system and

2:19-cv-01697-JAD-DJA - March 19, 2021

1    instrumentalities of interstate commerce to conduct business

2    as commodity pool operators.  These claims are also

3    meritorious, so the second and third *Eitel* factors weigh in

4    favor of default judgment.

5          The seventh *Eitel* factor, the policy favoring

6    judgments on the merits, with respect to that one, generally

7    default judgments are disfavored because cases should be

8    decided upon their merits whenever reasonably possible, but

9    here the defendants have acted on their own slow timetable or

10   no timetable throughout the entirety of this case.  They have

11   also failed to provide any basis for me to conclude that they

12   could present a meritorious defense to the Commission's

13   claims.  It is not possible to decide a case on the merits

14   when one side offers none, so this factor weighs in favor of

15   granting default judgment.

16         Finally, I back up and reach the fourth *Eitel* factor

17   which requires me to compare the amount of money at stake with

18   the seriousness of the defendants' conduct.  This is the most

19   difficult factor in this case because the numbers are

20   enormous.

21         The Commission seeks restitution against the

22   defendants jointly and severally in the amount of $14,841,280,

23   which it argues and provides evidence to show constitutes the

24   amount that defendant solicited from at least 179

25   participants, less the amount that defendants paid to earlier

1   participants, to prop up the scheme that funds were being

2   pooled and traded for guaranteed returns.  It also seems

3   disgorgement from defendants jointly and severally of

4   $15,815,967, which it argues and provides evidence to show

5   constitutes the known amount of funds the defendants solicited

6   from the participants.  The difference between the numbers is

7   that some of the money, almost a million dollars, was returned

8   as alleged profits or payments to -- to some of the

9   participants.

10          And the Commission seeks a civil penalty against the

11  defendants jointly and severally in the amount of $47,447,901,

12  which is three times the sum that the defendants gained from

13  their years-long fraudulent scheme.  The Commission relies on

14  the detailed and unrebutted declarations of its investigator,

15  George Malas, to support its damages request.

16          The evidence shows that the defendants acted with

17  knowledge and intent to defraud the participants.  They used

18  sophisticated means to create the illusion of legitimacy for

19  their scheme, and they repeated that conduct nearly 200 times.

20          The Commission has demonstrated to my satisfaction

21  that defendants' conduct was egregious and intentional, but in

22  no way has the Commission presented evidence, reasoned

23  argument, or authority justifying an order of restitution,

24  disgorgement, and civil penalties for more than $78 million.

25          I've wrestled with this issue and these numbers, and

1    I find that what is fair and just here is an award of

2    disgorgement and restitution -- which are two different ways

3    to get to the single bucket of money that is left -- that was

4    collected and not returned to participants, and that amount

5    has been demonstrated by the Commission to be $14,841,280.

6    And on top of that, a civil penalty I'm going to assess in the

7    amount of $1,484,128 against the defendants jointly and

8    severally plus post-judgment interest under 28 USC § 1961.

9         The civil penalty represents 10 percent on top of the

10   amount that the defendants gained through their scheme and

11   will be required to return.  I believe that these amounts will

12   deter these defendants from engaging in similar unlawful

13   behavior in the future and will allow their defrauded

14   participants to also be made whole.

15        So I grant the Commission's damage request in part

16   and find that this reduced amount causes this factor to also

17   weigh in favor of default judgment.

18        And to ensure better future behavior by these

19   defendants, I also grant the Commission request for a

20   permanent injunction.  In actions seeking statutory

21   injunctions, once a violation is demonstrated, the moving

22   party need show only that there's some reasonable likelihood

23   of future violations.

24        In determining whether to enter a permanent

25   injunction, courts consider:  One, the egregiousness of the

1  defendant's actions; two, the isolated or recurrent nature of

2  the infraction; three, the degree of scienter involved; four,

3  the sincerity of the defendant's assurances against future

4  violations; five, the defendant's recognition of the wrongful

5  nature of his or its conduct; and sixth, the likelihood that

6  the defendant's occupation will present opportunities for

7  future violations.  That's the *Ginsberg* case.

8       The Commission has demonstrated that defendants'

9  violations were not isolated but occurred at least 179 times.

10  It provides evidence that Mr. Saffron enticed some

11  participants with live demonstrations of his fake computer

12  trading bots and automated bots/AI trading software and used

13  attorneys to provide a veneer of legitimacy to the scheme.

14  These deceptions show that defendants intended to deceive,

15  defraud, and manipulate their participants.

16       There have been no believably sincere assurances

17  against future violations or recognition that the wrongful --

18  of the wrongful nature of this conduct, nor is there evidence

19  that Mr. Saffron has legitimate employment that will steer him

20  away of the opportunity to violate the Act in the future.

21  Thus, a permanent injunction under Title VII United States

22  Code § 13a-1(a) and in the form requested by the Commission is

23  warranted.

24       In deciding the Commission's motion for default

25  judgment, I reviewed and considered defendant's notice at

1    Number 94.  So, because I did, I deny the Commission's motion

2    to strike that notice, which is at Number 95.

3          And because I grant the Commission's request for a

4    permanent injunction, which necessarily dissolves the

5    preliminary injunction, I deny as moot its motion for

6    additional sanctions at Number 62 and its third motion for

7    order to show cause at Number 98.  These are moot because, as

8    courts recognize, if a civil contempt order is coercive in

9    nature -- and these were -- this one was -- it's mooted when

10   the proceeding out of which it arises terminates.  And so,

11   because we are now replacing those prior orders with a

12   permanent injunction and a default judgment and a civil

13   penalty, it has become mooted.

14          I think that resolves all of the motions.  Ms. Karst,

15   I'm going to turn to you and ask if there are any questions or

16   any clarification is necessary.

17          **MR. KARST:**  Your Honor, I just want to clarify, the

18   Court is ordering restitution and a civil monetary penalty but

19   no disgorgement?

20          **THE COURT:**  Well, let's talk about that for a minute.

21   What I want to -- I have -- I'm comfortable with both

22   remedies.  I'm not comfortable with double-dipping as the

23   remedies.  So the goal is to get the ill-gotten gains back to

24   the victims.  And that's where I want the money to go to, and

25   so I focus heavily on restitution because that becomes a

1    remedy for the victims.

2          If you can explain to me what the Commission would do

3    with disgorgement and how that would either somehow enhance

4    the opportunity or availability of the money to go back to the

5    victims or impact it?

6          **MR. KARST:**  Yes, Your Honor.  We -- you know, we're

7    seeking for both disgorgement and restitution.  Restitution of

8    course goes back to the victims.  The disgorgement, it is a

9    separate remedy that we are entitled to seek which the Court

10   has the power to order for Mr. Saffron's and Circle Society's

11   violations.  And the purpose is to deprive the wrongdoer of

12   their ill-gotten gains and to deter violations of law.  So we

13   find that disgorgement is a separate remedy.

14         **THE COURT:**  So tell me this.  So there's only one

15   bucket of 14-ish million dollars; right?

16         **MR. KARST:**  Yes, Your Honor.

17         **THE COURT:**  So I want that $14 million to come back

18   to the victims.  What is my best vehicle to accomplish that in

19   the Commission's opinion?

20         **MR. KARST:**  I mean, the money ordered, you know, that

21   is collected for restitution, that will go back to the

22   victims, but we also think that disgorgement from the

23   defendant is warranted here.

24         **THE COURT:**  But there's only one bucket, so I -- I'm

25   just trying to understand how this operates from the

 1    Commission's perspective.

 2              Tell me this.  Are there different collection methods

 3    for restitution versus disgorgement?

 4         **MR. KARST:**  I'm going to ask Mr. Mulreany if he would

 5    like to address that issue, Your Honor.

 6         **THE COURT:**  Mr. Mulreany, can you help us out?

 7         **MR. MULREANY:**  Good morning, Your Honor.  For the

 8    record, Tim Mulreany on behalf of the plaintiff.

 9              I think that discussion has to start off with the

10    fact that Congress has created the remedies of disgorgement

11    and restitution as two separate items that are statutorily

12    created in the Act, and it comes from a recognition that two

13    things are happening when a fraud takes place.  First,

14    customers are being deprived of their assets unlawfully, which

15    your order has already handled in the restitution order.  But

16    the second aspect of it is that over the last two to three

17    years, as alleged in the complaint, Mr. Saffron and Circle

18    Society have been spending funds to support their unlawful

19    lifestyle.  Those funds need to come back; otherwise, what

20    happens is the defendant is allowed to enjoy the fruits of his

21    fraud with no penalty.

22              This dovetails into the Commission's request and

23    Your Honor's order for an accounting.  Unless an accounting

24    takes place and the defendants provide us with the private

25    wallet addresses of their Bitcoin wallets, the Commission is

2:19-cv-01697-JAD-DJA - March 19, 2021

1    left with no vehicle through which it can obtain restitution

2    for the customers nor can it have an accurate number -- a more

3    accurate number, I should say, than what has already been

4    presented as to the amount of disgorgement that the defendants

5    should lawfully pay.

6         It's not -- it's not really one bucket as much as

7    it's one bucket with two sections.  The first section is

8    restitution.  That clearly goes back to the customer.  Under

9    our scheme, all funds we obtain go back to customers and

10   payment of the restitution order.  And then to the extent

11   other funds are collected above and beyond that amount,

12   disgorgement is paid and goes back to the United States

13   Treasury as a way to, in effect, pay for the enforcement

14   activities of the Commission and other federal agencies.  It

15   has the added benefit of depriving the defendants of their --

16   their unlawful gains.

17        **THE COURT:**  But if the entirety of the unlawful gains

18   are victim funds and they're going to the Treasury, what's

19   left for the victims?

20        **MR. MULREANY:**  Well, I'll put it to you this way,

21   Your Honor.  The -- the Bitcoin -- the particular commodity at

22   issue here is Bitcoin.  Like all commodities, its value

23   increases and decreases.  If we're to believe Mr. Saffron

24   that, indeed, he took in 600 -- or, excuse me, 6,882

25   approximate Bitcoins, well, when we filed this case, the

2:19-cv-01697-JAD-DJA - March 19, 2021

1    Bitcoins' value I think was somewhere in the area of about
2    $1,500 a Bitcoin.
3            The massive volatility of Bitcoin, just like other
4    commodities, can't be guaranteed; it goes up, it goes down.
5    Well, at present, I think last Friday Bitcoin closed somewhere
6    around $56,000.  Therefore, to the extent that Mr. Saffron is
7    currently holding Bitcoin belonging to customers, well, that
8    6,800 Bitcoin would be worth somewhere in the neighborhood of
9    $412 million.
10           If we only get an order for $14 million and change
11   and approximately a $1.5 million penalty, Mr. Saffron is
12   sitting on approximately, you know, somewhere in the
13   neighborhood of $400 million worth of Bitcoin that doesn't
14   belong to him.  The Court can address this issue by, in
15   essence, bifurcating the proceedings.  And [indiscernible]
16   liability now, as the Court has indicated on all counts, enter
17   the injunctive relief as indicated on all counts, incarcerate
18   Mr. Saffron until such time as he obeys the Court's contempt
19   order, and once he does, we'll have the ability to provide the
20   Court with a more up-to-date and accurate number of what was
21   taken in and what he has spent.
22           The only remedy to date that's going to encourage
23   Mr. Saffron to comply with this Court's authority is a civil
24   contempt order.  He can surrender himself to the United States
25   Marshal's Office in wherever city that's located now.  Or if

1    he fails to do that, Your Honor can issue a bench warrant and

2    the marshals can pick him up, remand him to custody in the

3    district of Nevada, and at that point in time Mr. Saffron will

4    have the keys to his confinement.  He can release himself at

5    any time; all he has to do is comply.

6          I think that it's important to demonstrate to

7    individuals, such as Mr. Saffron who choose to defraud members

8    of the public, that this Court's authority will be upheld and

9    that neither the Commission nor the Court will allow

10   fraudsters such as Mr. Saffron to get away with and enjoy the

11   fruits of ill-gotten gains.

12         **THE COURT:**  All right.  You have -- you have

13   explained to me why disgorgement is separate and additional.

14   Because it is the idea that by getting -- by taking in these

15   funds and using other people's money, he's had the opportunity

16   to make additional money off of that and that he needs to

17   disgorge the profits and benefits that he has experienced as a

18   result of holding all of these other victims' money.  So thank

19   you for that clarification.

20         Let me just make sure, that's essentially what you're

21   telling me; right?  That's the disgorgement side?

22         **MR. MULREANY:**  Your Honor is correct.

23         **THE COURT:**  Okay.  All right.  Let me ask this

24   question then.  We don't know how much that is?

25         **MR. MULREANY:**  Until the defendants obey your Court's

1   orders, that -- that's correct.  We have -- the Commission

2   has, through the shear hard work of counsel and our

3   investigators and the cooperation of defrauded customers, been

4   able to come up with the $14,841,280.  But we know, through

5   the somewhat happenstance of the slight candor of Mr. Saffron,

6   that he took in 6,882 Bitcoin.

7            So at today's rate, 6,882 Bitcoin has a current value

8   of approximately 412 -- $412 million.  If we don't order

9   Mr. Saffron to disgorge those amounts, if he doesn't comply

10  with this Court's order to provide an accounting and all his

11  Bitcoin private wallet addresses -- Bitcoin, by its nature, is

12  a non-transparent commodity.  The blockchain allows one to

13  determine whether or not a transaction has been taken, but it

14  doesn't allow us to determine with any clarity as to the

15  destination or the holder of it.

16           Indeed, if Mr. Saffron is holding what's been called

17  a cold wallet, that is a -- he has in his possession a USB

18  drive that has, you know, 6,000 Bitcoin destinations on it but

19  it's separate from the Internet, well, that's cold.  We can't

20  see it until he decides to begin using it.  We know some of

21  the numbers, but until he complies with the Court's order to

22  provide us with all of the Bitcoin addresses, then customers

23  will never see -- see their full restitution.  They'll never

24  have the benefit of their funds which have been held and used

25  by Mr. Saffron.  And, indeed, this Court's authority will be

2:19-cv-01697-JAD-DJA - March 19, 2021

1    laughed at by Mr. Saffron and his compatriots.

2          **THE COURT:**  All right.  So here's what I'm going to

3    do.  I -- I'm going to maintain the order that I have provided

4    with respect to disgorgement -- I'm sorry, with respect to

5    restitution, that $14 million figure, and maintain the civil

6    penalty amount that I have provided, the 1.484 figure.

7          I'm going to, on top of that, also order disgorgement

8    in the amount that the Government has sought and demonstrated

9    in its moving papers, which is $15,815,967.  So that's the

10   amount that the Government asked for and has demonstrated in

11   its moving papers.  So I'm going to go with that figure

12   because that's what has been established.

13         Also, I'm obviously not thrilled with the defendant

14   and his behavior and his failure to file updates or additional

15   information, and so I'm also, you know, going to have to apply

16   somewhat of a goose-and-gander approach to this, which is the

17   Government had the opportunity to present me with all of its

18   information, so I'm going to go with the information that the

19   Government has presented me in time for this hearing today on

20   these critical issues.

21         So restitution of $14,841,280 for the victims,

22   disgorgement of $15,815,967, and a civil penalty of

23   $1,484,128.

24         There are other aspects that I think will -- of -- of

25   how the -- the mechanisms of this occur that will be in the

1   written portion of the order that I do file.  I am not

2   ordering that he be arrested at this point because the

3   violations were -- that have been occurring were contempt

4   sanctions, civil contempt sanctions, and those are coercive.

5   And those were for orders that have now been supplanted by the

6   permanent injunction that I am entering today.  So I'm not

7   going to be ordering his arrest right now, and my biggest goal

8   at this moment is to get this money refunded to the victims

9   and to ensure that the restitution amounts are getting paid.

10          Am I certain that will happen?  No, not based on the

11  defendants' conduct for the last year and a half.  But we're

12  going to do what we can under the law to accomplish that at

13  this point.  And so the -- the posture to this case has

14  changed, default judgment is entered, and a permanent

15  injunction and awards of disgorgement, civil penalty, and

16  restitution.

17          So I'll go back to Ms. Karst or Mr. Mulreany.  Any

18  additional questions?

19          **MR. MULREANY:**  I have one -- one question,

20  Your Honor.  Your Honor has the authority to incorporate

21  certain aspects of the civil contempt order into its final

22  default judgment.  Specifically, the Court has the authority

23  to order the defendant to produce all his business records,

24  the accounting, and to answer the questions that were set

25  forth in the civil contempt order and the final default

2:19-cv-01697-JAD-DJA - March 19, 2021

1    judgment and provide a timeline.

2            The Commission is more than happy to move forward

3    with that -- on that basis.  The Court appreciates the -- or

4    the Commission appreciate's the Court's well-reasoned decision

5    and surely accepts it.  The Commission also notes that, you

6    know, to the extent that we can finally get the defendants to

7    comply with the record production order, the accounting order,

8    and the -- answer the questions regarding the private wallet

9    addresses, we can move forward to obtaining restitution --

10   full restitution for defrauded customers.  And to the extent

11   that we find out that the number far and exceeds that which we

12   were able to prove today, the Commission would have the

13   ability to move for a modification of the Court's order

14   pursuant to Federal Rule of Civil Procedure 60 based upon the

15   fraud of the defendants upon this Court.

16           Finally, mister~ -- my brother counsel, Mr. Gutke,

17   has noted that he holds records regarding the defendants'

18   activities.  The Commission would ask that the Court order

19   Mr. Gutke to immediately, as in by close of business today,

20   produce those records either via the FTP site the Commission

21   has provided with him to upload them, or if those records are

22   not in electronic format, that the Court order Mr. Gutke to

23   deliver those records in full to the office of the

24   United States Attorney, which is located in the building next

25   to the federal courthouse in Las Vegas, Nevada.

2:19-cv-01697-JAD-DJA - March 19, 2021

1      **THE COURT:**  So those I think are the records that
2  Mr. Gutke was indicating he wanted a protective order first.
3      Mr. Gutke, what -- what is the protective order that
4  you would have been seeking for those?
5      **MR. GUTKE:**  I really was asking for what would be a
6  standard protective order in any civil litigation case that I
7  typically litigate, which would be to be able to designate
8  documents as confidential or highly confidential based on the
9  fact that they contain information -- personal information
10 regarding the defendants' customers and -- or I would give
11 them the records with things redacted, with that type of
12 information redacted, but I was told in no uncertain terms
13 that I could not redact anything.  So that would be -- that's
14 the nature of the protective order that I was seeking from the
15 CFTC.
16      And then, for the record, earlier I know that when
17 the Court said that the protective order was never sought, I
18 know what you meant was never sought through the Court.  But
19 we -- for the record, we did seek it.  My client did earlier,
20 and then I did -- sought a stipulated protective order.
21      **THE COURT:**  Right, I meant from the person who could
22 grant one, which would be the Court.
23      **MR. GUTKE:**  I know.
24      **MR. MULREANY:**  Your Honor, I can address that I think
25 in simplified matters.  The Commission would stipulate that

1   all the records are -- will be held confidentially.  We don't

2   agree to any redactions.  That simply impairs our ability to

3   provide full relief for defrauded customers.  Mr. Gutke can

4   stamp all of them confidential and deliver them to the offices

5   of the United States Attorney this afternoon in Las Vegas,

6   Nevada, and we can move forward.

7          **THE COURT:**  Mr. Gutke, does that satisfy your

8   concerns?

9          **MR. GUTKE:**  As far as being able to -- the

10  stipulation that they'll be confidential, yes.  As far as them

11  stamped and delivered today, I don't know that I can do that

12  because there are other things that need to be taken care of,

13  and -- and I don't have staff available to do that today.

14         **THE COURT:**  Okay.  When can you --

15         **MR. GUTKE:**  Certainly by Monday.

16         **THE COURT:**  You can do that by Monday?

17         **MR. GUTKE:**  Yeah, I would just need some time to get

18  that done.

19         **THE COURT:**  Okay.

20         **MR. GUTKE:**  Well, I shouldn't say Monday.  I -- to

21  tell you with certainty, I would need to contact Holo

22  Discovery who helps me with these things.  Can we have one

23  week?

24         **MR. MULREANY:**  Your Honor, the Commission would be

25  happy to stamp them all confidential.  Mr. Gutke simply needs

1    to produce them.  We'll have them all imaged, and in the

2    imaging process we'll have them stamped confidential and we'll

3    return the originals to Mr. Gutke.

4         **THE COURT:**  Mr. Gutke, what format do you have them

5    in?  Do you have them on a thumb drive or something?

6         **MR. GUTKE:**  Well, yeah, I have them -- I have a box,

7    a Bankers Box of papers that have been given to my e-Discovery

8    vendor, and they've scanned them.  I think that they have them

9    in PDF, but I don't know that they're on a disc or in a way

10   that could be uploaded.  If they're on a disc, I can deliver

11   it.  If -- if it's something that can be uploaded to the FTP

12   site, I can instruct them to do that, too.

13        **THE COURT:**  I'm going to order you to produce them by

14   Tuesday afternoon at 3:00 p.m.  That should give you

15   sufficient time, whether you need to do it internally or with

16   some additional assistance, especially because it sounds like

17   you've already started.  So non-redacted and either you stamp

18   them confidential or, if you are unable to do that by

19   3:00 p.m. on Tuesday, then the Commission will do so.  And I

20   also am holding to the -- the Commission to its stipulation

21   that these documents will be held confidential.

22        **MR. MULREANY:**  Very well, Your Honor.

23        **MR. KARST:**  Thank you, Your Honor.

24        **MR. MULREANY:**  Thank you, Your Honor.

25        **THE COURT:**  Thank you.

1          All right.  Anything else then?  Let me ask
2     Ms. Karst, Mr. Mulreany again.
3          **MR. KARST:**  Nothing further from the CFTC,
4     Your Honor.  Thank you very much.
5          **THE COURT:**  Thank you.
6          Mr. Gutke, anything else from you, sir?
7          **MR. GUTKE:**  Yes, Your Honor.  A couple of points to
8     clarify.
9          First of all, on the permanent injunction, I don't
10    know if there was a form submitted or if the current
11    preliminary injunction is becoming a permanent injunction on
12    the same terms, but my question was I would like to have the
13    ability for the defendants to review the preliminary
14    injunction for us to understand what the exact language is of
15    that.
16         **THE COURT:**  Yeah.  So you've had that opportunity
17    because it's in the proposed order that the Commission
18    submitted and filed.  So --
19         **MR. GUTKE:**  Okay.
20         **THE COURT:**  -- we're unfortunately --
21         **MR. GUTKE:**  That was my -- then you answered my
22    question.
23         **THE COURT:**  Yeah, so -- so -- so we're -- we're past
24    that.  I -- I will be entering a written permanent injunction
25    in some format similar to that, but I'm still going to go

1    through it and -- and make some changes and finalize that but

2    based on that format.

3        **MR. GUTKE:**  Being -- okay.  It being attached to the

4    motion for default judgment, that answers my question.  Thank

5    you, Your Honor.

6        And then the other question I had was Ms. Karst

7    indicated that there were I think 128 or some number of

8    victims that they're aware of that they based the damages

9    calculation on.  The defendants haven't ever -- we don't know

10   who those individuals are.  Can we have an order that the CFTC

11   provide us with that list under the same terms I suppose of a

12   protective order, if needed?  But it would be helpful to know

13   who those individuals are.

14       **THE COURT:**  Ms. Karst?  Mr. Mulreany?

15       **MR. MULREANY:**  Your Honor, the Commission would

16   object to that.  We don't wish to revictimize these

17   individuals by providing their data to defense -- the

18   defendants by providing it to my brother counsel.  He has an

19   obligation to provide it to his client, so it would be the

20   same as if we provided it directly to the defendants.

21       I will say that the Commission's normal process is to

22   obtain a list of all defrauded customers, which we have.  We

23   can provide that to Your Honor *in camera* to the extent

24   Your Honor wishes to see that.  But making that data available

25   either publicly in the docket or to our brother counsel would

1    simply revictimize these individuals, and the Commission would
2    object to that.
3              **THE COURT:**  Right.  So typically we would see it as
4    maybe a restitution list and the amounts that those people
5    were victimized by so that we can ensure that restitution gets
6    paid appropriately.
7              Let me hear from Mr. Mulreany on how that process
8    of -- of paying restitution and finding its proper recipients
9    would work here.
10             **MR. MULREANY:**  Thank you, Your Honor.
11             The typical case, the Commission will obtain a master
12    list of -- of all known defrauded customers, their contact
13    data, and the amount that they were -- that they forwarded to
14    the defendants as part of the fraudulent scheme.  Then there
15    would be another column where, based upon the amount of assets
16    that have been frozen -- which, unfortunately, in this case
17    comprises absolutely zero -- or I shouldn't say that.  It's
18    probably less than a few thousand dollars.  We -- the
19    Commission would then make a *pro rata* distribution calculation
20    based upon the amount of money seized from the defendants and
21    the -- compared to the amount of funds that were sent to the
22    defendants by defrauded customers.
23             To the extent that that -- that -- let's assume for
24    the moment that eventually we end up seizing the full amount
25    of 14 million-plus that the Court has ordered in restitution.

1    The Commission would then approach its SRO, the National

2    Futures Association, for its assistance.  It has agreed in the

3    past to act as a disburser of checks to defrauded victims.

4    However, since we don't really have any funds, we're not at

5    that -- at that stage.

6            But normally we work with our SRO, our

7    self-regulatory organization, the National Futures

8    Association, to assist us in that thereby sharing the burden

9    of ensuring that, to the extent possible, defrauded customers

10   receive their restitution that we're able to provide them.

11           I will note again for the record, though, that at

12   this point in stage given the defendants' contemptuous

13   conduct, the Commission has been unable to seize any

14   appreciable amount of assets from Mr. Saffron.  I will note,

15   however, for the record, that the defendants should note that

16   they should expect no letup in the aggressive prosecution

17   they've seen to date by the Commission following entry of

18   judgment.

19           **THE COURT:**  Understood.

20           All right.  So I'm going to --

21       *(Simultaneous crosstalk.)*

22           **MR. KARST:**  Your Honor --

23           **THE COURT:**  Sorry.  Ms. Karst, go ahead.

24           **MR. KARST:**  Yeah.  I'll just note that in the

25   proposed order we submitted to the Court at ECF 61-4, we

2:19-cv-01697-JAD-DJA - March 19, 2021

1    include provisions to appoint the National Futures Association

2    as the monitor here to distribute payments against the

3    restitution obligation.  And, Your Honor, that's at

4    paragraphs 61 to 65.

5            **THE COURT:**  Thank you.

6            All right.  So I'm going to deny the request at this

7    time.  I think that there's probably going to be a lot of

8    document exchange that goes -- goes on after this judgment

9    gets entered.  And so I would expect that there's still

10   some -- some movement of information.  So I think it's

11   premature at this point to make that order.

12           So, Mr. Gutke, I appreciate it, but I'm going to deny

13   it.

14           Do you have anything else, sir?

15           **MR. GUTKE:**  Yes.  And just to clarify, the reason

16   that that would be useful is so that we can make sure that the

17   records pertaining to those specific individuals are what is

18   provided to -- to the CFTC.

19           And also, for example, my concern is that, you know,

20   someone who is getting restitution then also comes -- you

21   know, pursues Mr. Saffron separately, you know, and tries to

22   demand your money or your life, you know, and then it's

23   already -- they've already talked to the CFTC and been granted

24   restitution -- and I'm just -- I'm going down the road even

25   further with -- just assuming that this is going to be

1    resolved and restitution's going to be paid, what's going to

2    stop them from later trying to seek that money from -- from

3    the defendants separately?  That's --

4              **THE COURT:**  Right.

5              **MR. GUTKE:**  -- that's my concern.

6              **THE COURT:**  I can appreciate that.  Clearly, you

7    know, because we've had so little response from the defense in

8    this case and so little participation in this process from the

9    defense, I expect there'll be some questions that may come up,

10   and you're going to have to file motions in order to get

11   clarification or to seek additional information perhaps.  But

12   at this point I don't think I can really -- I can fully

13   anticipate what appropriate information should be exchanged.

14             **MR. GUTKE:**  Under -- understood, Your Honor.

15             And so then one other issue then or question that I

16   would really appreciate some clarification on, especially in

17   light of Mr. Mulreany's final parting comments, and that is

18   are the defendants still allowed to -- to pay me?  I mean,

19   I've spent much more time and my staff and my partner have

20   spent a lot more time than what we've been -- than what we've

21   been paid for.  I'll just say that and say that the concern of

22   receiving more money is because of the threats that any

23   receipt of any money essentially is -- is a violation.

24             And so, can you clarify that the defendants are

25   allowed to pay counsel and that, you know, unless there's some

2:19-cv-01697-JAD-DJA - March 19, 2021

1    clear evidence that they're paying with funds that are

2    ill-gotten gains or illegal, that they should be allowed to

3    retain counsel and defend themselves and have counsel

4    assisting them moving forward in this process?  Because I

5    can't -- I don't want to put myself and my family and everyone

6    at risk by getting paid by a client who, you know, my

7    understanding is the payments have been from funds that

8    weren't associated with the allegations in this complaint, and

9    so he should be allowed to hire counsel.

10          **THE COURT:**  Let me ask the Commission to respond.

11    Either --

12          **MR. KARST:**  Your Honor, we've addressed this in our

13    reply.  Mr. Gutke continues to make false allegations against

14    the CFTC here.  We have never given legal advice.  We've never

15    told Mr. Saffron that he could not retain counsel.  We, you

16    know, respect his right to retain counsel.  But they have --

17    defendants have no right to pay for counsel using funds in

18    violation of the Court's asset freeze.

19          And Mr. Gutke never made an application with the

20    Court for any type of carve out from the asset freeze.  He

21    continues to refuse to disclose the -- both the amount and the

22    source of fees that he has received to date.  He did not

23    address that in his opposition, the declaration that he filed

24    with the Court, and, you know, we request that the Court order

25    him to disclose the source and the amount of fees that he's

2:19-cv-01697-JAD-DJA - March 19, 2021

 1   paid and for the Court to require him to pay back -- surrender

 2   all fees that he's accepted already in violation of the asset

 3   freeze.

 4            **THE COURT:**  So -- so, Mr. Gutke, the challenge I

 5   have --

 6            **MR. GUTKE:**  Can I respond to that?

 7            **THE COURT:**  Hold on, Mr. Gutke.

 8            **MR. GUTKE:**  Okay.  Go ahead.

 9            **THE COURT:**  The challenge that I'm having is I just

10   don't have a lot of information about this; right?  So I --

11   I'm being asked to sort of decide this in -- in a black box,

12   and -- but you can go ahead.

13            **MR. GUTKE:**  Well, so -- and this is the problem I

14   have.  I've read the orders, and there's nothing that says

15   that he can't retain counsel.  He brought this issue up to --

16   to Your Honor, and -- and I think, from my reading of the

17   record, you sounded very clear that he's, of course, allowed

18   to have attorneys.

19            But the CFTC's approach to dealing with counsel is

20   completely detached from -- from Your Honor's comments in

21   court in January 2020.  And their position, as you just heard

22   right now, is basically that I have to seek a carve out of an

23   asset freeze?  I'm not asking to be paid with -- with funds

24   that have been frozen.  I'm not.  And I -- I did not get paid

25   with any funds that have been frozen to my knowledge.

1          **THE COURT:**  Well, the difficulty is that because the

2     defendant has not complied with the freeze order and there's

3     really nothing that's been frozen because of that, because so

4     much of this is this digital currency, that there is no --

5     there aren't buckets that we can look to at this point.  So --

6     so you're telling us that, but I have no way to even determine

7     that.

8          Ms. Karst, is that essentially the issue here?

9          **MR. KARST:**  Yes, Your Honor, that is the issue.  We

10    have asked Mr. Gutke, you know, even before he entered his

11    appearance if he would speak with us, disclose the source and

12    amount of the fees that he's getting from the defendants so we

13    wouldn't have this issue.

14         He made no application with the Court.  He refuses to

15    provide us any information.  We just don't have anything to

16    work with.  And given defendants' propensity to use third

17    parties to transfer and move funds around, you know, we still

18    have serious concerns that counsel is being paid with funds

19    that have been frozen in violation of the asset freeze.

20         **THE COURT:**  Right.  Go ahead and respond, Mr. Gutke.

21         **MR. GUTKE:**  Well, first of all, those things are

22    protected by attorney-client privilege.  You know, how much

23    the retainer was paid or if a third party provided it on

24    behalf of the defendants, those are privileged things.

25         And the way that I've always understood that

2:19-cv-01697-JAD-DJA - March 19, 2021

1    something like this would work is that, if the plaintiff has

2    reason to believe that defendants have violated the asset

3    freeze by hiring counsel, then they can present the evidence

4    that gives them the reason to believe that, and they can have

5    a determination be made on that.

6          It seems unfair that the defendants are being forced

7    and have been forced from the very start -- and there's

8    multiple attorneys who have wanted to maybe make an appearance

9    in the case but shied away from it because of the threats

10   that, you know, that I'm receiving now from the CFTC that

11   they're going to disgorge all the funds and they're going to,

12   you know, do everything -- the previous attorney had his

13   personal bank accounts frozen, family's accounts frozen.  So

14   this is something that has been a problem.

15         And so my belief is that the defendants should be

16   allowed to hire counsel.  Obviously counsel has an obligation

17   to not receive funds, and I can say that I would never accept

18   funds if I had reason to believe that the funds were being

19   funneled to me by a straw man or if they were coming from

20   assets that were illegally obtained by my client.  I -- I

21   would not do that, and I -- and so to place the burden on the

22   defendants to, like, prove a negative is the part that I have

23   a problem with.

24         And you can see from the comments from counsel that

25   it doesn't matter -- they're operating under the assumption

1    that anything -- any money that he spends on anything is -- is

2    just violation of the asset freeze.  If he's buying groceries,

3    it's a violation of the asset freeze.  Anything he does is a

4    violation, and so that's my concern.  And I have that concern

5    as we leave this hearing that they're going to immediately

6    make me a defendant or they're going to, you know, freeze my

7    children's college funds.  I mean, I -- I sound paranoid and

8    I've never really been one to be this way, but they wield

9    great power.

10          And, you know, to use the really cheesy cliche, with

11   great power comes great responsibility.  They need to be more

12   responsible in terms of not just making these allegations

13   and -- and making me into a criminal and making anyone into --

14   to someone that's facilitating someone who, by the way, has no

15   criminal charges brought against him.  This is a civil

16   complaint for damages, which the Court has now awarded.

17          And so it's just the tone of -- of working with the

18   CFTC that is just incredibly frustrating, and I probably

19   sound -- I apologize for my tone, Your Honor, because I -- I

20   don't get very fired up and worked up like this.  You've seen

21   me in court on other matters.  I just -- there's things here

22   that give me a lot of pause for concern.  My firm may need to

23   withdraw, you know, if the defendants aren't able to -- to pay

24   obligations for work that's been done or that will -- will

25   need to be done.  Because a lot of work will need to be done.

 1    And, you know, no attorney [indiscernible] their own personal

 2    freedom is going to want to represents the defendants when --

 3    based on the entirety of the record in this case.

 4        **THE COURT:**  So here's -- here's the thing.

 5    Completely understand your concerns about a defendant being

 6    able to be represented, and the courts have recognized that,

 7    too, and established a process for how this happens when

 8    there's an asset freeze.

 9         So, unfortunately, what we keep having happen in this

10    case is last-minute attempts to come in and deal with these

11    issues on behalf of the defense.  And, unfortunately, it's the

12    defendants that keep putting their lawyers in this position by

13    doing everything at the last moment and in no way complying

14    with any of the -- any of the requirements and processes that

15    have been established for cases like this.  And so here we are

16    again, and now I'm being asked again to -- to decide an issue

17    that I just don't have any briefing on, I don't have case law

18    on, I don't have affidavits, I have no information in order to

19    allow me to make an informed decision about the issue of

20    whether or not you can be paid.

21         Can you be -- can you be hired?  Can your -- can your

22    clients have representation and have an attorney represent

23    them?  Absolutely.  But there has to be an ordered process to

24    determine how the money gets paid for that representation.

25    And so that's not happening here yet because nobody's filed an

1   appropriate motion.

2          I agree with you that there's a bit of a

3   disadvantage.  It means that you sort of have to work for free

4   for a bit, and -- and maybe that's not something that is

5   appetizing to you.  So maybe you don't want to do that

6   representation.  Maybe it's going to be a different lawyer

7   that needs to be doing that on behalf of the defense.  But

8   this case has been going on a year and a half, and it has sat

9   idle for many months because, unfortunately, I have another

10  300 motions from other cases that I've been working on and so

11  this one's been sitting for a while.  There's been a great

12  opportunity here for a lot of things to get filed and

13  resolved, and it's just not happening.

14         So there's a process.  I can't just decide this stuff

15  in a vacuum without an informed briefing process, and I'm not

16  going to.

17         So if -- if you, Mr. Gutke, want to continue to

18  represent this client and they want you to continue to

19  represent them, you're going to have to just go through the

20  process.  And I'm sorry for that.  I realize that it's a -- a

21  challenge.  The defendant certainly has the ability to retain

22  counsel and have counsel represent them, but they have to do

23  it in a certain way because there's been an asset freeze in

24  place.  So that changed the game, and that means that we have

25  to have briefing on things.  That's the difference here.  It's

2:19-cv-01697-JAD-DJA - March 19, 2021

1    not that this is just a case that just started.  This is a
2    case that's been sitting for a year and a half, and that's
3    why.  So -- and there's been a history of non-compliance here.
4          So it isn't a clean slate.  It's a case with a lot of
5    established principles.  And, unfortunately, there are --
6    there are procedures that have to be complied with.  So I
7    can't tell you that you can run up a bill of a certain amount
8    and that the defendants can pay you with whatever funds
9    because I just don't know where those funds are coming from
10   and I don't have enough money -- enough information to talk
11   about what happens to the money.
12         So there's a procedure.  It's got to be followed, and
13   then I can decide it in an intelligent and informed way.  But
14   I can't do it today.
15         **MR. GUTKE:**  So my -- I appreciate that, Your Honor,
16   and I understand.  We're kind of both operating in a black box
17   of sorts because, you know -- but so, my question is -- and
18   pardon my ignorance perhaps, but what is that procedure then?
19   Because my reading of the orders is that the defendants cannot
20   use frozen funds.  The CFTC's position is that all their funds
21   are subject to the order, and so I need to seek a carve out
22   from them.
23         **THE COURT:**  Right.  So my -- my vague recollection is
24   that the United States Supreme Court addressed this issue a
25   few years back about how to do that because there is a

2:19-cv-01697-JAD-DJA - March 19, 2021

1    disadvantage of everything gets frozen and the defendant can't

2    have any -- any lawyers, and that can't be the answer.  So

3    I'm -- I'm certain that there's a procedure that is

4    established.  I can't give you the legal advice at this moment

5    on how to do that.

6              **MR. GUTKE:**  Okay.

7              **THE COURT:**  I don't know --

8              **MR. GUTKE:**  That's fine.

9              **THE COURT:**  -- if Ms. Karst or --

10             **MR. GUTKE:**  My question was --

11        *(Simultaneous crosstalk.)*

12             **THE COURT:**  -- wants to -- or Mr. Mulreany wants to

13   add anything.

14             **MR. MULREANY:**  For the record, Your Honor, this is

15   Tim Mulreany for the Commission.

16        I -- I -- the Commission refrains from giving legal

17   advice to brother counsels.  I would note, however, that to

18   the extent that Mr. Gutke knows a good criminal defense

19   attorney, he might want to ask those individuals how they deal

20   with it.

21        It's a very common issue in criminal cases where, for

22   instance, someone's accused of drug money laundering.  There's

23   a very clear, easy, and defined process the defense counsel

24   goes through to ensure that the funds they're accepting are

25   not the -- the fruits of unlawful bank transfers or wire

1    transfers or other fraudulent activity.

2           And I would note for the record that I do not believe

3    that the amount of one's attorney's fees or its source is

4    attorney-client privileged information, but that's -- that's

5    simply my personal opinion.  I would urge my brother counsel

6    to reach out to other counsel who have gone through the

7    process, and I'm sure they can provide him with a very

8    detailed and uncomplicated process in which to accomplish that

9    which he wishes to perform.

10          **THE COURT:**  Great suggestion.  Thank you.

11          All right.  Mr. Gutke --

12          **MR. GUTKE:**  And, Your Honor, if I could --

13          **THE COURT:**  Yes?

14          **MR. GUTKE:**  Sorry.  I jumped the gun.  These

15   videoconferences I -- I hate.  I don't -- I think I've only

16   started speaking over judges in the era of them, so I

17   apologize.

18          But -- so I appreciate the comments from counsel.  My

19   question was more whether there was a procedure on the record

20   in this case that I wasn't aware of, you know, prior to my

21   involvement.  So -- so thank you to the Court and to counsel.

22          And then could I just then confirm that my -- my

23   understanding again of the -- of the injunction -- and I

24   assume it's the same language in the permanent injunction --

25   is that the defendants are allowed to spend -- to use assets

1    that are obtained after the -- the injunction and asset freeze

2    were entered in this case?  Is that -- is that a correct

3    understanding, Your Honor?

4            **THE COURT:**  I don't know the answer to that.  I --

5            **MR. GUTKE:**  For example --

6            **THE COURT:**  I don't recall that being a term.

7            **MR. GUTKE:**  Okay.  Let me -- just so it's clear --

8            **THE COURT:**  Ms. Karst --

9            **MR. GUTKE:**  -- let me look at the order.

10           **THE COURT:**  Ms. Karst, can you maybe clarify that?

11           **MR. KARST:**  Yes, Your Honor --

12        *(Simultaneous crosstalk.)*

13           **MR. GUTKE:**  In the order for preliminary --

14           **MR. KARST:**  -- the order.  After-acquired assets are

15    fine, but if they are proceeds and part of the fraudulent

16    activity, then they would still be covered by the freeze.  And

17    we are not --

18           **MR. GUTKE:**  Yeah, I'm --

19        *(Simultaneous crosstalk.)*

20           **MR. KARST:**  -- aware of any source of legitimate

21    income for Mr. Saffron.

22           **THE COURT:**  Right.  I mean, if he's, you know,

23    working at -- I don't know -- some other actual employment and

24    getting a paycheck from that, I would think that absolutely

25    would not be covered.  But I think the Commission -- what the

1    Commission's saying is they're unaware of him having

2    legitimate employment from which additional funds and clean

3    funds, unencumbered funds might be coming.

4           **MR. GUTKE:**  Okay.  Understood.  And what I was

5    referring to, Your Honor, was in Document Number 31 in the

6    docket and on page 4, the portion of your order of the asset

7    freeze and injunction states that assets obtained after the

8    effective date of this order are not subject to the terms of

9    this order unless they are derived from or related to the

10   activities alleged in the complaint.

11          So, you know, if my client is, you know, since

12   December 2019 when that order was entered, you know, receiving

13   income consulting on -- on other projects, that even if

14   they're in the cryptocurrency space or DeFi -- which has been

15   a growing area where, you know, my client's expertise is -- is

16   needed and useful -- and people are willing to hire him, you

17   know, as an expert in the blockchain and in the realizing or

18   the decentralized finance, et cetera, you know, he has means

19   to earn money, and so he should be able to use that money how

20   he wants.

21          And we've had, you know, as the -- one of the motions

22   on the docket [indiscernible] is the CFTC basically freezing

23   any asset he has just operating from the presumption that

24   it's -- that it's part of the asset freeze without first

25   establishing that.  So -- and that ship's sailed.  I

1    understand.  But I'm just talking about his ability to pay a

2    lawyer with -- with income he earns since the date of this

3    asset freeze.  He's allowed to do that?

4            **THE COURT:**  Yeah, if he -- if he --

5            **MR. GUTKE:**  Okay.

6            **THE COURT:**  -- if he's earning income from something

7    unrelated to the allegations in the complaint that have now

8    become the facts that underlie the default judgment, then I

9    would think that that is not subject to the asset freeze.

10           Ms. Karst, would you agree?

11           **MR. KARST:**  Yes, Your Honor.  If it's wholly, you

12   know, unrelated and not derived from the activities that we

13   know and understand Mr. Saffron is still engaged in, then --

14           **THE COURT:**  Yep.

15           **MR. KARST:**  -- it would not be covered.

16           **THE COURT:**  Does that --

17           **MR. GUTKE:**  Okay.

18           **THE COURT:**  -- answer your question, Mr. Gutke?

19           **MR. GUTKE:**  Yes, it does.

20           And can you -- is my audio good?  I was on the phone,

21   and it got disconnected.

22           **THE COURT:**  I see you and hear you.

23           **MR. GUTKE:**  No?

24           **THE COURT:**  I see you and hear you.  I think he does

25   not see or hear us.

2:19-cv-01697-JAD-DJA - March 19, 2021

1       **MR. GUTKE:**  Okay, okay.  I can't hear.  My -- my

2   audio got disconnected from my phone, so now I'm trying to get

3   it on the computer.

4       But, okay, I -- I heard.  And thank you for

5   clarifying that.

6       **THE COURT:**  Okay.  Any other questions, Mr. Gutke?

7       **MR. GUTKE:**  No, I don't think so, Your Honor.

8       **THE COURT:**  Anything else from the Commission?

9       **MR. KARST:**  No, Your Honor.

10       **THE COURT:**  All right.  We anticipate -- I anticipate

11   that I will get an order out early next week that memorializes

12   and probably contains some further implementation tools based

13   on the proposed order that was provided by the Commission, but

14   for the most part my rulings and the basis for them have all

15   been placed on the record here.  And so the transcript of the

16   hearing today will serve as the record of my findings and

17   conclusions supporting these decisions.

18       All right, everyone.  Have a good weekend.  Thank you

19   for your arguments and your participation today, and we are

20   adjourned.

21       *(Proceedings adjourned at 12:17 p.m.)*

22                       --o0o--

23               COURT REPORTER'S CERTIFICATE

24

25       I, AMBER M. McCLANE, Official Court Reporter, United

1  States District Court, District of Nevada, Las Vegas, Nevada,

2  do hereby certify that pursuant to 28 U.S.C. § 753 the

3  foregoing is a true, complete, and correct transcript of the

4  proceedings had in connection with the above-entitled matter.

5

6  DATED:  4/1/2021

7

8           /s/_____Amber M. McClane_____

9              AMBER McCLANE, RPR, CRR, CCR #914

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25